UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| HAROLD H. HODGE, JR., | ) | |
| | ) | |
| PLAINTIFF | ) | Civil Action No. 1:12-cv-104 (BAH) |
| | ) | |
| vs. | ) | |
| | ) | |
| PAMELA TALKIN, et al. | ) | |
| | ) | |
| | ) | |
| DEFENDANTS | ) | |
| | ) | |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

I.    THE DECISIONS OF THE D.C. COURT OF APPEALS REGARDING THE CONSTRUCTION AND CONSTITUTIONALITY OF THE STATUTE ARE NOT BINDING ON THIS COURT

State court precedent is binding on federal courts as to issues of state law, but not as to issues of federal law. *See RAR Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1276 (7th Cir. 1992)("Federal courts are under no obligation to defer to state court interpretations of federal law . . . . Although state court precedent is binding upon us regarding issues of state law, it is only persuasive authority on matters of federal law") (citations omitted); *Grantham v. Avondale Indus., Inc.*, 964 F.2d 471, 473 (5th Cir. 1992) ("It is beyond cavil that we are not bound by a state court's interpretation of federal law regardless of whether our jurisdiction is based on diversity of citizenship or a federal question") (citations omitted).  Even if the District could be considered a state for purposes of this rule, 40 U.S.C. § 6135 must be considered to be a federal rather than a state law.  The statute was enacted by Congress, involves a national issue, and does not implicate any separate District of Columbia interests.  *See Boos v. Barry*, 485 U.S. 312, 330-31

(1988)(statute restricting certain activities near a foreign embassy, though part of the

District of Columbia code and limited in its application to the District of Columbia, is a

federal law).  Defendants have not argued to the contrary.  (See Def. Mot. to Dismiss at 2

(describing 40 U.S.C. § 6135 as a "federal statute" and arguing that the decisions of the

District of Columbia Court of Appeals interpreting  the law are "sound."))  Accordingly,

this Court is not bound by the decisions of the District of Columbia Court of Appeals

upholding the constitutionality of 40 U.S.C. § 6135.


II.      THE ASSEMBLAGES CLAUSE IS UNCONSTITUTIONAL ON ITS FACE

A.  First Amendment analysis

The First Amendment protects an individual's right to engage in "appropriate

types of action" in places where the individual has a right to be.  *Brown v. Louisiana*, 383

U.S. 131, 142 (1966)(plurality opinion).  Thus, the government cannot prohibit a brief,

silent protest in the reading room of a public library, *id.* at 141, although a loud oration

there presumably could be proscribed.  Even on government property that may be

subjected to extensive regulation, such as a school, an individual has the right to engage

in expressive activity "if he does so without materially and substantially interfering with"

the operation of the property "and without colliding with the rights of others."  *Tinker v.*

*Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 513 (1969).  When considering the

validity of a restriction on expressive activity in a public place, "[t]he crucial question is

whether the manner of expression is basically incompatible with the normal activity of a

particular place at a particular time."  *Grayned v. City of Rockford*, 408 U.S. 104, 116

(1972).  Constitutional protection of expressive activity should, and rightly does, turn on

2

the compatibility of the proposed activity with the normal operation of the property, rather than on a mere label describing the physical place.

While it is true that the Supreme Court has often applied different standards to review restrictions on expressive activity depending on the type of government property involved (the so-called "forum analysis"), it has never suggested that forum analysis should be adhered to in a rigid fashion that precludes an evaluation of the legitimacy of the interest served by the restriction.  Specifically, the Court has cautioned that it may be "of limited utility" in certain cases to "focus on whether the tangible property itself should be deemed a public forum."  *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 815 n.32 (1984).  As the Court explained,

> "Generally an analysis of whether property is a public forum provides a workable analytical tool. However, the analytical line between a regulation of the time, place, and manner in which First Amendment rights may be exercised in a traditional public forum, and the question of whether a particular piece of personal or real property owned or controlled by the government is in fact a public forum may blur at the edges, and this is particularly true in cases falling between the paradigms of government property interests essentially mirroring analogous private interests and those clearly held in trust, either by tradition or recent convention, for the use of citizens at large."  *Id.*

In other words, where government property does not fit neatly into the category of public or nonpublic fora, it may be difficult to determine whether a restriction on expressive activity is appropriately considered as a reason for defining the property as a nonpublic forum, or whether the restriction is better viewed as a time, place, and manner regulation of a public forum.  To the extent that a statutory ban on expressive activity would constitute a reason in itself for determining that a forum is nonpublic, the Court should reject such circular logic.  The Court has an obligation to protect citizens' First Amendment rights by engaging in a careful weighing of the government's asserted

interests against the public's right to engage in expressive activity.  "In every case, therefore, where legislative abridgment of the rights is asserted, the courts should be astute to examine the effect of the challenged legislation. Mere legislative preferences or beliefs respecting matters of public convenience may well support regulation directed at other personal activities, but be insufficient to justify such as diminishes the exercise of rights so vital to the maintenance of democratic institutions. And so, as cases arise, the delicate and difficult task falls upon the courts to weigh the circumstances and to appraise the substantiality of the reasons advanced in support of the regulation of the free enjoyment of the rights." *Schneider v. State*, 308 U.S. 147, 161 (1939).  The Court should therefore eschew the use of the labels "public" or "nonpublic" in order to avoid addressing the question of whether the legislation is supported by a sufficient governmental interest which outweighs the public's First Amendment rights.

It is particularly inappropriate for forum analysis to trump traditional principles of First Amendment jurisprudence where, as here, the restriction at issue is an absolute ban on a broad category of protected speech, rather than a narrow time, place, or manner regulation.  In *United States v. Grace*, 461 U.S. 171, 177 (1983), the Supreme Court contrasted "time, place and manner restrictions" with those "[a]dditional restrictions such as an absolute prohibition on a particular type of expression," and held that the latter "will be upheld only if narrowly drawn to accomplish a compelling governmental interest."  This heightened scrutiny derives, not from the nature of the property, but from a suspicion of "[b]road prophylactic rules in the area of free expression."  *Schad v. Mt. Ephraim*, 452 U.S. 61, 69 (1981)(requiring a showing that municipal zoning regulation

4

which prohibited live entertainment to be narrowly drawn and to further a sufficiently substantial government interest).

B.   Small, peaceful, and orderly group demonstrations are not basically incompatible with the normal activity of the Supreme Court plaza.

Defendants identify two purposes for the restriction on demonstrations at the Supreme Court plaza, "permitting the unimpeded ingress and egress of visitors to the Court, and preserving the appearance of the Court as a body not swayed by external influence." (Def. Mot. to Dismiss at 18.)  Neither of these concerns justifies a prohibition on demonstrations on the plaza.

The Supreme Court is a significant tourist attraction and received more than 340,000 visitors last year.  (Dolan Decl. ¶ 2.)  The Supreme Court plaza is a large, oval-shaped area which is approximately 98 feet by 252 feet at its largest part.  (Dolan Decl. ¶ 6.)  In light of the large size of the plaza and the huge number of visitors it receives, it cannot reasonably be expected that the presence of a small, peaceful, orderly group of demonstrators, such as proposed by Mr. Hodge, would impede ingress or egress of visitors to the Court.  If anything, a group demonstration is *more* compatible with the normal use of the plaza than the normal use of the sidewalk, because the plaza is wider and routinely accommodates groups of individuals standing in assemblages.[1]

The presence of demonstrators on the plaza would also be compatible with the operation of the Supreme Court and its appearance as a body not swayed by outside influence.  Any concerns about improper influence-picketing or its appearance have

---

[1]"Visiting the Court – Frequently Asked Questions" *available at* http://www.supremecourt.gov/faq_visiting.aspx (noting that visitors wishing to attend oral arguments may begin lining up on the plaza well before the building opens).

already been fully addressed by a separate statute, 18 U.S.C. § 1507, which prohibits, *inter alia*, picketing or parading in or near a building housing a court of the United States with the intent to interfere with, obstruct, or impede the administration of justice. The Assemblages Clause goes further, however, and prohibits all picketing and demonstration activity, regardless of its intent or effect. Far from preserving the integrity and dignity of the Court, the Assemblages Clause does the opposite. "[A]n enforced silence, however limited, solely in the name of preserving the dignity of the bench, would probably engender resentment, suspicion, and contempt much more than it would enhance respect." *Bridges v. California*, 314 U.S. 252, 270-71 (1941).

Further, despite the government's contention in *Grace* that allowing demonstrations on the sidewalk directly in front of the Supreme Court would give the appearance that the Supreme Court as a body swayed by outside influence, nothing occurred in the nearly thirty years since *Grace* was decided which would demonstrate that such a concern was reasonable. It cannot seriously be contended that the public would draw any different conclusion about the Court's reception to outside influence from seeing a group of demonstrators on the sidewalk as compared to the plaza.

   C.  The Assemblages Clause is an impermissible restriction on expressive activity on the Supreme Court plaza, which is either a traditional or designated public forum.

       a.  The Supreme Court plaza is a traditional public forum

Click   If this Court decides to engage in forum analysis, it must conclude that the Supreme Court plaza is a public forum. Public parks, the Supreme Court sidewalk, the

United States Capitol grounds,[2] and state capitol grounds[3] are all public fora.  In contrast, airport terminals[4], residential mailboxes,[5] military installations,[6] and jailhouse grounds[7] are nonpublic fora.  Based on its history, uses, status, and characteristics, the Supreme Court plaza fits in much more comfortably with the class of government properties that have been found to be public fora.

The Supreme Court building was completed in 1935, but the prohibition on demonstrations in the building and grounds was not enacted until 1949.  During this interim period, there were pickets in and around the Supreme Court building.[8]  Since 1949, there have been numerous demonstrations on the Supreme Court plaza relating to controversial decisions of the high court and other social and political issues.[9] Courthouse plazas as a "type" of forum are a common location for demonstrations around the country.[10]

---

[2] *Jeannette Rankin Brigade v. Chief of Capitol Police*, 342 F. Supp. 575, 584 (D.D.C. 1972)(three-judge panel), *aff'd*, 409 U.S. 972 (1972).

[3] *Lehman v. Shaker Heights*, 418 U.S. 298, 313 (Brennan, J., dissenting)("the Court has added state capitol grounds to the list of public forums compatible with free speech, free assembly, and the freedom to petition for redress of grievances, *Edwards v. South Carolina*, 372 U.S. 229 (1963).")

[4] *International Soc'y for Krishna Consciousness v. Lee*, 505 U.S. 672, 683 (1992).

[5] *United States Postal Serv. v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 128 (1981)

[6] *Greer v. Spock*, 424 U.S. 828, 838 (1976).

[7] *Adderley v. Florida*, 385 U.S. 39, 41 (1966).

[8] 95 Cong. Rec. H7958 (June 20, 1949) (statement of Rep. Bryson)("Since I have been in Congress I remember seeing pickets marching in and around the Supreme Court Building.")

[9] *United States v. Mark*, 2011 CMD 23560 (D.C. Super. Ct. 2012)(demonstration relating to *Citizens United v. FEC*, 130 S. Ct. 876 (2010)); *Bonowitz v. United States*, 741 A.2d 18, 19 (D.C. 1999)(demonstration against execution); *Pearson v. United States*, 581 A.2d 347, 349 (D.C. 1990)(demonstration against *Roe v. Wade*, 410 U.S. 113 (1973)).

[10] *See e.g.*, "Couples stage protest in support of gay marriage," *The Herald-Sun* at C-1 (May 10, 2012)(protest at North Carolina courthouse plaza); "Protesters required to obtain permit for use of courthouse plaza," *U.S. State News* (Dec. 7, 2011)(noting that

The Supreme Court plaza is a large, open area, much like a park, and on either side of the plaza are benches and fountains.[11]  Members of the public are permitted to freely enter and leave the grounds at practically all times.  *Grace*, 461 U.S. 171.  Individuals on the Supreme Court grounds may also engage in oral expression on any subject.  *Id.* at 181 n.10.  Reporters mill around, interviewing advocates about cases before the Court.[12] On some days, attorneys and parties in cases that have been argued can be heard giving press conferences on the plaza.  (Dolan Decl. at ¶ 9.)  During high profile cases, the Supreme Court plaza is indistinguishable from a town square.[13]

The Supreme Court is also, significantly, the apex of one of the three branches of the national government, and the protections of the First Amendment apply with equal force to it.  Although Madison's original draft of the First Amendment guaranteed citizens only the right to petition "the Legislature" for redress of their grievances,[14] the final version guarantees the right to petition "the Government," including all three branches. "[T]he law gives judges as persons, or courts as institutions no greater immunity from criticism than other persons or institutions.  The operations of the courts and the judicial conduct of judges are matters of utmost public concern." *Landmark Communications v. Va.*, 435

---

Boulder County Courthouse plaza has been a venue for protests for over one hundred years); "Hoping against hope for peace," *Spokane Spokesman-Review* at B8 (Mar. 25, 2007)(vigil at federal courthouse plaza in Spokane, WA).

[11] "The Court Building," *available at* http://www.supremecourt.gov/about/courtbuilding.aspx.

[12] "U.S. abortion decision not simple or neat," *Winnipeg Free Press* at A14 (May 3, 2007).

[13] "'Obamacare' Protests Expand to Abortion Coverage," CBN News (noting that "[t]he Supreme Court plaza has become the public square as justices weigh in on the constitutionality of President Barack Obama's health care law"), *available at* http://www.cbn.com/cbnnews/politics/2012/March/Washingtons-Obamacare-Protests-Expand-to-Abortion/

[14] 1 Annals of Congress 434 (J. Gales ed. 1789)

U.S. 829, 838-39 (1978) (internal citations and marks omitted).  The Supreme Court

grounds accordingly should be treated no differently than the grounds of a national or

state legislature, which have been considered public fora.

Defendants contend that "the fact that the Court in *Grace* so carefully carved out

the perimeter sidewalks as a public forum, while pointedly declining to apply the same

reasoning to the plaza or other parts of the Court grounds, suggests strongly that it

recognized the important differences between the two spaces." (Def. Mot. to Dismiss at

13-14.)  This characterization of the Court's opinion in Grace is inaccurate.  The reason

that the Court declined to analyze whether the plaza was a public forum was because the

appellees had only sought access to the sidewalk.  *Grace*, 461 U.S. at 175.  ("Likewise,

the controversy presented by appellees concerned their right to use the public sidewalks

surrounding the Court building for the communicative activities they sought to carry out,

and we shall address only whether the proscriptions of § 13k are constitutional as applied

to the public sidewalks.")

Defendants also rely on cosmetic features of the Supreme Court plaza, such as the

fact that it is made of a different material and is a different shape, in order to distinguish

it from the perimeter sidewalk.  (Def. Mot. to Dismiss at 13-14.)  However, "cosmetic

differences, such as distinctive pavement and landscaping, are insufficient to distinguish

an area from surrounding public forums." *ACLU of Nev. v. City of Las Vegas*, 333 F.3d

1092, 1102 (9th Cir. 1993).  Cosmetic differences, unlike the situation of a forum in an

isolated location, do not suggest to ordinary citizens that the Supreme Court plaza is a

special enclave.  *See id.*  Indeed, the Supreme Court police typically give multiple

warnings to individuals engaging in demonstrations or other types of expressive activity

that violate the statute, in order "to ensure that the individuals understand that their conduct is illegal."  (Dolan Decl. at ¶ 7.)

        b.   In the alternative, the Supreme Court plaza is a designated public forum

A designated public forum is created when "government property that has not traditionally been regarded as a public forum is intentionally opened up for that purpose; speech restrictions in such a forum are subject to the same strict scrutiny as restrictions in a traditional public forum."  *Christian Legal Soc'y Chapter of the Univ. of Cal. v. Martinez*, 130 S. Ct. 2971, 2984 n.11 (2010).  If this Court determines that the Supreme Court plaza is not a traditional public forum, it must still consider whether it is a designated public forum which has been opened up by the government to members of the public to speak and assemble.

Despite the literal language of the Assemblages Clause, which would prohibit groups of lawyers and tourists from assembling on the plaza, the government has chosen to open up the plaza for such individuals, as well as members of the general public, to speak on any topic and assemble for any lawful purpose.  The Supreme Court police "utilize[e] the narrowing construction of the Assemblages Clause that has been adopted by the District of Columbia courts."  (Dolan Decl. at ¶ 7.)  Presumably, this means that the policy of the Supreme Court police is to follow *Pearson v. United States*, 581 A.2d 347, 356-57 (1990), in which the D.C. Court of Appeals stated that the Assemblages Clause only applies to the protection of the Supreme Court "building and grounds and of persons and property within, as well as the maintenance of proper order and decorum,

10

and to [the] preserv[ation] the appearance of the Court as a body not swayed by external influence" (internal quotation marks and citations omitted).  By choosing to administer the plaza in accordance with the D.C. Court of Appeals' construction of the Assemblages Clause,[15] the government has determined that oral expression on the plaza should not be limited to certain classes of speakers or certain topics, but that all should be free to assemble and speak, without permission, provided that they do not interfere with the protection of the Supreme Court building and grounds and of persons and property within; do not disturb the maintenance of proper order and decorum; and do not cause the Supreme Court to appear to be swayed by external influence.

> c.   The Assemblages Clause does not survive strict scrutiny.

The Assemblages Clause is not a reasonable time, place, and manner restriction, but is an unconstitutional ban on an entire medium of expression.  It proscribes all picketing and demonstration activity at all times, throughout the entire forum, and in any manner.  It does not survive strict scrutiny because it is not narrowly draw to serve a compelling government interest.

The defendants assert two interests which the Assemblages Clause is alleged to further, "permitting the unimpeded ingress and egress of visitors to the Court, and preserving the appearance of the Court as a body not swayed by external influence." (Def. Mot. to Dismiss at 18.)  While these interests may be substantial, they are not sufficient to justify the unnecessarily broad reach of the Assemblages Clause.

---

[15] Because violations of the Assemblages Clause may be prosecuted in this Court as well as in Superior Court, the government is under no obligation to follow the construction of the statute set forth in *Pearson*, 581 A.2d at 356-57, which is not binding in this Court.

First, the defendants have not met their burden because they stop short of demonstrating how the Assemblages Clause, as written or as they would construe it, is necessary to support these interests.  The Supreme Court has made clear that "[t]o survive strict scrutiny, however, a State must do more than assert a compelling state interest – it must demonstrate that its law is necessary to serve the asserted interest." *Burson v. Freeman*, 504 U.S. 191, 199 (1992).  The defendants cannot make such a demonstration because there are a variety of less speech-restrictive alternatives that would serve the asserted interests.  The government could, for example, regulate the time of day when demonstrations may occur; restrict demonstrations to portions of the plaza that are not near entrances; or proscribe large or unruly protests.  Indeed, as the government conceded in its brief before the Supreme Court in *Grace*, "We recognize, of course, that a single leafleter or demonstrator – or, for that matter, most small crowds or a well-behaved large crowd – will usually not create an actual danger of real or perceived intimidation of the judiciary."  Gov. Br. at 25, n.9.

Further, other existing laws already serve the government's interest in ensuring egress and ingress and protecting the judiciary from the appearance of being swayed by outside influence.  *See* D.C. Code § 22-1307 (prohibiting blocking the entrance to a public building); 18 U.S.C. § 1507 (prohibiting pickets and parades in or near federal courts with the intent to influence the administration of justice).  If the defendants believe that these laws are not sufficient to protect the asserted government interests, the Marshal may, under authority of 40 U.S.C. § 6102, prescribe additional regulations.

Even if the Assemblages Clause was considered a time, place, and manner restriction, however, it would not survive constitutional scrutiny because it is not

narrowly tailored to serve a significant governmental interest.  It is both under- and over-inclusive.  It is over-inclusive in that it prohibits peaceful and orderly demonstrations which would not even have the appearance of impact on the case-deciding function of the Supreme Court.  For example, the statute would prohibit a labor-related demonstration against a contractor performing renovations to the Supreme Court building.

The Assemblages Clause is underinclusive for several reasons.  First, it does not prohibit demonstrations across the street or, after *Grace*, on the perimeter sidewalk.  It is difficult to see how the public would see a demonstration on the plaza, but not on the sidewalk or across the street, as potentially influencing the Court.  Second, the Assemblages Clause does not apply to any other federal courthouse, despite the fact that district courts, which hold jury trial, might be seen by the public as more likely to be influenced by demonstrations.  Third, according to the defendants, the Assemblages Clause permits limited exceptions for business relating closely to the Court, including allowing attorneys and litigants to hold press conferences on the plaza after oral arguments.  (Def. Mot. to Dismiss at 14.)  If indeed the Assemblages Clause does not proscribe this conduct, the Assemblages Clause is underinclusive in that observers would be likely to conclude that a press conference given by a litigant or his or her attorney during the pendency of the case is an attempt to influence the Supreme Court directly or through public opinion.

D. Even if the Supreme Court plaza is a nonpublic forum or not a forum at all, the Assemblages Clause on its face violates the First Amendment.

While the legitimacy of the Supreme Court as an institution may depend on its perceived resistance to outside influence, it is simply unreasonable to think that the presence of demonstrators on the plaza, as opposed to the perimeter sidewalk, would enhance in any way the legitimacy of the Court.[16]  There are significant constitutional protections against Supreme Court justices pandering, or appearing to pander, to public opinion or politicians – lifetime tenure, appointment (rather than election), and the prohibition against having their salaries reduced while in office.  In addition, statutory protections such as 18 U.S.C. § 1507 (prohibiting pickets and parades in or near federal courts with the intent to influence the administration of justice), 18 U.S.C. § 201 (prohibiting bribing federal officials), 18 U.S.C. § 1503 (prohibiting threats and endeavors to influence court officers), and 28 U.S.C. § 453 (oath of office for federal judges and justices) provide additional guarantees to the public that justices will carry out their duties impartially and unaffected by outside influences.  Finally, the Supreme Court has taken administrative measures, such as passing a 1991 resolution requiring justices to adhere to certain Judicial Conference Regulations, which help to ensure against bias and the appearance of bias resulting from outside income.  *See* Resolution, Jan. 18, 1991, available at http://www.documentcloud.org/documents/296686-1991-supreme-court-internal-ethics-resolution.html.  In light of these real and necessary protections, whatever

---

[16] To the extent that defendants are concerned about the public losing confidence in the Supreme Court as an impartial body, that ship has already sailed.  A recent survey found only 27% of those polled believed that Supreme Court justices remain impartial. "Supreme Court Update," Rasmussen Reports (Jul. 1, 2012) *available at* http://www.rasmussenreports.com/public_content/politics/mood_of_america/supreme_court_update

marginal benefit there may be to the reputation of the Supreme Court from having demonstrators congregate on the sidewalk instead of the plaza, it is so trivial that it cannot possibly justify a complete ban on expressive conduct there.

Yet it is neither possible nor desirable for the Supreme Court to operate in a vacuum, as if justices were not a part of the society in which they live.  Judicial decisions are a product of their times.  *See Lawrence v. Texas*, 539 U.S. 558, 579 (2003)("times can blind us to certain truths and later generations can see that laws once thought necessary and proper in fact serve only to oppress.")  Indeed, the academic literature is replete with evidence of the correlation between public opinion and Supreme Court decisions.[17]

More fundamentally, however, the suppression of speech is not a legitimate way to respond to the (presumably) false impression of observers that demonstrations on the Supreme Court plaza influence justices' decisions.  As the Supreme Court recently made clear, the remedy prescribed by the Constitution for falsity is truth, not silence.  *United States v. Alvarez*, ___ U.S. ___ (2012).  The government could reasonably combat the perception of outside influence with education about the functioning of the Supreme Court.[18]  *See id.* (suggesting an informational website as a less speech-restrictive alternative to banning false statements).

---

[17] Casillas, J., "How Public Opinion Constrains the U.S. Supreme Court," *Amer. J. Pol. Sci.* (2010) at 1 (citing studies), *available at* http://falcon.arts.cornell.edu/pe52/CEW_ajps2011.pdf
[18] For example, an education portion of the U.S. Courts website explains that "[a]n independent judiciary makes decisions based on law, not outside influences. Constitutional safeguards help to ensure that the decisions judges render are not influenced by Congress, the President, or public opinion."  See "Federal Courts in a Nutshell," *available at* http://www.uscourts.gov/EducationalResources/FederalCourtBasics/FastFacts/FederalCo urtsInANutshell.aspx

E.  The Assemblages Clause on its face is substantially overbroad in violation of the
First and Fifth Amendments.

a.   Overbreadth analysis

According to the overbreadth doctrine, a statute is facially invalid "if it prohibits a

substantial amount of protected speech."  *United States v. Williams*, 553 U.S. 285, 292

(2008).  The first step in the overbreadth analysis is to construe the statute at issue

because "it is impossible to determine whether a statute reaches too far without first

knowing what the statute covers."  *Id.* at 293.  In interpreting the statute in the context of

a facial challenge, a limiting construction on a statute may be imposed only if it is

"readily susceptible" to such a construction.  *Reno v. ACLU*, 521 U.S. 844, 884 (1997).

Although a statute may be construed narrowly where "the text or other source of

congressional intent identifie[s] a clear line" for a court to draw, a court may "not rewrite

a . . . law to conform it to constitutional requirements." *Id.* (ellipsis in original).

The second step is to determine whether the statute, as construed, "criminalizes a

substantial amount of protected expressive activity."  *Id.* at 297.  Whether the statute

reaches a substantial amount of protected expressive activity is "judged in relation to the

statute's plainly legitimate sweep."  *United States v. Stevens*, 130 S. Ct. 1577, 1587

(2010).

b.   Construction of the Assemblages Clause

The Assemblages Clause makes it "unlawful to parade, stand, or move in

processions or assemblages in the Supreme Court Building or grounds."  40 U.S.C. §

6135.  On its face, the Assemblages Clause is extraordinarily broad, applying to a vast

array of innocent behavior which does not threaten any conceivable government interest.

16

For example, the Assemblages Clause would prohibit a group of schoolchildren waiting in line together for a tour of the Court or a group of lawyers walking across the plaza together after completing oral arguments.  Defendants suggest that this Court adopt a "limiting construction" of the Assemblages Clause along the lines set forth in *Pearson*, 581 A.2d at 357, restricting application of the Assemblages Clause to "protection of the Court building and grounds and persons and property therein, the maintenance of order and decorum therein, and to preserve the appearance of the Court as a body not swayed by external influence."  (Def. Mot. to Dismiss at 20.)

The first problem with defendants' narrowing construction is that it would represent a "serious invasion of the legislative domain." *Stevens*, 130 S. Ct. at 1592 (internal quotation marks omitted).  Nothing in the text of the statute or the congressional history of 40 U.S.C. § 13k, its predecessor statute, suggests that Congress had as its purpose in passing that law the protection of the Supreme Court buildings and grounds and persons and property therein or the preservation of the appearance of the Court as a body not swayed by external influence. Congress's only articulated purpose in enacting § 13k was to preserve the dignity of the Court's grounds.[19] Congress intended simply to

---

[19] "It is the belief of the Committee on the Judiciary that in keeping with the dignity of the highest Court in the land, provision should be made for the policing of its building and grounds similar to that which is made for the United States Capitol."  H.R.Rep. No. 814, 81st Cong., 1st Sess. 2 (1949).

"In keeping with the dignity which should surround the Supreme Court of the United States and the building and grounds which house it, the committee feels that this legislation should be enacted promptly." S.Rep. No. 719, 81st Cong., 1st Sess. 2 (1949), reprinted in 1949 U.S. Code Cong. & Ad. News 1827, 1829 (M.A.App. 34a, 36a).

extend the prohibitions on assemblages long in effect at the United States Capitol[20]

(which until 1935 housed the Supreme Court) to the recently constructed Supreme Court

grounds.  As explained by Congressman Celler, Chairperson of the House Judiciary

Committee which authored the House Report on H.R. 4948, 81st Cong., 1st Sess. (1949),

explained, "all this bill does . . . is to apply the same rules to the Supreme Court building

and its adjoining grounds as are now applicable to the Capitol itself -- no more and no

less."  95 Cong. Rec. H8962 (July 6, 1949) (statement of Rep. Celler) (debate concerning

H.R. 4948).  Because nothing in the text or legislative history would support defendants'

construction of the statute, their limitation would improperly "require[] rewriting, not just

reinterpretation." *Stevens*, 130 S. Ct. at 1592.

        While the complete ban on all processions or assemblages may be the result of "a

curiously inept and ill-conceived Congressional enactment," *Jeannette Rankin Brigade*,

342 F. Supp. at 587, such an absolute ban is precisely what Congress has enacted.

Congress *could* have written the Assemblages Clause to apply only to actions having an

adverse effect on the Supreme Court building or grounds and persons and property

therein, the order and decorum of the Court, or the appearance of the Court as a body not

swayed by external influence, but it did not *actually* do that.  In contrast, when the same

Congress passed 18 U.S.C. § 1507 in 1950, it limited the statute's prohibition on pickets

and parades of federal court buildings to those intended to interfere with, obstruct or

impede the administration of justice, or to influence any judge, juror, witness, or court

officer in the discharge of his duty.  When Congress, in 2002, recodified 40 U.S.C. § 13k

---

[20] The legislative history for the statute which banned assemblages at the Capitol, 40
U.S.C. § 193g, contains no House or Senate reports, debates, or hearings reflecting
Congress's reasons for passing that law.

as 40 U.S.C. § 6135 and slightly amended its language, it *could* have adopted the limiting

construction set forth by the D.C. Court of Appeals in *Pearson* and suggested by the

defendants in this case, but it did not do so.  Congress was surely aware that a violation of

40 U.S.C. § 6135 could be prosecuted in this Court, that any limiting construction

imposed on the Assemblages Clause by the D.C. Court of Appeals would not be binding

on this Court, and that therefore its failure to incorporate the limiting language announced

in *Pearson* into the text of the statute itself could lead to prosecution of any group of

individuals assembled for any reason whatsoever.  Nevertheless, Congress did not take

the opportunity to limit the Assemblages Clause in any way and it would be improper for

this Court to read into the statute a limiting construction that Congress plainly never

intended.

Accepting defendants' interpretation would also "sharply diminish Congress's

incentive to draft a narrowly tailored law in the first place." *Id.*  As the Supreme Court

has explained, "If the promulgation of overbroad laws affecting speech was cost free . . .

that is, if no conviction of constitutionally proscribable conduct would be lost, so long as

the offending statute was narrowed before the final appeal . . . then legislatures would

have significantly reduced incentive to stay within constitutional bounds in the first place.

When one takes account of those overbroad statutes that are never challenged, and of the

time that elapses before the ones that are challenged are amended to come within

constitutional bounds, a substantial amount of legitimate speech would be 'chilled' as a

consequence." *Osborne v. Ohio*, 495 U.S. 103, 120-21 (1990)(*quoting Massachusetts v.

Oakes*, 491 U.S. 576, 586 (1989)(Scalia, J., concurring in part and dissenting in part)).  If

Defendants' construction is adopted in order to save the statute from facial invalidity on

19

overbreadth grounds, there would be no constitutional impediment to Congress banning *all* assemblages on *all* federally owned property and then leaving it up to the courts to determine which types of assemblages must be constitutionally permitted on each property.  When challenged, the government could then, as the defendants do here, invent reasons wholly absent from the text of the legislation or the congressional record in order to justify a limiting construction as to each property.

The only conclusion that this Court can reach is the same one reached by the D.C. Circuit in *Grace v. Burger*, 665 F.2d 1193, 1206 (D.C. Cir. 1981)(vacated in part), that "a validating construction is simply impossible here."  Because Congress's clear intent was an impermissible one, "to surround the Court with the same cordon of silence that Congress attempted to place around the Capitol," the legislative history provides no basis for saving the Assemblages Clause.

c.   The Assemblages Clause is substantially overbroad

Even if this Court adopts Defendants' limiting construction, the Assemblages Clause would still be substantially overbroad.  As an initial matter, it is not clear how defendants' "limiting" construction, adopted from *Pearson*, 581 A.2d 347, would actually limit the Assemblages Clause as a practical matter.  In the *Pearson* case itself, the D.C. Court of Appeals affirmed the convictions of a group of anti-abortion protesters for violating the Assemblages Clause by doing no more than entering the Supreme Court plaza and kneeling down in prayer.  *Id.* at 349-50, 356 n.18.  Similarly, in 2010, a group of schoolchildren were praying in a conversational tone on the Supreme Court plaza

when they were ordered to stop by the Supreme Court police.[21]  Earlier this year, a Superior Court judge, purporting to apply the *Pearson* construction of the Assemblages Clause, held that a group of demonstrators had "compromised the . . . dignity and decorum of the Court in the sense of that buffer, that neutral and detached space reserved to the Court," notwithstanding the fact that the demonstration was conducted, "not in an unruly fashion, [but] in a respectful fashion."  *See United States v. Justine Mark*, 2011 CMD 23560 (Apr. 6, 2012)(oral ruling of Judge Stephen Milliken).  Thus, as a practical matter, it does not appear that any demonstration on the Supreme Court plaza would be permissible under the *Pearson* standard and that the defendants' limiting construction still creates an absolute ban on a medium of expression.

However, even if it is assumed that the defendants' suggested construction imposes some meaningful limitation on the Assemblages Clause, it still leaves that provision overbroad.  The Assemblages Clause, as construed, would still apply at any time of day or night; whether or not the demonstration concerned a matter pending before the Court[22]; regardless of the intent of the demonstrators; whether or not the demonstration poses a risk of influencing a Supreme Court justice; regardless of whether the demonstration was targeting a function of the Supreme Court other than adjudication of cases (say, for example, a group opposed to the Supreme Court cafeteria serving meat);

---

[21] "Breakup of prayer group outside Supreme Court prompts legal complaint, investigation," *available at* http://www.catholicnewsagency.com/news/breakup-of-prayer-group-outside-supreme-court-prompts-legal-complaint-investigation/
[22] The defendants' proposed limiting construction is slightly different than that approved by *Pearson*.  Under the *Pearson* formulation, the government is required to demonstrate that the demonstration was "directed at the Court."  *See Pearson*, 581 A.3d at 358; *Mark*, 2011 CMD 23560 (Apr. 5, 2012)(oral ruling of Judge Stephen Milliken)(interpreting *Pearson* to require proof that a demonstration was directed at the Court).

whether or not the demonstration is any more disruptive than the ordinary conduct of tourists[23];  even if the demonstrators were peaceful and orderly; regardless of the number of demonstrators (as long as it was more than one); even if the demonstrators were not blocking ingress or egress or otherwise impeding others; and regardless of where on the plaza the demonstration takes place.  *See Burger*, 665 F.2d 1193.

Fundamentally, the defendants' limiting construction fails to alleviate the problem that the overbreadth doctrine is designed to remedy, which is the chilling effect on protected activities during the time it takes for case-by-case adjudication of the limits of the statute's constitutionality.  *Bd. of Airport Comm'rs v. Jews for Jesus*, 482 U.S. 569, 575 (1987) ("the chilling effect of the resolution on protected speech in the meantime would make such a case-by-case adjudication intolerable.")  The limiting construction proposed by the defendants and articulated in *Pearson* leaves open numerous questions about how to apply such a standard, some of which are: Must the government demonstrate that a defendant intended to injure the Court building or grounds or persons or property therein, compromise the order and decorum of the Court, or cause the Court to appear to be swayed by external influence? If so, is the required showing general or specific intent?  Must the government demonstrate actual harm to the building or grounds or persons or property therein, an actual compromising of the order and decorum of the Court, or an actual effect of causing the Court to appear to be swayed by external influence?  Or would the mere potential for such harm suffice?  Must there be a clear and present danger that such harm will occur, or is a mere tendency to cause such a harm

---

[23] *See Bonowitz v. United States*, 741 A.2d 18, 23 n.4 (declining to engraft a "tourist standard" on the Assemblages Clause).

sufficient?[24]  From whose perspective must there appear to be a swaying of the Court by external influence?  A hypothetical reasonable person who is familiar with the workings of the Court?  An average tourist riding by on a sightseeing bus who may not be able to distinguish a small group of demonstrators from the crowd of tourists?  Is there any kind of demonstration at all that meets the *Pearson* standard?

In the over two decades since the D.C. Court of Appeals applied a limiting construction to the Assemblages Clause in *Pearson*, there have been no published opinions from that court applying or clarifying the *Pearson* standard, let alone answer any of these significant and delicate questions brought about by the *Pearson* ruling.  Even if all of these questions were answered by the D.C. Court of Appeals tomorrow, however, there is no guarantee that this Court would answer the questions in the same way.  Because a prosecution for violation of 40 U.S.C. § 6135 may be brought in this Court, which is not bound by the interpretations of the D.C. courts on questions of federal law, potential demonstrators would be left to guess as to how to conform their conduct to the law.  Given the uncertainty created by the defendants' proposed limiting construction, individuals may avoid engaging in protected expressive activity, and this chilling effect is precisely what the overbreadth doctrine is designed to avoid.

---

[24] *See Bridges*, 314 U.S. at 261-62, 272 (requiring a showing of clear and present danger, rather than a "reasonable" or "inherent" tendency to interfere with the administration of justice before a publisher can be held in contempt for a publication related to a pending case).

F.   The Assemblages Clause on its face is impermissibly vague in violation of the
First and Fifth Amendments.

a.   Vagueness analysis

A criminal statute is void for vagueness unless it "define[s] the criminal

offense with sufficient definiteness that [(1)] ordinary people can understand what

conduct is prohibited and [(2)] in a manner that does not encourage arbitrary and

discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357-358 (1983)

(citations omitted).  Further, "standards of permissible statutory vagueness are strict in

the area of free expression" and a court must not presume that an ambiguous line between

permitted and prohibited activity will minimally impact protected expression. *NAACP v.

Button*, 371 U.S. 415, 432 (1963).  In the First Amendment context, a statute is

unconstitutionally vague if its "deterrent effect on legitimate expression is ... both real

and substantial, and if the statute is [not] readily subject to a narrowing construction."

*Young v. Am. Mini Theatres, Inc.*, 427 U.S. 50, 60 (1976) (internal quotation marks

omitted).


b.   The Assemblages Clause gives virtually unfettered discretion to law
enforcement

The Assemblages Clause as written is so broad that even-handed enforcement, if

possible, would lead to absurd results.  For example, the late Chief Justice Rehnquist and

former Justice O'Connor would have been subject to arrest and prosecution when they

marched in an assemblage or procession across the Supreme Court plaza.[25]  Congress

---

[25] *See* Lodging Exhibits F171 (Newsweek photograph) and G173 (Time magazine
photograph), *Grace*, 461 U.S. 171.

obviously would not have intended that Supreme Court justices be arrested for marching in an assemblage or procession on the plaza, but the lack of textual support or legislative history to support a workable narrowing construction leaves complete discretion to law enforcement to determine which assemblages and processions to allow and which to prohibit. *See Houston v. Hill*, 482 U.S. 451, 466-67 (1987)("Houston's ordinance criminalizes a substantial amount of constitutionally protected speech, and accords the police unconstitutional discretion in enforcement. The ordinance's plain language is admittedly violated scores of times daily, yet only some individuals -- those chosen by the police in their unguided discretion -- are arrested. Far from providing the breathing space that First Amendment freedoms need to survive, the ordinance is susceptible of regular application to protected expression")(internal quotation marks and citations omitted).

As a result, the Supreme Court police have conflicting policies on enforcement.  On the one hand, they inform would-be demonstrators that *all* demonstrations on the plaza are prohibited (Dolan Decl. at ¶ 5), while on the other hand they adhere to a policy of disallowing only "demonstrations . . . that violate the statute on the plaza[,] . . .  utilizing the narrowing construction of the Assemblage Clause that has been adopted by the District of Columbia courts" (Dolan Decl. at ¶ 7).  They further allow media to assemble on the plaza, but only if they have press credentials; attorneys and parties in cases that have been argued to address the media immediately following argument are allowed to assemble, apparently without the need to obtain permission; and commercial or professional filming is allowed only when approved, subject to content-based restrictions. (Dolan Decl. at ¶ 9.)

The relaxation of the statute in these situations is arbitrary – why should litigants be allowed to assemble on the plaza to hold a press conference while their case is pending, but not after the case is decided?  Surely the reverse would make more sense if the Supreme Court police were enforcing the statute in a manner that was designed to avoid the appearance of the Court being swayed by influences outside the formal submissions and arguments in a case.

Further, the appearance of the Court as a body not swayed by outside influence would be the same to most passersby observing an assemblage which is permitted, as compared to one which is not permitted.  A passerby would be unlikely to tell by observation, for example, whether members of the media assembled on the plaza have press credentials; whether attorneys gathered to give a press conference had participated in oral arguments that morning; whether a camera crew assembled to engage in commercial or professional filming had obtained a permit from the Court's Public Information Office; or whether filmmakers' final product would relate to the Court.

The limiting construction proposed by the defendants also injects additional vagueness into the Assemblages Clause by adding subjective terms susceptible to arbitrary enforcement.  Under the defendants' construction, an assembly would be prohibited on the plaza if it causes the Court to "appear[]" to be a body swayed by external influence.  (Def. Mot. to Dismiss at 20.)  This creates the same problem that doomed the ordinance at issue in *Chicago v. Morales*, 527 U.S. 41, 60-64 (1999).  The Supreme Court police need not inquire into the reason for the assemblage, and completely innocent behavior would be prohibited if it "appear[s]" to a police officer that the Supreme Court is swayed by external influence.  *See id*. at 60.  This standard is

26

inherently subjective because its application depends on how an assemblage "appear[s]" to the police. *See id.* at 62. The defendants' interpretation requires no showing of a harmful purpose and a group of tourists may unwittingly violate the statute by engaging in conversation that makes the Court "appear[]" to be a body swayed by external influence. *See id.* at 62-63. That the Supreme Court police have adopted a policy of giving warnings to individuals violating the statute before making arrests is not a sufficient limitation on the discretion of the police, as the lack of a warning would provide no defense. *Potts v. United States*, 919 A.2d 1127, 1131 n.3 (D.C. 1999).

Similarly, the term "decorum" is too vague to provide a meaningful limitation on police discretion. The term "decorum," like the term "dignity," is too subjective to provide guidance to law enforcement. In *Boos v. Barry*, 485 U.S. 312, 315, 321 (1988) the Supreme Court considered whether a ban on expressive activity around foreign embassies could be justified by the "need to protect the dignity of foreign diplomatic personnel." The Court observed that a "dignity standard" was "inherently subjective" and inconsistent with the Court's precedents. *Id.* at 322; s*ee Williams*, 553 U.S. at 306 (holding that a statute may be rendered vague if it ties criminal culpability to "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings.")

The "decorum" of the Supreme Court means many different things to different, reasonable people. Given the accusations of attorneys and Supreme Court justices themselves breaking with the decorum of the Court,[26] it is difficult to conceive of how a

---

[26] *See, e.g.*, "Sotomayor Breaks With Supreme Court Decorum," available at http://nation.foxnews.com/justice/2009/11/17/sotomayor-breaks-supreme-court-decorum (criticizing Justice Sotomayor for having "mamboed with movie stars, exchanged

peaceful, orderly demonstration would compromise the decorum of the Court.[27]  Yet
Superior Court Judge Milliken found that a demonstration on the Supreme Court plaza
which was conducted "in a respectful fashion" nonetheless "compromised . . . the dignity
and decorum of the Court."  The ease with which the term "decorum" can be used to
proscribe any demonstration activity at all is simply a result of the subjectiveness of that
term, which in turn leaves law enforcement officers with no objective standard upon
which to determine whether a particular group activity comports with the decorum of the
Court.

      c.   The Assemblages Clause does not place citizens on notice as to what is
            prohibited

The same considerations which cause the statute's vague, subjective terms to vest
excessive discretion in law enforcement also leave citizens without adequate notice as to
what conduct is prohibited.  Additionally, Defendants' limiting construction fails to
inform citizens about what a group must do to be subject to the Assemblage Clause.[28]  By

_____

smooches with musicians at the White House, and thrown out the first pitch for her
beloved New York Yankees); "The Case Against A Late-Breaking Roberts 'Vote
Switch'," *available at* http://anewmerckreviewed.wordpress.com/2012/06/29/6452/
(criticizing Justice Scalia for "abandon[ing] at least 90 years of decorum — to attack a
sitting President, from the bench — about a matter not presented by the case he was
asked to decide"); "Low Jinks at the High Court," *available at*
http://www.courtartist.com/supreme_court/ (describing an attorney's "playful break of
decorum" in which he placed a quill behind his ear);
[27] Indeed, one of the definitions of "decorum" is "orderliness."  See "decorum," Merriam-
Webster, available at http://www.merriam-webster.com/dictionary/decorum
[28] "National Day of Prayer Special Report," Religious Freedom Coalition ("On the
National Day of Prayer my morning began with a prayer group on the Supreme Court
Plaza. Our group actually had permission to pray, as long as our group did not constitute
a 'demonstration.' The line between the two is very ill defined"), *available at*

defining the prohibited conduct only in terms of the effects of the group's actions, without indicating what acts are prohibited,[29] and without specifying the required intent, the limiting construction fails to place citizens on notice as to what they must avoid doing. *See United States v. L. Cohen Grocery*, 255 U.S. 81, 89 (1921) ("Observe that the section forbids no specific or definite act. . . . It leaves open, therefore, the widest conceivable inquiry, the scope of which no one can foresee and the result of which no one can foreshadow or adequately guard against.")

An ordinary citizen, unfamiliar with the nuances of Supreme Court protocol, would also likely be unable to determine what group activities would compromise the decorum of the Court.  Protests are common outside many federal courthouses,[30] and the idea that a peaceful, orderly demonstration at the Supreme Court plaza would compromise the decorum of the Court would strike many as unfathomable, particularly when noisy protests are allowed on the perimeter sidewalk.  If a prohibition on demonstrations which compromise the decorum of the Court means a flat ban on all demonstrations, surely this "limiting" construction would make the Assemblages Clause a "[v]ague law[] [which] may trap the innocent by not providing fair warning." *Grayned*, 408 U.S. at 108.  What other group activities which commonly take place outside federal courthouses, a citizen may wonder, would compromise the decorum of the Supreme Court?  The answer to this question is left entirely unanswered by the defendants' limiting construction.

---

http://www.religiousfreedomcoalition.org/2012/05/05/report-from-washington-may-5-2012/

[29] Although the Assemblage Clause does list certain prohibited acts, including "stand[ing]" and "mov[ing]" in a group, surely no one would contend that standing or moving in a group, without more, affects any of the interests cited by the defendants. Exactly what acts constitute the "more" is unclear.

[30] "Protesting at the Courts," *available at* http://movetoamend.org/protesting-courts (noting protests at 110 federal courthouses).

III.    THE DISPLAY CLAUSE IS UNCONSTITUTIONAL ON ITS FACE AND
        AS APPLIED.

A.  The Display Clause on its face violates the First Amendment because it is a ban
    on pure speech.

The Display Clause prohibits pure speech, not conduct which incidentally burdens speech.  The prohibition extends to, for example, "wearing t-shirts with protest slogans." *Kinane*, 12 A.3d at 27.  As the Supreme Court made clear in *Cohen*, this type of expression is pure speech.  In invalidating Cohen's conviction for wearing a jacket with the words "Fuck the Draft" into a courthouse, the Court explained, "The only 'conduct' which the State sought to punish is the fact of communication. Thus, we deal here with a conviction resting solely upon 'speech,' *cf. Stromberg v. California*, 283 U.S. 359 (1931), not upon any separately identifiable conduct which allegedly was intended by Cohen to be perceived by others as expressive of particular views but which, on its face, does not necessarily convey any message and hence arguably could be regulated without effectively repressing Cohen's ability to express himself. *Cf. United States v. O'Brien*, 391 U.S. 367 (1968)." *Cohen*, 403 U.S. at 18.  Despite the fact that Cohen's expression took place in a non-public forum, a courthouse, the Court refused to apply the *O'Brien* standard. *Id.*  Strict scrutiny applies to laws targeting expression, regardless of the forum. *United States v. McDermott*, 822 F. Supp. 582, 594 (N.D. Iowa 1993) ("the Supreme Court appears to treat 'public forum' strict scrutiny and non-public forum strict scrutiny as the same 'exacting' test.")  Under strict scrutiny, a regulation will be "sustained only if the government can show that the regulation is a precisely drawn means of serving a compelling state interest." *Consolidated Edison Co. v. Public Serv. Comm'n*, 447 U.S. 530, 540 (1980).

30

Similarly, the Display Clause's absolute ban on leafleting is a restriction on pure speech.  The fundamental right to distribute handbills was recognized in *Lovell v. Griffin*, 303 U.S. 444 (1938), which involved an ordinance that flatly banned the distribution of literature of any kind within the city without first obtaining permission from the city authorities. Lovell was arrested for distributing a religious tract concerning the "Kingdom of Jehovah" without first obtaining a permit. 303 U.S. at 448. The Supreme Court reversed, and its holding remains good law to this day: the First Amendment protects a peaceful leafletter on the public street from the strictures of any licensing law, permit or solicitation laws, or any other form of prior restraint. The *Lovell* Court instructed that freedom of the press "necessarily embraces pamphlets and leaflets," *id.* at 452, and emphasized that leaflets represent expression in its most pristine and coveted form and which "indeed have been historic weapons in the defense of liberty as the pamphlets of Thomas Paine and others in our history abundently attest." *Id. Accord, Schneider v. State*, 308 U.S. 147, 160 (1939).

Although the Government may prescribe narrowly drawn regulations pertaining to the time, place or manner of expression, the Display Clause constitutes an absolute ban on a medium of pristine expression. Absolute bans on pristine expression have generally been struck down by the Supreme Court. *See, e.g., Talley v. California*, 362 U.S. 60 (1960) (city ordinance prohibiting distribution of anonymous handbills); *Jamison v. Texas*, 318 U.S. 413 (1943) (local ordinance prohibiting distribution of handbills on the city streets); *cf. Heffron v. International Society for Krishna Consciousness*, 452 U.S. 640, 655 n.16 (1981) (emphasizing that the state fair's booth rule was not a "total ban on protected First Amendment activity").

The protection afforded on-the-street leafletting under *Lovell*, *Schneider*, *Jamison* and *Talley* approaches absolute protection for orderly, public leafletting during reasonable hours. This is evidenced by the Supreme Court's consistent solicitude for the freedom of citizens to solicit door to door for religious, charitable or political causes, despite the paramount public interest in preserving the privacy of the home from unwanted or fraudulent solicitors. *Larson v. Valente*, 102 S.Ct. 1673 (1982); *Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620 (1980).

The Supreme Court has not looked favorably on the rationale that pure speech should be suppressed to protect the judiciary.  In *Bridges v. California*, 314 U.S. 252, 258, 270-71 (1941), the Supreme Court, invalidating a conviction of contempt relating to the publication in a newspaper of comments relating to pending litigation, explained, "an enforced silence, however limited, solely in the name of preserving the dignity of the bench, would probably engender resentment, suspicion, and contempt much more than it would enhance respect."  In another case involving a contempt conviction relating to a newspaper article, *Craig v. Harney*, 331 U.S. 367, 376 (1947), the Supreme Court required that there be a showing that the speech at issue create a clear and present danger to the administration of justice.  "The fires which it kindles must constitute an imminent, not merely a likely, threat to the administration of justice. The danger must not be remote or even probable; it must immediately imperil."  In *Landmark Communications v. Va.*, 435 U.S. 829, 838-39 (1978), the Supreme Court explained that "the law gives judges as persons, or courts as institutions no greater immunity from criticism than other persons or institutions.  The operations of the courts and the judicial conduct of judges are matters of utmost public concern" (internal citations and marks omitted).

Case 1:12-cv-00104-BAH   Document 15   Filed 07/09/12   Page 33 of 42

If "sheltering and insulating the judiciary from the appearance of political influence" (Def. Mot. to Dismiss at 20) was a sufficient reason to ban pure speech activities near the Supreme Court, it would also be a sufficient reason to ban newspaper articles critical of the Supreme Court.  However, as the Supreme Court's precedents indicate, the First Amendment does not countenance such a restriction.  The restriction imposed by the Display Clause is also unreasonable, as it does not enhance respect for the Court, but "engender[s] resentment, suspicion, and contempt," and absent a clear and present danger to the administration of justice, cannot stand.

There is also a poor fit between the alleged purpose of the Display Clause and the defendants' reading of the statute to "limit[] culpability to those who (1) have affirmatively displayed such an item, and (2) have a specific intention to convey a message with it"  (Def. Mot. to Dismiss at 20) because of underinclusiveness. *See Brown v. Entm't Merchs. Ass'n*, 131 S. Ct. 2729, 2740 (2011) ("Underinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes.") By requiring a specific intent to convey a message, the prohibition does not penalize speech activities that *actually* cause the Court to appear as a body swayed by public influence if the speaker had no intention of conveying a message.  For example, an individual who wears a sweatshirt with the name of the state of Kansas on it on a day in which Kansas is a party to a case pending before the Court may cause the Court to appear to be swayed by public influence, although the individual may have had no intent to do so.  Additionally, the Supreme Court's holding in *Grace*, 461 U.S. at 179, that the Display Clause cannot be applied to the public sidewalks surrounding the Court, leaves the remainder of the statute underinclusive.  Demonstrations and displays of signs and

33

banners which have the effect of making the Court appear to be a body swayed by public influence are allowed on the perimeter sidewalk (and in fact occur with regularity). Drawing a distinction between the impact on public perception of demonstrations and displays on the public sidewalk versus the Court plaza is unreasonable, and the Supreme Court likely would have held as much in *Grace*, had it not been constrained by the procedural posture of the case.

The Supreme Court has required "more than assertion and conjecture," *Landmark Communications Inc. v. Virginia*, 435 U.S. 829, 841 (1978), to support a claim that a particular statute furthers a compelling interest. Where the government seeks to curtail protected First Amendment rights, it bears the burden of producing evidence indicating the statute is necessary to serve a recognized and compelling interest. Here, the defendants have not offered any evidence indicating either the existence of a compelling governmental interest or that an asserted interest is substantially furthered by the Display Clause.  Nor can the Government hope to evade this requirement by invoking the interest in the "appearance of justice" and expecting the Court to uncritically accept this rationale as a basis for the Display Clause. Where First Amendment rights are involved, "undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 508 (1969).

B. The "Display Clause" on its face is substantially overbroad in violation of the
First and Fifth Amendments.

a. The Display Clause is substantially overbroad

The Display Clause is overbroad in that it prohibits speech activities unrelated to the interest in preserving the appearance of the Court as a body not swayed by public opinion. It prohibits, for example, speech activities unrelated to the Court or parties or matters before it. Further, its application to a lone leafleter or a small group of leafleters spread out around the plaza would be overbroad in that it would not further the government's interests.

C. The "Display Clause" on its face is impermissibly vague in violation of the First
and Fifth Amendments.

Different judges, government attorneys, and the Supreme Court police all have a different understanding of what is meant by the phrase "flag, banner, or device." This illustrates just how vague the term is. Judge MacKinnon, dissenting in *Grace v. Burger*, acknowledged the vagueness of the term "device," stating that "[a]lthough 'flag' and 'banner' may describe a readily identifiable group of objects, the inclusion of the word 'device' makes difficult the task of limiting these three terms to a particular class of objects." 665 F.2d at 1207. He ultimately concluded that "it would appear that the reach of 'device' would include any object that is capable of display." *Id.* The Supreme Court held that the phrase "flag, banner, or device" would include a picket sign or leaflet, but did not specifically define the term "device." *Grace*, 461 U.S. at 176.

In *Jeannette Rankin Brigade*, the government argued that the phrase "flag, banner, or device," as used in the similarly worded statute which applied to the U.S. Capitol, 40 U.S.C. § 193g, included picket signs, placards, and billboards, but not lapel buttons, name cards, insignias, or armbands. 342 F. Supp. at 586 n. 13.  At oral argument in *Grace*, the government stated that it had "some question whether the wearing of a campaign button would actually come within the strictures of the statute itself.  If it simply happens to be something that is a matter of the individual's apparel and is not done in a demonstrating kind of fashion, then it might not come within the... within the... within the scope of the statute."

In *United States v. Ebner*, No. M-12487-79 (D.C. Super.Ct. Jan. 22, 1980), the government stated that the Display Clause would forbid the carrying of the American flag on the Supreme Court plaza.  However, in *United States v. Mark*, Supreme Court police officer Justen Freeman stated to the best of his knowledge, it is not illegal to hold an American flag on the Supreme Court's steps.

At oral argument in *Grace v. Burger*, the government admitted that it was "not sure" whether T-shirts with insignias or mottos were banned by the Display Clause.  An individual wearing a jacket with the motto "Occupy Everywhere" was arrested by the Supreme Court police,[31] whereas individuals carrying items such as shopping bags with corporate slogans are not arrested.

Additionally, the phrase "bring into public notice a party, organization, or movement" is vague in that it has been interpreted to apply to any expression of views, regardless of whether the message is associated with an identifiable party, organization, or movement.

---

[31] "Occupy Jacket-wearer Arrested at Supreme Court Building," *Constitutional Law Prof Blog*, *available at* http://lawprofessors.typepad.com/conlaw/2012/01/occupy-jacket-wearer-arrested-at-supreme-court-building.html

In *Grace*, 461 U.S. at 176, for example, the Supreme Court found the Display Clause to be applicable to Mary Grace, who wore a sign with the verbatim text of the First Amendment.  No citizen of ordinary intelligence would expect that the plain language of the statute extends to expressive conduct unrelated to an identifiable party, organization, or movement, and thus the statute may trap innocent citizens.  See Grace, 461 U.S. at 188 (Stevens, J., concurring in part and dissenting in part)("I do not agree that her device was 'designed or adapted to bring into public notice any party, organization, or movement.' A typical passerby could not, merely by observing her sign, confidently link her with any specific party, organization, or 'movement' as that term was understood when this statute was drafted.")

   D.   The "Display Clause," as applied, violates the First Amendment because it
        discriminates on the basis of content and viewpoint.

   On any given day, numerous individuals violate the Display Clause, and yet these individuals are not arrested or even told to cease their behavior.  Instead, the Supreme Court police target for arrest and refer for prosecution only those individuals who engage in First Amendment activity which particular officers believe, in their personal opinion, to be political or controversial speech.  Thus, "innocuous and less controversial commercial" speech is allowed while "issue-oriented" political speech is not.  *See Lehman v. Shaker Heights*, 418 U.S. 298, 304 (1974)(plurality opinion).  It is possible that Congress could constitutionally create such a distinction, *see id.*, but is has not done so.  Thus, the Supreme Court police must enforce the statute in a uniform fashion that does not discriminate between commercial and political speech unless a sufficient government interest supporting such a distinction is shown.

Although discovery will be required on this issue, Plaintiff expects to be able to develop a record that shows that the Supreme Court police apply the Display Clause in a viewpoint-discriminatory fashion such that an individual wearing a T-shirt with the slogan "Go Terps!" would not be considered to be in violation, but an individual whose T-shirt read "University of Maryland discriminates" would be; an individual with a T-shirt having a Nike logo would not be considered to be in violation, but an individual with a T-shirt having a Nike logo with a line through it and the message "Boycott Nike," would be; and an individual with an American flag lapel pin would not be considered to be in violation, but an individual holding a sign that contained an anti-American message would be.  Plaintiff need not show, of course, that the Supreme Court police support Nike, but rather that slogans or messages that are deemed controversial, or which are likely to draw a crowd, are singled out for adverse treatment.[32]  *See People for the Ethical Treatment of Animals v. Gittens*, 215 F. Supp. 2d 120, 134 n.41 (D.D.C. 2002)(noting in dicta that exclusion of a speaker based on the controversial nature of its message would be *per se* viewpoint discrimination and a violation of the First Amendment).  Where the government discriminates on the basis of viewpoint, a court need not determine the nature of the forum or decide whether the restriction is reasonable in light of the purposes served by the forum.  *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 107 (2001).

---

[32] "Surprise! U.S. Supreme Court policy mirrors Christ's instructions to us all," (quoting U.S. Supreme Court deputy public information officer Patricia McCabe Estrada as stating that the Court has a policy "not to permit  . . . other types of activity that may tend to draw a crowd or onlookers") *available at* http://blog.beliefnet.com/on_the_front_lines_of_the_culture_wars/2011/03/surprise-us-supreme-court-policy-mirrors-christs-instructions-to-us-all.html

E.   The Display Clause, as applied, violates the Fifth Amendment guarantee of Equal Protection because it discriminates among government and non-government speakers.

a.   Equal Protection analysis in the context of the First Amendment

Courts that have considered the issue, including in this jurisdiction, have found that the guarantee of equal protection is implicated where government speakers are treated differently than private speakers.  *Women Strike for Peace v. Morton*, 472 F.2d 1273, 1274, 1298 (D.C. Cir. 1971)(per curiam)(affirming holding of district court that although there was no First Amendment violation, National Park Service regulation which favored government-sponsored event over private event violated equal protection guarantee); *Congregation Lubavitch v. City of Cincinnati*, 997 F.2d 1160, 1165-67 (6th Cir. 1993)(finding an Equal Protection violation where ordinance required removal of private displays overnight while allowing government displays to remain 24 hours a day); *Beckerman v. Tupelo*, 664 F.2d 502, 513 (5th Cir. 1981)(finding Equal Protection violation where ordinance governing marchers in parade excepted marchers from government agencies).  When an equal protection violation is alleged over a right to engage in expressive activity in a public forum, strict scrutiny is applied, while in a nonpublic forum, rational basis is applied.  *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 54 (1983).

b.   The "Display Clause," as applied discriminates among speakers

Because the Display Clause, as applied,[33] treats some displays of "flags, banners, or devices" differently than others, it implicates the constitutional guarantee of equal protection.  *See Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 94-95 (1972). Specifically, while the Display Clause on its face would prohibit the display of an American flag, the government itself displays an American flag at the Supreme Court.  At a hearing in *United States v. Ebner*, No. M-12487-79 (D.C. Super.Ct. Jan. 22, 1980) on the defendants' motion to dismiss, the following colloquy took place:

The Court: What does that mean... any flag, banner or device designed or adapted to bring into public notice any party, organization or movement. I gather the Iranian flag would do that as well as the American Flag, wouldn't it? What does that mean?

[AUSA] Cornell: Well, I think, Your Honor, that it means that you can't do it.

The Court: You can't carry an American flag on the grounds of the Supreme Court of the United States?

[AUSA] Cornell: Yes, Your Honor.

The Court: Isn't that patent nonsense? They put the flag up in the doorstep every morning, don't they?

[AUSA] Cornell: Well –

The Court: They can do it but others can't.

[AUSA] Cornell: I think that that is the Government's position in this case, Your Honor.

The Court: Well, it seems to me that the Government has to do better, Mr. Cornell.

---

[33] Defendants assert that "there is no conceivable argument that flying the American flag might be interpreted as in violation of the Display Clause."  (Def. Mot. to Dismiss at 26). If this is true, the Display Clause violates the guarantee of equal protection on its face, rather than as applied.

    c.   The discrimination between speakers is not justified by any governmental interest

The defendants have not, nor could they, argue that the government has any interest that would be served by prohibiting private speakers from displaying an American flag on the Supreme Court plaza while allowing government speakers to do the same. Because the defendants have not even advanced an interest which would support rational basis review, the Court should find an equal protection violation, regardless of the type of forum at issue.

IV.    CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny the defendants' motion to dismiss.

Dated this 9th day of July, 2012.

Respectfully Submitted,

 /s/ Jeffrey Light_____

    Jeffrey L. Light
    D.C. Bar #485360
    1712 Eye St., NW
    Suite 915
    Washington, DC 20006
    (202)277-6213
    Jeffrey.Light@yahoo.com

    *Counsel for Plaintiff and*
    *Participating Attorney for*
    *The Rutherford Institute*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 9th day of July, 2012, a copy of the foregoing **PLAINTIFF'S OPPOSTION TO DEFENDANTS' MOTION TO DISMISS OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT** was served via ECF on all counsel of records in the case.

 /s/ Jeffrey Light

Jeffrey L. Light
D.C. Bar #485360
1712 Eye St., NW
Suite 915
Washington, DC 20006
(202)277-6213
Jeffrey.Light@yahoo.com

*Counsel for Plaintiff and
Participating Attorney for
The Rutherford Institute*

42