**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HAROLD H. HODGE, JR., | |
| Plaintiff, | |
| v. | Civil Action No. 12-00104 (BAH) Judge Beryl A. Howell |
| PAMELA TALKIN, *et al*., | |
| Defendants. | |

## <u>MEMORANDUM OPINION</u>

Following his arrest for violation of 40 U.S.C. § 6135 for wearing a sign while standing "quietly and peacefully" on the Supreme Court plaza, the plaintiff, Harold Hodge, Jr., brought this lawsuit to challenge the constitutionality of that statute under the First and Fifth Amendments "on its face and as applied to his desired activities," which include returning to the Supreme Court plaza to "engage in peaceful, non-disruptive political speech and expression." Amended Complaint ("Am. Compl."), ECF No. 8, ¶¶ 1, 20, 28.  The defendants − Pamela Talkin, Marshal of the United States Supreme Court, and Ronald Machen, Jr., U.S. Attorney for the District of Columbia, in their official capacities − have moved to dismiss the complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).  Alternatively, they have moved for summary judgment pursuant to Federal Rule of Civil Procedure 56(a).  Defs.' Mot. to Dismiss or in the Alternative, for Summ. J. ("Defs.' Mot."), ECF No. 14.  For the reasons explained below, the defendants' motion is denied because the Court finds the

challenged statute unconstitutional under the First Amendment.  Summary judgment will therefore be entered for the plaintiff pursuant to Federal Rule of Civil Procedure 56(f).[1]

## I.     BACKGROUND

The plaintiff, as noted, has been arrested for violating the statute he now challenges on constitutional grounds.  Set forth below is pertinent factual and legal background to evaluate his claim and the pending motion.

### A.     The Plaintiff's Protest and Arrest at the Supreme Court Plaza and Subsequent Prosecution

The plaintiff, Harold Hodge, Jr., is a citizen of Maryland and a full time-student at the College of Southern Maryland.  Am. Compl. ¶ 5.  According to the Amended Complaint, the plaintiff, on January 28, 2011, visited the Supreme Court plaza ("the plaza") wearing a sign "approximately 3 feet long and 2 feet wide" that read: "The U.S. Gov. Allows Police To Illegally Murder and Brutalize African Americans And Hispanic People."  Am. Compl. ¶¶ 17-20.  The plaintiff states that his purpose in standing on the plaza and wearing the sign "was to engage in expression on a political matter of public interest and importance and to raise public awareness about the adverse treatment of minorities by law enforcement."  Am. Compl. ¶ 18.  According to the plaintiff, he "approached the Supreme Court building from the west . . . and . . . proceed[ed] up the steps leading up to the plaza in front of the Supreme Court building."  Am. Compl. ¶ 19.  Once there, the plaintiff "stood quietly and peacefully upon the plaza area near the steps leading to the sidewalk in front of the Supreme Court Building, approximately 100 feet from the doors of the main entrance leading into the Supreme Court Building."  Am. Compl. ¶ 20.  After standing there for a few minutes, the plaintiff was approached by an officer of the Supreme Court of the

---

[1] While the plaintiff has not filed a motion for summary judgment, the Court, as explained in more detail below, will grant summary judgment for the nonmoving plaintiff pursuant to Federal Rule of Civil Procedure 56(f).  *See* FED. R. CIV. P. 56(f) ("After giving notice and a reasonable time to respond, the court may: (1) grant summary judgment for a nonmovant").

United States Police, who "informed Mr. Hodge that he was violating the law and . . . told [him] to leave the plaza." Am. Compl. ¶ 21. After the plaintiff was given three warnings, and refused to depart, the officer told the plaintiff "that he was under arrest for violating 40 U.S.C. § 6135." Am. Compl. ¶¶ 22-23. The plaintiff "was told to place his hands behind his back, and he peacefully and without resistance complied with this request." Am. Compl. ¶ 23. The plaintiff was "then handcuffed and taken to a holding cell within the Supreme Court building [and then] transported to U.S. Capitol Police Headquarters where he was booked and given a citation for violating 40 U.S.C. § 6135." Am. Compl. ¶ 24.

On February 4, 2011, the plaintiff was charged in an information filed in the Superior Court for the District of Columbia by the U.S. Attorney for the District of Columbia with violating 40 U.S.C. § 6135. Am. Compl. ¶ 25. The information alleged specifically that the plaintiff "'did unlawfully parade, stand, or move in processions or assemblages in the Supreme Court Building or grounds, or to [sic] display in the Building and grounds a flag, banner, or device designed or adapted to bring into public notice a party, organization, or movement.'" Am. Compl. ¶ 25 (quoting Information). The plaintiff and the government reached an agreement, pursuant to which the charge under 40 U.S.C. § 6135 would be dropped if the plaintiff stayed away from the Supreme Court Building and grounds for six months. Am. Compl. ¶ 26. The plaintiff complied with the agreement, and, on September 14, 2011, the charge under 40 U.S.C. § 6135 was dismissed. Am. Compl. ¶ 27.

### B.     The Instant Lawsuit

On January 23, 2012, the plaintiff filed this lawsuit challenging the constitutionality of 40 U.S.C. § 6135.[2] The plaintiff claims that he "desires to return to the plaza area . . . and engage in

---

[2] The initial complaint named as defendants Pamela Talkin, the District of Columbia, and Cathy Lanier, Chief of Police of the Metropolitan Police of the District of Columbia. Compl., ECF No. 1. On May 15, 2012, the plaintiff

peaceful, non-disruptive political speech and expression in a similar manner to his activity on January 28, 2011." Am. Compl. ¶ 28. He also "desires to return to the plaza area in front of the Supreme Court building and picket, hand out leaflets, sing, chant, and make speeches, either by himself or with a group of like-minded individuals." Am. Compl. ¶ 29. Specifically, the plaintiff is interested in "convey[ing]" a "political message," "directed both at the Supreme Court and the general public," namely to "explain how decisions of the Supreme Court have allowed police misconduct and discrimination against racial minorities to continue." Am. Compl. ¶ 29. He claims, however, that he is "deterred and chilled from doing so because of the terms of 40 U.S.C. § 6135 and his prior arrest on January 28, 2011 and subsequent prosecution for violating that statute." Am. Compl. ¶ 30. The Court held argument on the pending motion on April 26, 2013, and, following that hearing, both parties, with the permission of the Court, supplemented their briefing regarding issues raised at the motions hearing.[3] *See* Defs.' Supplemental Brief ("Defs.' Supplemental Br."), ECF No. 19; Pl.'s Supplemental Opp'n to Defs.' Mot. to Dismiss or in the Alternative for Summ. J. ("Pl.'s Supplemental Opp'n"), ECF No. 20.

### C.      The Challenged Statute – 40 U.S.C. § 6135

The challenged statute, 40 U.S.C. § 6135, provides in full that:

> It is unlawful to parade, stand, or move in processions or assemblages in the Supreme Court Building or grounds, or to display in the Building and grounds a flag, banner, or device designed or adapted to bring into public notice a party, organization, or movement.

---

filed the Amended Complaint, which is the operative pleading in this case, naming as defendants Pamela Talkin and Ronald Machen, Jr. Am. Compl. ¶¶ 6-7. As the Marshal of the Supreme Court, Ms. Talkin's job requirements include, *inter alia*, "[t]ak[ing] charge of all property of the United States used by the [Supreme] Court or its members . . . [and] [o]versee[ing] the Supreme Court Police." 28 U.S.C. §§ 672(c)(3), (c)(8); Am. Compl. ¶ 6. Mr. Machen, the U.S. Attorney for the District of Columbia, is responsible for prosecuting violations of 40 U.S.C. § 6135, the challenged statute. Am. Compl. ¶ 7; 40 U.S.C. § 6137(b).

[3] The Court relies on the court reporter's rough transcript of the April 26, 2013 motion hearing in this Memorandum Opinion. *See* Rough Transcript of Oral Argument (Apr. 26, 2013) ("Tr.").

40 U.S.C. § 6135.  The statute is comprised of two clauses: first, the "Assemblages Clause," which provides that "[i]t is unlawful to parade, stand, or move in processions or assemblages in the Supreme Court Building or grounds," and, second, the "Display Clause," which makes it unlawful "to display in the Building and grounds a flag, banner, or device designed or adapted to bring into public notice a party, organization, or movement."  40 U.S.C. § 6135.  The plaintiff was charged with violating both clauses of the statute.  *See* Am. Compl. ¶ 25.

The Court's "Building and grounds" referenced in the statute include the Supreme Court Building as well as the grounds extending to the curbs of four streets, namely "the east curb of First Street Northeast, between Maryland Avenue Northeast and East Capitol Street[,]" "the south curb of Maryland Avenue Northeast, between First Street Northeast and Second Street Northeast[,]" "the west curb of Second Street Northeast, between Maryland Avenue Northeast and East Capitol Street[,]" and "the north curb of East Capitol Street between First Street Northeast and Second Street Northeast[.]"  40 U.S.C. § 6101(b)(1).  Violations of section 6135, which may be prosecuted in the United States District Court for the District of Columbia or the Superior Court of the District of Columbia, are subject to a fine or imprisonment for "not more than 60 days, or both[,]" except if "public property is damaged in an amount exceeding $100, the period of imprisonment for the offense may be not more than five years."  40 U.S.C. § 6137(a)-(c).

**D.     History of the Challenged Statute**

A review of the history of the challenged statute and the case law addressing its constitutionality is necessary to set the plaintiff's instant challenge in context.  The statute was enacted in 1949 and originally codified at 40 U.S.C. § 13k.  The bill introducing the statute was "patterned very largely after the law which authorized special guards to police the Capitol

grounds." S. Rep. No. 81-719, at 1828 (1949).  Thus, the Court first briefly examines the statute

promulgated to govern the policing of the Capitol grounds, 40 U.S.C. § 193g.

### 1.    Statute Governing Capitol Grounds, 40 U.S.C. § 193g[4]

From 1810 until 1935, the Supreme Court was housed in the United States Capitol

Building.  *See* Architect of the Capitol, Old Supreme Court Chamber,

http://www.aoc.gov/capitol-buildings/old-supreme-court-chamber (last visited June 10, 2013).

During that period, in 1882, Congress enacted legislation "to regulate the use of the Capitol

Grounds," then including the Supreme Court, and "to prevent the occurrence near it of such

disturbances as are incident to the ordinary use of public streets and places[.]"  22 Stat. 126

(1882); *see also* 13 Cong. Rec. 1949 (1882) (statement of Morrill) (stating that the bill to

regulate the use of the Capitol Grounds was necessary because "[c]onstant damage is committed

on the Capitol, pieces of the bronze doors are stolen, ink is strewed from the bottom to the top of

the stairs, plants are stolen from the grounds in large numbers, shrubs and trees are injured" and

"I believe there can be no objection to giving the police court some chance to prevent the

constant mutilation of the Capitol and of the trees and shrubs and grounds around about it").  The

legislation included, in section 6, essentially the same language that would, more than a half

century later, appear in 40 U.S.C. § 6135 and its predecessor statute, 40 U.S.C. § 13k:

---

[4] Neither party briefed in any detail the history of and case law addressing the Capitol Grounds statute, which was a precursor to the challenged statute.  The defendants do not so much as cite the statute, or the case ruling the statute unconstitutional.  The plaintiff discusses the statute only briefly and cites to *Jeannette Rankin Brigade v. Chief of Capitol Police*, 342 F. Supp. 575 (D.D.C. 1972) ("*Jeannette Rankin Brigade II*"), the case holding the statute unconstitutional.  *See* Pl.'s Opp'n at 17-18, 36.  Nevertheless, given that the challenged statute was rooted directly in the Capitol Grounds statute, which was ruled unconstitutional, and is clearly relevant here, the Court takes judicial notice of this history because these facts "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  FED. R. EVID. 201(b)(2).  At oral argument, when the Court queried the government about the relevance of the legislative history of statutes "in connection with the building of the Supreme Court building[,]" the government again did not reference the Capitol Grounds statute or its relationship to the challenged statute, but did acknowledge that the Court may consider legislative history and that the Court may take judicial notice of legislative history or the history of the Supreme Court building.  Tr. 2-6.

> Sec. 6.    That it is forbidden to parade, stand, or move in processions or assemblages, or display any flag, banner, or device designed or adapted to bring into public notice any party, organization, or movement.

22 Stat. 127 (1882) (hereinafter, "Capitol Grounds statute").  From 1882 until 1969, there were "several recodifications, and various changes in and additions to the surrounding statutory provisions relating to conduct upon the Capitol Grounds[,] [b]ut the absolute prohibition against all 'processions or assemblages' . . . remained untouched."  *Jeannette Rankin Brigade v. Chief of Capitol Police*, 421 F.2d 1090, 1106 (D.C. Cir. 1969) ("*Jeannette Rankin Brigade I*") (Bazelon, C.J., dissenting) (footnote omitted).  This was "despite suggestions to the legislature that passing years and progressive developments in the protection of First Amendment freedoms may have sorely dated the statute."  *Id.* (citing *Security of the Capitol Buildings: Hearing on S. 2310 Before the S. Subcomm. on Pub. Bldgs. and Grounds of the S. Comm. on Pub. Works*, 90th Cong., 1st Sess. at 9-10, 26 (1967)).[5]

---

[5] The Senate Hearing cited by Chief Judge Bazelon in *Jeannette Rankin Brigade I* included, for example, the following discussion between members of the Senate and Mr. David Bress, then United States Attorney for the District of Columbia, regarding the Capitol Grounds statute:

> Senator COOPER.  In your view, as I think would be mine, wouldn't the present provision of the law with an absolute provision be unconstitutional in view of the holdings of the Court?
> Mr. BRESS.  The present statute has not been tested in the courts.  There is enough language to indicate some doubt.  I am not prepared to say that the present law is unconstitutional.  On the contrary, it is our belief that the law as it now stands is probably constitutional.
> Senator COOPER.  Do you think the absolute prohibition of parades and demonstrations on the Capitol Grounds is unconstitutional? . . . Do you think we could absolutely prohibit by statute parade or assemblage on the Capitol Grounds?
> Mr. BRESS.  I believe that that presents a problem.  It is hazardous to predict that the Court would uphold that.  I believe that in the first amendment area this does present a problem.
> Senator COOPER.  I believe you can have reasonable regulation, but I don't believe you can prohibit.
> . . .
> Mr. BRESS. The indications are that reasonable regulations evenhandedly enforced as a regulatory measure over the area adjacent to a legislative assembly would be valid under the recent Supreme Court decisions, but that is different from providing for an outright abolition without any regulatory steps.
> Senator TYDINGS.  Any type of regulation or restriction would have to do with the orderly conduct of a legislative body.  It couldn't have to do with outright forbidding of people to picket or peacefully present petitions.  There was a revolution fought about that.

In the 1960s and 1970s, this nearly century-old Capitol Grounds statute was subject to scrutiny both by the D.C. Court of Appeals, which imposed a limiting construction on the statute,[6] and by a three-judge panel of this Court, which found the statute unconstitutional, a holding summarily affirmed by the Supreme Court.  Some discussion of those cases is necessary to provide context for this Court's examination of 40 U.S.C. § 6135.

In 1970, the D.C. Court of Appeals affirmed the judgment of the Chief Judge of what was then the D.C. Court of General Sessions, who imposed a limiting construction on the Capitol Grounds statute.  In that case, the appellees, who refused to leave the East Capitol steps after being ordered to do so by the Capitol police, had moved to dismiss the charging informations on grounds that § 9-124 of the D.C. Code, or 40 U.S.C. § 193g, was unconstitutional.  The trial court acknowledged "the overbroad scope of § 9-124[,]" but nevertheless found "sufficient basis in legislative and other materials" to limit its scope.  *United States v. Nicholson*, 263 A.2d 56, 57 (D.C. 1970).  Specifically, the trial court limited the statute "to the imposition of criminal

---

*Security of the Capitol Buildings: Hearing on S. 2310 Before the S. Subcomm. on Pub. Bldgs. and Grounds of the S. Comm. on Pub. Works*, 90th Cong., 1st Sess. at 9-10 (1967).

[6] The federal Capitol Grounds statute, 40 U.S.C. § 193g, has "a peculiar duality" in that "[i]t appears both in the United States Code and the District of Columbia Code; and violations of it may be prosecuted either in the local District of Columbia courts or in the federal district court for the District of Columbia."  *Jeannette Rankin Brigade II*, 342 F. Supp. at 580 (citing 40 U.S.C. § 193h).  Before 1973, the United States Code authorized the Committee on the Judiciary of the House of Representatives "to print bills to codify, revise, and reenact the general and permanent laws relating to the District of Columbia[.]"  1 U.S.C. § 203 (1964).  Thus, the statute at issue "relating" to the District of Columbia was codified by Congress in both the U.S. Code and the D.C. Code.  *See* D.C. Code § 9-124 (1967).  Since 1973, the District of Columbia Council has been empowered to "set forth the general and permanent laws relating to or in force in the District of Columbia, whether enacted by the Congress or by the Council of the District of Columbia[.]"  *See* D.C. Code 45-102.  Since then, despite being held unconstitutional in 1972, the statute has been recodified at D.C. Code §  9-113 (1981) and § 10-503.17 (2013), which currently reads in full:

> § 10-503.17.  Parades, assemblages, and displays forbidden.  It is forbidden to parade, stand, or move in processions or assemblages in said United States Capitol Grounds, or to display therein any flag, banner, or device designed or adapted to bring into public notice any party, organization, or movement, except as hereinafter provided in §§ 10-503.22 and 10-503.23.

The statute has remained substantively the same over the years, including the provision of an exception ("except as hereinafter provided in . . .") for suspension of prohibitions for "occasions of national interest."  *Compare* D.C. Code § 9-124 (1967) *with* D.C. Code § 10-503.17 (2013).

punishment for acts or conduct which interferes [sic] with the orderly processes of the Congress, or with the safety of individual legislators, staff members, visitors, or tourists, or their right to be free from intimidation, undue pressure, noise, or inconvenience." *Id*. (internal quotation marks omitted). Limited in that manner, the trial court found the statute constitutional, while simultaneously concluding that the facts did not justify convictions based on this limited construction of the statute. *Id*. The D.C. Court of Appeals affirmed the dismissal of the informations for failure to state an offense. *Id*.; *Jeannette Rankin Brigade v. Chief of Capitol Police*, 342 F. Supp. 575, 580 (D.D.C. 1972) ("*Jeannette Rankin Brigade II*") (quoting the D.C. Court of General Sessions as further explaining that "[i]t is appropriate, therefore, under the statute, to bar or order from the Capitol, any group which is noisy, violent, armed, or disorderly in behavior, any group which has a purpose to interfere with the processes of Congress, any member of Congress, congressional employee, visitor or tourist; and any group which damages any part of the building, shrubbery, or plant life" (citation omitted)).

Two years later, in 1972, a three-judge panel of the District Court for the District of Columbia, including two D.C. Circuit judges, reviewed a complaint by a coalition of women against the Vietnam War, challenging the validity of the Capitol Grounds statute, 40 U.S.C. § 193g, under the First and Fifth Amendments. *Jeannette Rankin Brigade II*, 342 F. Supp. at 577-78. In that case, the defendants "assure[d]" the panel that, although they disagreed with the *Nicholson* interpretation of the statute, they had nonetheless adhered to that interpretation of the statute in enforcing it. *Id*. at 580. The panel refused to embrace the *Nicholson* limiting construction, however, nor the government's argument that, *inter alia*, the statute should "not be read literally as forbidding all assemblages, but . . . should be taken as providing that there may

be no assemblages larger than 15 in number[,]" *id.* at 586,[7] and found the statute facially

unconstitutional.[8]  The panel concluded that "it is difficult to imagine a statute which could more

plainly violate the principle that 'First Amendment freedoms need breathing space to survive

[and] government may regulate in the area only with narrow specificity.'"  *Id.* at 585 (alteration

in original) (quoting *N.A.A.C.P. v. Button*, 371 U.S. 415, 433 (1963)).  The panel further

expounded that "[w]hile some substantial governmental interests in the Capitol Grounds may

warrant protection, none have been alleged which are sufficiently substantial to override the

fundamental right to petition 'in its classic form' and to justify a blanket prohibition of all

assemblies, no matter how peaceful and orderly, anywhere on the Capitol Grounds." *Id.*[9]  The

panel also noted the difficulties that the "flatly prohibitory language" of the statute posed for

those enforcing the statute, stating that "[t]hey bear the burden of trying to enforce and sustain a

statute which, however unremarkable it may have appeared to be in 1882 when it was first

---

[7] The panel noted that the "Government forcefully argues" that "[w]ithout such judicial emendations . . . the present language of the statute is open to absurdities which Congress cannot be taken to have intended." *Jeannette Rankin Brigade II*, 342 F. Supp. at 586.

[8] As the panel explained, since the statute appears both in federal and local law, and violations may be prosecuted in either federal or local courts, "the construction of the statute by the local courts has no binding effect on the federal courts if the Government elects to prosecute violations here." *Jeannette Rankin Brigade II*, 342 F. Supp. at 580.

[9] Notably, the panel in *Jeannette Rankin Brigade II* suggested in dictum that there are some areas, including "[t]he area surrounding a courthouse," where the government "may absolutely prohibit the exercise of First Amendment rights, especially the right to assemble." *Jeannette Rankin Brigade II*, 342 F. Supp. at 583 (citing *Cox v. Louisiana*, 379 U.S. 559 (1965) ("*Cox II*")); *see also id.* at 584 (contrasting the functions of the judiciary and legislature, and determining that "the primary purpose for which the Capitol was designed – legislating" is not "incompatible with the existence of all parades, assemblages, or processions which may take place on the grounds").  To the extent that the panel's recognition that the area surrounding a courthouse could justify a broader restriction on expressive activity, the panel's citation to *Cox II* lends no support to the defendants' argument that a blanket prohibition on expressive activity passes constitutional muster.  The panel was emphatic regarding the vulnerability of section 193g to constitutional challenge, and its language regarding the different considerations that may be in play in the area surrounding a courthouse does not undermine that conclusion, particularly where the panel provided a citation to a case concerning a statute with an intent requirement that was much more narrowly drawn than the challenged statute.  *See infra* note 15.

enacted, fairly bristles with difficulties when it is sought to be enforced 90 years later." *Id*. at 586.[10]

The panel in *Jeannette Rankin Brigade II* reflected that "[t]he local courts of the District of Columbia have . . . felt unable to recognize [the constitutional propriety of the statute] without putting a substantial gloss upon Section 193g by an expansive interpretation of its terms," but refused the invitation to adopt this construction or create a limiting construction of its own that could save the statute's constitutionality.  *Jeannette Rankin Brigade II*, 342 F. Supp. at 586.  The panel also discussed failed attempts in 1967 by the U.S. Attorney for the District of Columbia "to warn the Congress that this statute was in trouble, and to make a proposal for its revision" to limit its scope.  *Id*.  Specifically, the panel highlighted the U.S. Attorney's testimony before Congress that Section 193g "'presents a problem,'" and his statement that "'[t]he indications are that reasonable regulations even-handedly enforced as a regulatory measure over the area adjacent to a legislative assembly would be valid under recent Supreme Court decisions, but that is different from providing for an outright abolition without any regulatory steps.'"  *Id*. at 586 n.14 (quoting *Security of the Capitol Buildings: Hearing on S. 2310 Before the S. Subcomm. on Pub. Bldgs. and Grounds of the S. Comm. on Pub. Works*, 90th Cong., 1st Sess. at 10 (1967)).[11] The government urged the *Jeannette Rankin Brigade II* panel to save the Capitol Grounds statute by adopting its own limiting construction of the statute.  *Id*. at 586-87.  The panel did not mince

---

[10] The D.C. Circuit issued an earlier decision in *Jeannette Rankin Brigade I* in 1969, following an appeal from a district judge's decision not to grant the plaintiffs' motion for a three-judge panel pursuant to 28 U.S.C. §§ 2282 and 2284.  Chief Judge Bazelon dissented from the panel's decision granting a three-judge panel, and would have instead reached the merits of the case, stating: "I would find that the sweep of Section 193g so far exceeds whatever limitations the public interest might justify upon the right to petition Congress that we must declare this law unconstitutional on its face."  *Jeannette Rankin Brigade I*, 421 F.2d at 1096 (Bazelon, C.J., dissenting).

[11] At the time, the U.S. Attorney's "proposed amendment to 193g would have abolished the absolute prohibition and merely substituted the requirement that organizations notify the Chief of the Capitol Police five days prior to any parade or demonstration."  *Jeannette Rankin Brigade II*, 342 F. Supp. at 586 n.14.  The proposal was rejected "over the dissents of Senators Gruening, Cooper, and Young, in whose view the statute as written was plainly unconstitutional."  *Id*.

words in rejecting that proposal, however.  While the panel was "not unsympathetic with the reasons which prompt the United States Attorney to ask us to rewrite a curiously inept and ill-conceived Congressional enactment, we think that is a function more appropriately to be performed by Congress itself."  *Id.* at 587.  The Supreme Court summarily affirmed the panel's decision later that year.  *See Chief of Capitol Police v. Jeannette Rankin Brigade*, 409 U.S. 972, 972 (1972).[12]

### 2.    History of the Challenged Statute, 40 U.S.C. § 6135

As noted, the immediate predecessor to the challenged statute was 40 U.S.C. § 13k, which was introduced as part of a bill intended "to provide positive statutory authority for the policing of the Supreme Court Building and grounds, defining the exact territorial limits thereof, authorizing the appointment of special police, and defining their duties and powers."  S. Rep. No. 81-719, at 1828 (1949).  This legislation had become necessary because, although the Supreme Court had occupied its own building since 1935, from 1935 until 1948, the Supreme Court Building and grounds were policed under the authority of the District of Columbia's government.  *Id.*  In 1948, however, the governing body of the District of Columbia, the Board of Commissioners, "cancel[led] all special police commissions, including the ones for the guards for the Supreme Court Building" because of uncertainty over the authority the Commission

---

[12] Although the Supreme Court summarily affirmed the three-judge panel's decision that the federal Capitol Grounds statute was unconstitutional, just as with the local codification of this law, *see supra* note 6, the federal statute has never been repealed but was re-codified in 2002 at 40 U.S.C. § 5104(f), *see* Public Buildings, Property, and Works, Pub. L. No. 107-217, § 1, § 5104(f), 116 Stat. 1062, 1176 (2002).  In its current form, 40 U.S.C. § 5104(f) reads as follows:

(f) Parades, assemblages, and display of flags. Except as provided in section 5106 of this title [40 USCS § 5106], a person may not--
  (1) parade, stand, or move in processions or assemblages in the Grounds; or
  (2) display in the Grounds a flag, banner, or device designed or adapted to bring into public notice a party, organization, or movement.

40 U.S.C. § 5104(f).  Section 5106, which is referenced in the text of 40 U.S.C. § 5104(f), provides for the suspension of the prohibitions "[t]o allow the observance in the United States Capitol Grounds of occasions of national interest becoming the cognizance and entertainment of Congress[.]"  40 U.S.C. § 5106(a).

could give to the police assigned to the Supreme Court.  *Id.*  This prompted introduction in
Congress of legislation modeled after the statute governing the U.S. Capitol Building and
grounds to govern the policing of the Supreme Court and grounds.  *Id.*; H.R. Rep. No. 81-814, at
2 (1949) (noting that when the uncertainty over the authority of the Supreme Court guards was
brought to the attention of the Chief Justice, "the Marshal was directed to have a bill prepared
similar to the legislation providing for the Capitol Police, 'To define the area of the United States
Capitol Grounds, to regulate the use thereof and for other purposes[.]'" (citing 60 Stat. 718, ch.
707 (1946)).

The legislation for the Supreme Court Building and grounds defined the territory
covered and provided for regulations governing "[v]arious acts, such as sale of goods in the
building, display of advertising, soliciting alms, injury to the building or grounds, discharging of
firearms, making speeches, parading or picketing."  S. Rep. No. 81-719, at 1828 (1949).  The
legislation, *inter alia*, authorized the Marshal of the Supreme Court "to restrict and regulate
travel and occupancy of the building and adjacent grounds and to prescribe rules and regulations
for the protection of said premises and the maintenance of order and decorum."  *Id.*  The Senate
Report accompanying the legislation noted that "[i]n keeping with the dignity which should
surround the Supreme Court of the United States and the building and grounds which house it,
the committee feel [sic] that this legislation should be enacted promptly."  *Id.*  The House Report
also noted the urgency of enacting the legislation, explaining that "[u]nless the authority
requested in this bill is provided at this session of Congress, the guards of the Supreme Court
will have no authority as special policemen to make arrests for offenses committed in the
Supreme Court or grounds after November 1, 1949[,]" and noting that "[i]t is the belief of the
Committee on the Judiciary that in keeping with the dignity of the highest Court in the land,

13

provision should be made for the policing of its building and grounds similar to that which is made for the U.S. Capitol." H.R. Rep. No. 81-814, at 2 (1949).

Section 6 of the legislation contained the prohibition that would later be codified at 40 U.S.C. § 13k. The House Report accompanying the legislation summarized section 6, stating that it "prohibits parades or displaying of any flag or banner designed to bring into public notice any party, organization or movement[,]" and that the section was "based upon the law relating to the Capitol Buildings and Grounds." H.R. Rep. No. 81-814, at 3 (1949). As enacted, 40 U.S.C. § 13k is nearly identical to the challenged statute, providing in full:

> It shall be unlawful to parade, stand, or move in processions or assemblages in the Supreme Court Building or grounds, or to display therein any flag, banner, or device designed or adapted to bring into public notice any party, organization, or movement.

Pub. L. No. 81-250, § 6, 63 Stat. 616, 617 (1949) (codified at 40 U.S.C. § 13k).[13]

The statute was in the same form in 1981 when the D.C. Circuit considered the constitutionality of 40 U.S.C. § 13k in *Grace v. Burger*, 665 F.2d 1193 (D.C. Cir. 1981) (hereinafter, "*Grace I*"), and found the statute unconstitutional on its face. In that case, two individuals, who were threatened with arrest while separately distributing leaflets and wearing a sign on the sidewalks surrounding the Supreme Court, filed a complaint "seeking a declaratory judgment that 40 U.S.C. § 13k is unconstitutional on its face, and a permanent injunction prohibiting the Supreme Court police from enforcing the statute." *Grace I*, 665 F.2d at 1195. The D.C. Circuit considered the statute in its entirety and found the statute wholly "repugnant to the First Amendment of the Constitution." *Id*. at 1194. Specifically, while the Circuit acknowledged that "public expression that has an intent to influence the administration of justice

---

[13] The challenged statute differs in three nonmaterial ways from the original version: 40 U.S.C. § 6135 says "It is unlawful" rather than "It shall be unlawful[;]" "in the Building and grounds" rather than "therein[;]" and "a party" rather than "any party." *Compare* 40 U.S.C. § 13k *with* 40 U.S.C. § 6135.

may be restricted," *id.* (citing *Cox v. Louisiana*, 379 U.S. 559 (1965) ("*Cox II*")), it found that

Congress had already achieved that result in a "more narrowly drawn statute," *id.*, namely 18

U.S.C. § 1507, enacted in 1950 as part of the Subversive Activities Control Act of 1950, Title I,

Pub. L. No. 81-831, § 31(a), 64 Stat. 987, 1018 (1950).  That statute provided in full:

> Whoever, with the intent of interfering with, obstructing, or impeding the
> administration of justice, or with the intent of influencing any judge, juror,
> witness, or court officer, in the discharge of his duty, pickets or parades in or near
> a building housing a court of the United States, or in or near a building or
> residence occupied or used by such judge, juror, witness, or court officer, or with
> such intent uses any sound-truck or similar device or resorts to any other
> demonstration in or near any such building or residence, shall be fined not more
> than $ 5,000 or imprisoned not more than one year, or both.

18 U.S.C. § 1507 (1976) (quoted in *Grace I*, 665 F.2d at 1203).[14]  As Justice Clark explained in

*Cox II*, 18 U.S.C. § 1507 was "written by members of [the Supreme Court] after disturbances . . .

occurred at buildings housing federal courts."  *Cox II*, 379 U.S. at 585 (Clark, J., concurring and

dissenting).[15]

　　　　In *Grace I*, the D.C. Circuit compared the total ban on expressive activity set out in 40

U.S.C. § 13k unfavorably to the more narrowly drawn provision in 18 U.S.C. § 1507.  *See Grace*

*I*, 665 F.2d at 1203.  Specifically, the Court explained that 18 U.S.C. § 1507 "prohibits

---

[14] 18 U.S.C. § 1507 has the same operative language today; the only changes since 1976 to the statute's language are (1) the fine provision was changed from "fined not more than $ 5,000" to "fined under this title[,]" and (2) the addition of the following sentence: "Nothing in this section shall interfere with or prevent the exercise by any court of the United States of its power to punish for contempt."  18 U.S.C. § 1507.

[15] The Supreme Court decided two cases in 1965 called *Cox v. Lousiana*, 379 U.S. 536 (1965) ("No. 24") ("*Cox I*") and 379 U.S. 559 (1965) ("No. 49") ("*Cox II*").  In the excerpt cited, Justice Clark was "concurring in No. 24 and dissenting in No. 49."  *Cox II*, 379 U.S. at 585 (Clark, J., concurring and dissenting).  Although the constitutionality of 18 U.S.C. § 1507 has not been directly challenged, in addressing a challenge to the constitutionality of a Louisiana statute, which "was taken *in haec verba* from a bill which became 18 U.S.C. § 1507 (1958 ed.)," *Cox II*, 379 U.S. at 585 (Clark, J., concurring and dissenting), the Supreme Court held that the Louisiana statute was a facially "valid law dealing with conduct subject to regulation so as to vindicate important interests of society and that the fact that free speech is intermingled with such conduct does not bring with it constitutional protection."  *Cox II*, 379 U.S. at 564.  The Supreme Court found, furthermore, that the statute was "precise" and "narrowly drawn." *Id.* at 562.  The Louisiana statute is identical to 18 U.S.C. § 1507 except for the specifics of the fine provision and the fact that the Louisiana statute refers to "a court of the State of Louisiana" rather than "a court of the United States."  *Compare* LA. REV. STAT. ANN. § 14:401 *with* 18 U.S.C. § 1507.

expressive conduct on the Supreme Court grounds designed to influence Supreme Court Justices or to interfere with the administration of justice[,]" and concluded that it was "unable to find any other significant governmental interest to justify the absolute prohibition of all expressive conduct contained in section 13k[.]" *Id.* at 1194, 1203.  The D.C. Circuit therefore rejected the government's argument that the total ban on expressive conduct was necessary "to maintain the dignity and decorum of the Supreme Court." *Id.* at 1203.  While the Circuit acknowledged that "it would appear that this is the sole justification of the statute advanced in the legislative history" for 40 U.S.C. § 13k, the Circuit "[did] not believe that this concern alone is sufficient to justify the absolute prohibition of free expression contained in this statute." *Grace I*, 665 F.2d at 1203; *see also id.* at 1203 n.18 (citing, *e.g.*, 95 Cong. Rec. 8962 (1949) (statement of Rep. Celler) ("(All) this bill does . . . is to apply the same rules to the Supreme Court building and its adjoining grounds as are now applicable to the Capitol itself-no more and no less."); *id.* at 1204 ("[E]ven if the asserted interest [in the 'peace' and 'decorum' of the Supreme Court] is legitimate by itself, it cannot justify the total ban at issue here.").  Thus, the D.C. Circuit found the statute "unconstitutional and void." *Id.* at 1194.

In its decision, the D.C. Circuit analogized the challenged statute with the "similarly worded" statute governing the policing of the Capitol Building and grounds.  The Circuit pointed out that the three-judge panel in *Jeannette Rankin Brigade II*, 342 F. Supp. at 585, had "unequivocally stated, '[the] desire of Congress, if such there be, to function in the 'serenity' of a 'park-like setting' is fundamentally at odds with the principles of the First Amendment.'" *Grace I*, 665 F.2d at 1204 (quoting *Jeannette Rankin Brigade II*, 342 F. Supp. at 585).  Acknowledging the different institutions that were the focus of the Capitol Grounds statute and the precursor to the challenged statute, the Circuit nevertheless found the constitutional infirmity the same, explaining that, "while the Capitol and Supreme Court buildings house different government

entities, justifying different restrictions on free expression, . . . an interest in 'the glorification of a form of government through visual enhancement of its public buildings' can no more justify an absolute prohibition of free expression on the Supreme Court grounds than on the grounds of the United States Capitol."  *Id.* (no citation provided).  The Circuit further explained that:

> The sight of a sole picketer may indeed mar an otherwise pristine morning or perfectly centered snapshot.  However, it is just that annoyance-if such be the case-that may cause bystanders or passerby to stop and take notice, to become aware of an issue, to formulate a response to a companion.  This awareness and interchange is, in part, precisely what the First Amendment is designed to protect.

*Id*.  The Circuit went so far as to emphasize that "we believe that it would be tragic if the grounds of the Supreme Court, unquestionably the greatest protector of First Amendment rights, stood as an island of silence in which those rights could never be exercised in any form."  *Id*. at 1205.  While noting a preference "to adopt a narrowing construction of the statute in order to avoid a holding that section 13k is unconstitutional," the Circuit nevertheless concluded that a "validating construction is simply impossible here" where the legislative history is "slim" and "suggests only the desire on the part of Congress to surround the Court with the same cordon of silence that Congress attempted to place around the Capitol," a measure found unconstitutional.  *Id*. at 1205-06.

Following the D.C. Circuit's clear rejection as facially unconstitutional of the precursor to the challenged statute, the Supreme Court took a narrower approach to its review of the statute.  By contrast to the D.C. Circuit, which held the entire statute unconstitutional, the Supreme Court limited its review to the Display Clause as the plaintiffs were threatened with arrest only for violation of that clause.  *United States v. Grace*, 461 U.S. 171, 175 (1983)

(hereinafter, "*Grace II*").[16] Upon review of the statute and its legislative history, the Supreme

Court concluded that "it is fair to say that the purpose of the Act was to provide for the

protection of the building and grounds and of the persons and property therein, as well as the

maintenance of proper order and decorum" and that, in particular, section 6, codified at 40

U.S.C. § 13k, "was one of the provisions apparently designed for these purposes." *Id*. at 182

(noting that "[a]t least, no special reason was stated for [the] enactment" of 40 U.S.C. § 13k).

The Supreme Court echoed the D.C. Circuit's decision in part, however, and expressed

the view that, while "[w]e do not denigrate the necessity to protect persons and property or to

maintain proper order and decorum within the Supreme Court grounds, . . . we do question

whether a total ban on carrying a flag, banner, or device on the public sidewalks substantially

serves these purposes." *Id*. Indeed, finding that "[a] total ban on that conduct is no more

necessary for the maintenance of peace and tranquility on the public sidewalks surrounding the

building than on any other sidewalks in the city[,]" the Supreme Court found the Display Clause

unconstitutional as applied to the public sidewalks surrounding the Supreme Court. *Id.* at 182-84

(explaining that "this is not to say that those sidewalks, like other sidewalks, are not subject to

reasonable time, place, and manner restrictions, either by statute or by regulations"). The

Supreme Court thus "affirmed" the judgment of the D.C. Circuit "to the extent indicated by [its]

opinion" with respect to the Display Clause as applied to the sidewalks surrounding the Court,

and "otherwise vacated" the D.C. Circuit's decision without reaching the broader questions of

the facial constitutionality of the Display Clause or the statute as a whole. *Id*. at 184.[17]

---

[16] The Supreme Court explained that, while the D.C. Circuit's opinion could be read as finding the entire statute unconstitutional, "the decision must be read as limited" to the Display Clause of the statute. *Grace II*, 461 U.S. at 175 n.5.

[17] The Supreme Court, notably, also refrained from comment about how the D.C. Court of Appeals had thus far construed the statute. The Supreme Court in *Grace II* explained that appellee Thaddeus Zywicki consulted with an attorney before distributing handbills regarding oppression in Guatemala on the sidewalk in front of the Supreme

Justice Marshall concurred in part and dissented in part with this decision, finding the

Display Clause of 40 U.S.C. § 13k "plainly unconstitutional on its face" and asserting that he

"would not leave visitors to this Court subject to the continuing threat of imprisonment if they

dare to exercise their First Amendment rights once inside the sidewalk." *Grace II*, 461 U.S. at

185, 188 (Marshall, J., concurring in part and dissenting in part) (emphasis and footnote

omitted).  More clearly aligning with the D.C. Circuit's decision, Justice Marshall concluded that

it "is not a reasonable regulation of time, place, and manner for it applies at all times, covers the

entire premises, and, as interpreted by the Court, proscribes even the handing out of a leaflet and,

presumably, the wearing of a campaign button as well." *Id*. at 185-86 (citations omitted).

Justice Marshall would thus have found the Display Clause of the statute unconstitutional

"[s]ince the continuing existence of the statute will inevitably have a chilling effect on freedom

of expression, there is no virtue in deciding its constitutionality on a piecemeal basis." *Id*. at

184; *see also id*. at 187 (noting that the Supreme Court has "repeatedly recognized that a statute

which sweeps within its ambit a broad range of expression protected by the First Amendment

should be struck down on its face"); *id*. at 188 ("As Justice Brennan stated in his opinion for the

Court in [*NAACP v. Button*], First Amendment freedoms 'are delicate and vulnerable' and '[the]

---

Court, and was informed by his attorney "that the Superior Court for the District of Columbia had construed the statute that prohibited leafleting, 40 U.S.C. § 13k, to prohibit only conduct done with the specific intent to influence, impede, or obstruct the administration of justice." *Grace II*, 461 U.S. at 173-74 (citing *United States v. Ebner*, No. M-12487-79 (D.C. Super. Ct. Jan. 22, 1980)).  Furthermore, when Zywicki was told he would be arrested if he continued to distribute leaflets, he "complained that he was being denied a right that others were granted, referring to the newspaper vending machines located on the sidewalk." *Id*. at 174.  The Supreme Court noted that the *Ebner* case was on appeal pending the outcome of its decision in *Grace II*, but otherwise made no comment regarding the construction of the statute, including the purported intent requirement it attributed to the D.C. Superior Court.  *See id*. at 173-74 & n.2.  Following *Grace II*, the appeal in the *Ebner* case was evidently dismissed on the "the joint motion of the parties to dismiss appeals[.]"  *See* Order, *Turner v. United States*, No. M-5572-79; *United States v. Ebner*, No. 12487-79 (D.C. undated); Superior Court docket for *United States v. Ebner*, No. M-12487-79 (noting "Order received from the D.C.C.A. dismissing said appeal" on June 15, 1983).  As explained below, the D.C. Court of Appeals does not rely on the decision in *Ebner* for its limiting construction of the challenged statute, nor does it currently graft an intent requirement on the challenged statute.

threat of sanctions may deter their exercise almost as potently as the actual application of

sanctions.'" (quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963) (emphasis omitted)).

Following the Supreme Court's decision in *Grace II*, the statute was recodified in 2002

at 40 U.S.C. § 6135 with only minor stylistic changes as part of the revision of Title 40 of the

United States Code.  *See* Pub. L. No. 107-217, § 1, 116 Stat. 1183 (2002); H.R. Rep. No. 107-

479, at 1-3, reprinted at 2002 U.S.C.C.A.N. 827, 828-29 ("Although changes are made in

language, no substantive changes in the law are made."); Defs.' Mem. in Supp. of Defs.' Mot. to

Dismiss or in the Alternative, for Summ. J., ECF No. 14 ("Defs.' Mem."), at 5 n.1.  After 2004,

prosecutions under the statute may occur in the District Court for the District of Columbia in

addition to the Superior Court of the District of Columbia, where any prosecutions before 2004

took place.  *See* 40 U.S.C. § 6137(b); Declaration of Timothy Dolan ("Dolan Decl."), ECF No.

14-1, ¶ 8.[18]

### 3.     The District of Columbia Court of Appeals' Limiting Construction of the Assemblages Clause and Upholding of the Challenged Statute

The Supreme Court's decision in *Grace II* focused only on the constitutionality of the

Display Clause in 40 U.S.C. § 13k as applied to the sidewalks surrounding the Supreme Court's

grounds, but left unresolved the facial constitutionality of the Display Clause and Assemblages

Clause.  In a series of subsequent cases, the D.C. Court of Appeals has examined both the

Assemblages Clause and the Display Clause of 40 U.S.C. § 13k, and its successor, 40 U.S.C. §

6135, and found both clauses to be constitutional.  A review of the decisions, which are not

binding on this Court, underscores the extent to which the local courts have struggled to save the

challenged statute from constitutional challenge.  As with the Capitol Grounds statute, "[t]he

---

[18] To date, no prosecutions under this statute have occurred in the District Court for the District of Columbia.  *See* Dolan Decl. ¶ 8.

local courts of the District of Columbia have . . . felt unable to recognize [the constitutional propriety of the statute] without putting a substantial gloss upon [the statute] by an expansive interpretation of its terms." *Jeannette Rankin Brigade II*, 342 F. Supp. at 585.

At the outset, the government acknowledges, and the D.C. Court of Appeals "recognized[,]" that "the literal language of section 6135 may be read to prohibit *any type* of group activity on the Court grounds, including congregation on the plaza by groups of tourist[s], or even by Court employees." Defs.' Mem. at 7 (emphasis added). Rather than declare the statute, or at least the Assemblages Clause, unconstitutional, however, the D.C. Court of Appeals instead imposed a limiting construction upon the Assemblages Clause to "save it from any possible constitutional challenge." *Id.* Thus, the D.C. Court of Appeals has found the clause constitutional in challenges brought over the last two decades only by adopting a limiting construction of the Assemblages Clause. Notably, in these decisions, the D.C. Court of Appeals has not grappled with the panel decision in *Jeannette Rankin Brigade II* regarding the ineffectiveness of a limiting construction to cure the constitutional defects in the closely analogous Capitol Grounds statute, 40 U.S.C. § 193g, nor the D.C. Circuit's similar discussion in *Grace I* regarding 40 U.S.C. § 13k.

By contrast to the Assemblages Clause, the local courts have not expressly adopted a limiting construction of the Display Clause. Yet, the local courts' opinions examining the Display Clause follow a long line of cases upholding the constitutionality of the Assemblages Clause, and the statute, because of the limiting construction of the Assemblages Clause.

Indeed, while not binding on this Court, the government urges this Court to accept the D.C. Court of Appeals' limiting construction of the Assemblages Clause before undertaking its constitutional analysis of the statute. *See, e.g.*, Defs.' Mem. at 20-21 (arguing that "[b]ecause there have never been any prosecutions under the statute in federal court, this is, for all practical

purposes, the definitive judicial construction of the statute" and asserting that "the District of Columbia courts have had no difficulty in determining that, limited in this way, the statute is not overly broad because it only prohibits the types of activity that are consistent with the legitimate interests it is intended to address" (citation omitted)).  This Court thus briefly reviews how the local D.C. courts have construed and limited this statute.

The Court first addresses the Assemblages Clause cases.  In *United States v. Wall*, 521 A.2d 1140, 1142 (D.C. 1987), the D.C. Court of Appeals reversed a decision by the trial court that, while Wall's conduct violated 40 U.S.C. § 13k, the application of that statute to his activity would be unconstitutional because the plaza area and main steps of the Supreme Court are public fora "available for the free expression of ideas under the [F]irst [A]mendment, so long as the Supreme Court is not in session."  The D.C. Court of Appeals, while not determining whether the Supreme Court plaza and main entrance steps of the Supreme Court were public or nonpublic fora, found that the Assemblages Clause was both reasonable and viewpoint neutral, and thus constitutional, if the plaza and main entrance steps of the Supreme Court were considered nonpublic fora.  *Id*. at 1142, 1144.  In addition, the D.C. Court of Appeals concluded this clause was a reasonable time, place, and manner restriction, and thus constitutional, if those areas were considered public fora.  *Id*.  In doing so, the court concluded that the Assemblages Clause was not overbroad, and, in fact, was "narrowly drawn to serve" the "'significant' governmental interests" articulated by the government in that case – namely (1) "to permit the unimpeded access and egress of litigants and visitors to the Court," and (2) "to preserve the appearance of the Court as a body not swayed by external influence."  *Id*. at 1144-45.  The court found that these interests were reflected in the statute's provisions and legislative history, which suggested that the purpose of the statute "was to provide for the protection of the building and grounds of the Supreme Court, and of persons and property therein, as well as to maintain proper order and

decorum." *Id*. at 1144 n.6 (citing *Grace II*, 461 U.S. at 182).  *But see id*. at 1145 (Ferren, J.,

concurring) (agreeing that the Assemblages Clause "is not unconstitutional" if the plaza and

main entrance steps are considered a nonpublic forum, but "not prepared to say that the blanket

prohibition against processions or assemblages . . . amounts to 'reasonable time, place and

manner regulations' that 'are narrowly tailored to serve a significant government interest, and

leave open ample alternative channels of communication'" if the plaza and steps are considered a

public forum (quoting *Grace II*, 461 U.S. at 177)).

The D.C. Court of Appeals next examined the Assemblages Clause in *Pearson v. United*

*States*, 581 A.2d 347 (D.C. 1990).  There, the court considered whether, as the appellants

contended, recent Supreme Court precedent following *Wall* – namely *Ward v. Rock Against*

*Racism*, 491 U.S. 781 (1989), *Frisby v. Schultz*, 487 U.S. 474 (1988), and *Boos v. Barry*, 485

U.S. 312 (1988) – meant that section 13k (as well as a separate, related regulation) were "far

broader than necessary to achieve any legitimate governmental objectives and consequently fail

to meet the narrowly tailored standard."  *Pearson*, 581 A.2d at 351 (internal quotation marks

omitted).  The *Pearson* court concluded that none of these intervening cases altered the court's

analysis regarding the constitutionality of the Assemblages Clause.  *See id*. at 354-55.  The court

acknowledged, in response to the appellants' overbreadth claim, that "[s]uch an absolute ban on

any group activity is not supported by the government's legitimate and important interests in

protecting the integrity of the Court, preventing the appearance of judicial bias, and safeguarding

the Court grounds and personnel."  *Id*. at 356-57 (footnotes omitted).  Nevertheless, the court

confirmed that the Assemblages Clause is, as the *Pearson* trial court and the *Wall* court had

found, "susceptible to a narrowing construction, confining the scope of the clause to protection

of 'the [Supreme Court] building and grounds and of persons and property within, as well as the

maintenance of proper order and decorum,' and 'to preserve the appearance of the Court as a

body not swayed by external influence.'" *Id.* at 357 (internal citation omitted) (quoting *Grace II*, 461 U.S. at 182-83; *Wall*, 521 A.2d at 1144); *see also id.* at 358 (noting that "there is no requirement that a limiting construction must be derived from the express language of the statute, merely that the statute itself be susceptible to the narrowing construction"). With that limiting construction, the court concluded that the statute could withstand the appellants' overbreadth challenge. *Id.* at 358-59.

Following *Pearson*, the D.C. Court of Appeals again examined the Assemblages Clause, holding expressly in *Bonowitz v. United States*, 741 A.2d 18, 22 (D.C. 1999), that "the Supreme Court plaza is a nonpublic forum" because of the Supreme Court's "selective process of allowing only certain classes of speakers access to the plaza and requiring individual members of these classes to obtain advance permission[.]" Relying on the "two primary purposes" of section 13k, as articulated in *Wall* – "to permit the unimpeded access and egress of litigants and visitors to the Court, and to preserve the appearance of the Court as a body not swayed by external influence," *id.* at 23, – the Court of Appeals again found that "'13k's prohibition on processions and assemblages in the plaza area and main entrance steps of the Supreme Court is reasonable'" and viewpoint neutral. *Id.* (quoting *Wall*, 521 A.2d at 1144). Furthermore, relying on *Pearson*'s limiting construction of the Assemblages Clause, the Court of Appeals rejected the appellants' argument that the statute was unconstitutionally vague. *See id.*[19]

---

[19] The court also addressed, in a footnote, the trial court's assertion, in dicta, that application of a so-called "tourist standard" may be appropriate for section 13k, although the D.C. Court of Appeals had not yet applied that standard – employed in rulings brought pursuant to a D.C. Code regulation "dealing with buildings associated with the legislative branch" – in rulings related to section 13k. *See Bonowitz*, 741 A.2d at 23 n.4 (citing *Berg v. United States*, 631 A.2d 394, 398 (D.C. 1993)). The D.C. Court of Appeals has imposed the "tourist standard" in cases involving the U.S. Capitol Rotunda in order "to save content-neutral statutes regulating the time, place, and manner of expression from unconstitutionality in their application." *Berg*, 631 A.2d at 398. The standard "restricts the scope of statutes by penalizing only conduct that is more disruptive or more substantial (in degree or number) than that normally engaged in by tourists and others and routinely permitted." *Id.* (citation and internal quotation marks omitted). In *Bonowitz*, the trial court stated that "'it may be that the terms "order and decorum of the court" necessarily confine themselves to activity more disruptive or more substantial (in degree or number) than normally engaged in by tourists.'" *Bonowitz*, 741 A.2d at 23 n.4. Although the trial court believed that application of the

The D.C. Court of Appeals, as noted, has also addressed the Display Clause.  In *Potts v. United States*, 919 A.2d 1127 (D.C. 2007), for example, without relying on the limiting construction used to save the Assemblages Clause from unconstitutionality, the D.C. Court of Appeals found the Display Clause constitutional on its face and as applied to the appellants, who were part of a small group of protestors at the Supreme Court plaza.  The court also, *inter alia*, rejected the appellants' claim that the Display Clause was unconstitutionally vague, explaining that "[t]he Supreme Court's decision in *Grace*, coupled with the plain text of the statute, makes it clear that protestors may not demonstrate on the Supreme Court steps and plaza." *Id*. at 1130. Even more recently, in *Lawler v. United States*, 10 A.3d 122, 126 (D.C. 2010), the D.C. Court of Appeals affirmed convictions under the Display Clause, noting that "[a]ppellants' actions here, in displaying a large banner to convey the message that the death penalty should be abolished, clearly fell within the reach of the statute."  Finally, in *Kinane v. United States*, 12 A.3d 23 (D.C. 2011), *cert. denied*, 132 S. Ct. 574, 181 L. Ed. 2d 424 (2011), the D.C. Court of Appeals affirmed the conviction under the Display Clause of appellants demonstrating on the plaza and within the Supreme Court building regarding Guantanamo detainees and construed the statute as "prohibit[ing] expression such as picketing, leafleting, and wearing t-shirts with protest slogans because such expression is 'designed . . . to bring into public notice [a] party, organization, or movement[.]'" *Kinane*, 12 A.3d at 27 (quoting *Potts*, 919 A.2d at 1130).

As this discussion reveals, the D.C. courts have for decades affirmed convictions under the challenged statute but without delving deeper into constitutional analysis than did the decisions in *Wall* and *Pearson*.  Rather, later D.C. decisions have simply followed in line with

---

tourist standard seemed "appropriate" for section 13k, the D.C. Court of Appeals declined to apply the standard "[b]ecause of the manifest difference between the legislative branch—which must be accessible to expressions of popular opinion—and the judicial branch—which renders opinions free from the pressure of popular opinion." *Id*. The trial court's instinct to graft a tourist standard on section 13k simply underscores the overbreadth of the statute.

*Wall* and *Pearson* in upholding the statute from constitutional challenge.  Yet, those earlier decisions, as noted, failed to engage fully with the reasoning of the D.C. Circuit's decision in *Grace I*, which, even if vacated in part, provided a persuasive analysis.  They likewise failed to grapple at any length with the panel's decision in *Jeannette Rankin Brigade II*, and the fate of the closely analogous Capitol Grounds statute.

### 4.    Challenges to Related Regulations in this Jurisdiction

Other restrictions related to the Supreme Court Building and grounds have also been subject to constitutional scrutiny in this jurisdiction.  In 2000, in *Mahoney v. Lewis*, a district court rejected plaintiffs' challenge to the constitutionality of Regulation Six, promulgated by the Marshal of the Supreme Court, pursuant to 40 U.S.C. § 13l.  *See Mahoney v. Lewis*, No. 00-1325, 2000 U.S. Dist. LEXIS 10348 (D.D.C. June 23, 2000), *aff'd*, No. 00-5341, 2001 U.S. App. LEXIS 4014 (D.C. Cir. Feb. 23, 2001).  This regulation sets forth restrictions on the size, composition, and number of signs used to protest and picket outside of the Supreme Court.[20] The court granted summary judgment for the defendant, finding, *inter alia*, that Regulation Six

---

[20] In that case, Regulation Six is described as follows:

> Regulation Six states that (1) no signs shall be allowed except those made of cardboard, posterboard, or cloth; (2) supports for signs must be entirely made of wood, have dull ends, may not be hollow, may not exceed three-quarter inch at their largest point, and may not include protruding nails, screws, or bolt-type fastening devices; (3) hand-carried signs are allowed regardless of size; (4) signs that are not hand-carried are allowed only if they are no larger than four feet in length, four feet in width, and one-quarter inch in thickness and may not be elevated higher than six feet; they may not be used so as to form an enclosure of two or more sides; they must be attended by an individual within three feet of the sign at all times; and they may not be arranged in such a manner as to create a single sign that exceeds the four feet by four feet by one-quarter inch size limitations; and (5) no individual may have more than two non-hand-carried signs at any one time.  *See* Reg. Six (Pl's Ex. A).  The Regulation further provides that "notwithstanding the above, no person shall carry or place any sign in such a manner as to impede pedestrian traffic, access to and from the Supreme Court Plaza or Building, or to cause any safety or security hazard to any person." *Id.*  The stated purposes of this Regulation are "to protect the Supreme Court Building and grounds and persons and property thereon, and to maintain suitable order and decorum within the Supreme Court Building and grounds."  Any person failing to comply with Regulation Six is subject to a fine and/or imprisonment.

*Mahoney v. Lewis*, 2000 U.S. Dist. LEXIS 10348, at *2-4.

was (1) content neutral, (2) narrowly tailored to serve significant government interests, and that it (3) left open ample alternative means of communication.  *See Mahoney*, 2000 U.S. Dist. LEXIS 10348, at *11-22.  In finding the statute constitutional under the First Amendment, the district court notably emphasized that Regulation Six does not "ban speech entirely," *id*. at *12, but instead constitutes a valid time, place, and manner regulation.  While the court asserts broadly that "[a]nyone can protest or picket *outside the Supreme Court* as long as their signs conform to the requirements of Regulation Six[,]" *id*. at *12 (emphasis added), the decision appears to focus only on signage displayed on *public sidewalks* surrounding the Supreme Court, *see id*. ("According to Marshal Bosley's testimony, he enacted Regulation Six because[,]" *inter alia*, "he determined that excessively large signs erected on the Supreme Court sidewalks threaten the safety and security of Court personnel, visitors, demonstrators and pedestrians using the sidewalk."); *id*. at *17 (noting that "Regulation Six serves several significant and judicially recognized governmental interests[,]" including "protecting the safety and security of Court personnel, visitors, demonstrators, and pedestrians using the sidewalk, ensuring access and the appearance of access to the Court, allowing passersby and visitors to the Court an unobstructed view of the Court building and maintaining suitable order and decorum within the grounds of the Supreme Court"); *id*. at *20 (noting that the requirement "that the regulation leave open ample alternative channels of communication, is easily met here" because "Plaintiffs may still protest on the sidewalks of the Supreme Court at the time that they prefer, with signs").  Thus, that decision, while similarly related to the display of signage "outside the Supreme Court," did not reference nor contemplate the broader ban on displays of signage, of any size, number, or composition, enshrined in the challenged statute as related to the Supreme Court plaza.[21]

---

[21] The *Mahoney* court also rejected the plaintiffs' due process challenge to 40 U.S.C. § 13l, which is now codified with slight stylistic revisions at 40 U.S.C. § 6102, and authorizes the Marshal to "prescribe such regulations,

**E.      The Supreme Court Plaza Today**

**1.      Description of the Supreme Court Plaza**

The plaintiff's challenge relates to enforcement of 40 U.S.C. § 6135 on the plaza area

outside of the Supreme Court building.  Thus, a brief description of the plaza is necessary.  The

Supreme Court plaza is oval in shape and approximately 252 feet in length from North to South

at the largest part of the oval, and approximately 98 feet from East to West from the sidewalk to

the steps leading up to the front entrance of the Supreme Court building.  *See* Am. Compl. ¶ 11;

Pl.'s Ex. 5, ECF No. 18-5, at 1-2 ("The Court Building" from the Supreme Court website,

available at http://www.supremecourt.gov/about/courtbuilding.aspx); Defs.' Statement of

Material Facts Not in Dispute ("Defs.' Facts"), ECF No. 23, ¶¶ 1-2; Dolan Decl. at ¶¶ 2, 6; *id.* at

5 (drawing of Supreme Court grounds, including plaza).  The marble plaza "is separated from the

sidewalk between First Street, N.E., and the Supreme Court building grounds by a few small

steps which lead up about 3 feet to the plaza."  Am. Compl. ¶ 11; *see* Dolan Decl. ¶ 6.  "While

the perimeter sidewalks are made of concrete, the plaza is made of marble and is visually distinct

from the sidewalk."  Defs.' Facts ¶ 3; *see* Dolan Decl. ¶ 6.  Specifically, the declaration of

Timothy Dolan, Deputy Chief of the Supreme Court of the United States Police, states that "[t]he

plaza is set off from the front sidewalk by a set of eight steps, and a marble wall separates it from

the natural space on the North and South sides of the plaza."  Dolan Decl. ¶ 6.  "Flanking these

steps is a pair of marble candelabra with carved panels on their square bases depicting: Justice,

---

approved by the Chief Justice of the United States, as may be deemed necessary for the adequate protection of the
Supreme Court Building and grounds and of persons and property therein, and for the maintenance of suitable order
and decorum within the Supreme Court Building and grounds."  40 U.S.C. § 13l(a) (quoted in *Mahoney*, 2000 U.S.
Dist. LEXIS 10348, at *2 n.2).  In doing so, the court noted correctly that "Section 13[l] was implicitly approved by
the Supreme Court in *Grace*, where it noted that Supreme Court sidewalks are 'subject to reasonable time, place,
and manner restrictions, either by statute or by regulations issued pursuant to 40 U.S.C. § 13[l]."  *Mahoney*, 2000
U.S. Dist. LEXIS 10348, at *24.

holding sword and scales, and The Three Fates, weaving the thread of life."  Pl.'s Ex. 5 at 2.

"On either side of the plaza are fountains, flagpoles, and benches."  *Id*.  "The plaza ends with a

second set of steps, with thirty-six more steps leading to the main entrance of the Supreme

Court."  *Kinane*, 12 A.3d at 25 n.1.

The plaza is "open to the public 24 hours a day, except under special circumstances when

it is closed by the Marshal," and "[t]he public is free to enter and leave the Supreme Court plaza

at all hours."  Am. Compl. ¶ 13.  Besides its function as a working office building for the Justices

of the Supreme Court, and their staff, as well as other Court employees, the Supreme Court

attracts numerous tourists, and, in 2011, for example, was host to 340,000 visitors.  Dolan Decl.

¶ 2.  There is "no gate" or "fence" separating the plaza from other parts of the Supreme Court

grounds, Am. Compl. ¶ 14, which "include the area within the curbs of the four streets

surrounding the Court, *i.e.*, First Street, N.E.; Maryland Avenue, N.E.; Second Street, N.E.; and

East Capitol Street," Dolan Decl. ¶ 3 (citing 40 U.S.C. § 6101(b)).

### 2.     Types of Activities Permitted on Supreme Court Plaza

Pursuant to 40 U.S.C. § 6121, the Marshal of the Supreme Court and the Supreme Court

Police have the authority, *inter alia*, "to police the Supreme Court Building and grounds and

adjacent streets to protect individuals and property" and "to protect – (A) the Chief Justice, any

Associate Justice of the Supreme Court, and any official guest of the Supreme Court; and (B)

any officer or employee of the Supreme Court while that officer or employee is performing

official duties[.]"  Under the authority of 40 U.S.C. § 6135, as limited by case law, the Supreme

Court Police have distinguished between the types of activities permitted on the plaza and those

permitted on the surrounding sidewalks.  Specifically, "demonstrations or other types of

expressive activity" on the plaza that are deemed violative of the challenged statute are not

permitted.  Defs.' Facts ¶¶ 5-6; Dolan Decl. ¶ 7.

While the plaintiff states that the "Supreme Court plaza has historically been used for First Amendment activities," Am. Compl. ¶ 12, the Deputy Chief of the Supreme Court Police disputes this characterization and explains that "some form of expressive activity is allowed on the Supreme Court plaza" only in "two very limited circumstances." Dolan Decl. ¶ 9. These two circumstances are where: (1) "the Court allows attorneys and parties in cases that have been argued to address the media on the plaza immediately following argument[,]" which "typically occurs for less than one hour, and only on the approximately 40 days each year when the Court hears oral arguments" [22] and (2) "the Court on very limited occasion allows commercial or professional filming on the plaza[,]" in which case "[s]uch filming must be approved by the Court's Public Information Officer, the project in question must relate to the Court, and substantial filming projects are typically authorized only on weekends or after working hours." Dolan Decl. ¶ 9.

If the Supreme Court Police determine that individuals or groups are in violation of section 6135, the police "inform them of the violation and of the fact that they will be arrested if they do not discontinue their conduct or leave the plaza." Defs.' Facts ¶ 7; Dolan Decl. ¶ 7. The Deputy Chief of the Supreme Court Police explains that "[t]ypically, multiple warnings are given to ensure that the individuals understand that their conduct is illegal and have the opportunity to conform their conduct to the law." Dolan Decl. ¶ 7; Defs.' Facts ¶ 7. The Supreme Court Police "have employed substantially this same practice" over the last twenty-five years. Dolan Decl. ¶ 7.

Sidewalks surrounding the Supreme Court grounds do not fall within these limitations, because the Supreme Court has held that the Supreme Court's perimeter sidewalks are a public

[22] In that case, "[m]embers of the media must have press credentials issued or recognized by the Supreme Court's Public Information Office to participate in this session, which occurs near the sidewalk on the southern portion of the plaza." Dolan Decl. ¶ 9.

forum and that section 6135's restrictions "are unconstitutional as applied to those sidewalks."

Dolan Decl. ¶ 5 (citing *Grace II*, 461 U.S. 171).  Accordingly, the Supreme Court Police "do not

enforce section 6135 on the perimeter sidewalks[,]" and "[v]arious forms of demonstrations and

protest regularly occur on the perimeter sidewalk directly in front of the Court."  Dolan Decl. ¶

5; Defs.' Facts ¶ 4.  If the Supreme Court Police are in contact "with representatives of

organizations planning to protest at the Court, those individuals are typically informed that they

have the right to demonstrate on the sidewalk, but not elsewhere at the Court."  Dolan Decl. ¶ 5.

It is against this backdrop, where the challenged statute and its precursors have already

been subject to extensive scrutiny and notable disfavor, that the plaintiff brings his constitutional

challenge.

## II.    LEGAL STANDARD

Since the Court relies on materials outside the pleadings to resolve the plaintiff's claim,

the Court applies the standard for summary judgment.  Specifically, the Court has relied upon

Deputy Chief Dolan's declaration describing the Supreme Court plaza and the enforcement

policies and practices of the Supreme Court police in connection with the challenged statute.

Federal Rule of Civil Procedure 56 provides that summary judgment shall be granted "if the

movant shows that there is no genuine dispute as to any material fact and the movant is entitled

to judgment as a matter of law."  FED. R. CIV. P. 56(a).  The burden is on the moving party to

demonstrate that there is an "absence of a genuine issue of material fact" in dispute.  *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  In ruling on a motion for summary judgment, the

Court must draw all justifiable inferences in favor of the nonmoving party and shall accept the

nonmoving party's evidence as true.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986);

*Estate of Parsons v. Palestinian Auth.*, 651 F.3d 118, 123 (D.C. Cir. 2011); *Tao v. Freeh*, 27

F.3d 635, 638 (D.C. Cir. 1994).

The Court is only required to consider the materials explicitly cited by the parties, but may on its own accord consider "other materials in the record." FED. R. CIV. P. 56(c)(3).  For a factual dispute to be "genuine," *Estate of Parsons*, 651 F.3d at 123, the nonmoving party must establish more than "[t]he mere existence of a scintilla of evidence" in support of its position, *Anderson*, 477 U.S. at 252, and cannot simply rely on allegations or conclusory statements, *see Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).  Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor.  *See Anderson*, 477 U.S. at 250.  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Id.* at 249–50 (citations omitted).

While the only pending motion was filed by the defendants, and there is no pending motion filed by the plaintiff, since there are no genuine issues of material fact, and the defendant believes the record before the Court is "adequate" for this Court to resolve a facial challenge, *see* Tr. at 50-51 ("This is a facial challenge, and the record before the [C]ourt is adequate. . . . [W]e don't need discovery."), the Court shall exercise its authority to resolve this matter on the defendants' motion.  *See* FED. R. CIV. P. 56(f) ("After giving notice and a reasonable time to respond, the court may: (1) grant summary judgment for a nonmovant").  Pursuant to Federal Rule of Civil Procedure 56(f), the Court provided the parties notice and a reasonable time to respond as to "why the Court should not grant summary judgment to the nonmoving plaintiff, who has not moved for summary judgment, under Federal Rule of Civil Procedure 56(f) if there is no genuine dispute of fact on a given claim."  Minute Order (May 22, 2013).  As the plaintiff indicates correctly, the defendants have previously "argued that the record is 'adequate' and [have] pointed to no adjudicative facts that are in dispute."  Pl.'s Resp. to Defs.' Resp. to the

Court's Order to Show Cause, ECF No. 24 ("Pl.'s Resp."), at 5-6.[23]   The Court therefore concludes that resolving this matter on the defendants' motion and granting the nonmoving plaintiff summary judgment is appropriate.

## III.   DISCUSSION

The plaintiff challenges 40 U.S.C. § 6135 both on its face and as applied.   In his Amended Complaint, he raises five claims.   Specifically, he claims that both the Assemblages Clause and Display Clause of the statute (1) are facially unconstitutional under the First Amendment (Count I), (2) are overbroad and violate the First and Fifth Amendments (Count II), and (3) are unconstitutional under the First and Fifth Amendments because they are void for vagueness (Count III).   The plaintiff also claims that the Display Clause of the statute is unconstitutional (4) under the First Amendment, because, as applied, it "discriminates in favor of corporate speech and against political speech," and "discriminates in favor of speech supportive of the United States government and the Supreme Court and against speech critical of the United States government and the Supreme Court," (Count IV), and (5) under the Fifth Amendment because, as applied, "it discriminates in favor of [the] United States government, litigants before

_____

[23] In their response to the Court's minute order, the defendants did not "speculat[e] about what particular facts the Court may view as material," and suggested a "better course" for the Court: (1) "Plaintiff [could] file a formal motion for summary judgment along with a statement of material facts that are not in genuine dispute[,]" or, alternatively, (2) "the Court could issue an opinion ruling on Defendants' pending motion to dismiss" and "issue an order to show cause why summary judgment in [the plaintiff's] favor should not be entered[,]" so that "Defendants would be able to take an informed position on the issue because they would know which facts this Court views as material."   Defs.' Resp. to Order to Show Cause, ECF No. 21 ("Defs.' Resp."), at 2-3.   The defendants also expressed concern about the plaintiff's filing of an "errata" to his Opposition brief the night before oral argument, including exhibits "that were presumably intended to lend support to various factual assertions made in that brief."   *Id.* at 2.   Nothing in the defendants' response persuades the Court that a different "course" is more appropriate here, however.   Since the Court does not believe that there are any issues of material fact, and the defendants earlier acknowledged on the record at the oral argument that the record in this case was "adequate" to evaluate the plaintiff's facial challenge, *see* Tr. at 50-51, granting summary judgment for the nonmovant is both well within this Court's discretion pursuant to Federal Rule of Civil Procedure 56(f) and the best course here.   Furthermore, as the plaintiff notes, the non-record exhibits filed in his errata were all "previously cited in Plaintiff's brief."   Pl.'s Resp. at 5.   Thus, the defendants already had an opportunity to address these exhibits in their Reply brief in support of the instant motion.

the Supreme Court, and their attorneys, as speakers, and against private citizens as speakers."

(Count V).  Am. Compl. at 8-9.

In moving to dismiss the claim or, in the alternative, for summary judgment, the

defendants argue, *inter alia*, that because the Supreme Court plaza is a "nonpublic forum" under

First Amendment forum analysis, restrictions on speech activity must only be "reasonable and

content-neutral," criteria the statute easily satisfies under the limiting construction adopted by the

D.C. Court of Appeals in *Pearson v. United States*, 581 A.2d 347 (D.C. 1990).  *See* Defs.' Mem.

at 1, 17-29.  For the reasons explained below, the Court disagrees, rejects the defendants'

invitation to accept the D.C. Court of Appeals' limiting construction, or to create its own, and

finds the statute unconstitutional as unreasonable and overbroad under the First Amendment, and

void.[24]  The Court addresses below (1) the scope of the plaintiff's challenge to, and this Court's

review of, the statute, (2) a forum analysis of the Supreme Court plaza, and (3) the other

considerations – namely, that the statute is substantially overbroad and not susceptible to a

limiting construction – that ultimately require this Court to find 40 U.S.C. § 6135

unconstitutional on its face.

### A.   The Scope of the Plaintiff's Challenge and this Court's Review

As a preliminary matter, the Court must address the scope of the plaintiff's challenge to

the statute at issue and the plaintiff's standing to raise these claims.  While neither of the parties

explicitly addressed these issues in their briefs, the defendants suggested at oral argument that

"[i]t might be possible" for the Court to "construe the complaint" to find that the plaintiff does

not have standing to raise a claim regarding the Assemblages Clause.  *See* Tr. at 18-19.  It

---

[24] Since the Court finds the statute plainly unconstitutional on its face as unreasonable and overbroad, as alleged in
Counts I and II of the Amended Complaint, it ends its analysis there and declines to reach the plaintiff's other
claims, namely Count II as related to the Fifth Amendment and Counts III through V.  The Court also denies the
plaintiff's request for discovery made on the record at the April 26, 2013 oral argument, *see* Tr. 30-33, as discovery
is unnecessary to rule on the plaintiff's facial challenge.

appears to be undisputed that the plaintiff's conduct is covered by the Display Clause of the statute. *See* Defs.' Reply in Supp. of Mot. to Dismiss or in the Alternative, for Summ. J. ("Defs.' Reply"), ECF No. 17, at 15 (explaining that "[t]his plaintiff was arrested for wearing a sign that protested against the treatment of minority groups by police"); *id.* at 15-16 (commenting that "[n]o one of common intelligence could doubt that the sign he wore violated the statute").[25]

The government's suggestion at oral argument that the plaintiff may lack standing to challenge the Assemblages Clause and that the Court limit its review to the Display Clause as the Supreme Court did in *Grace II*, *see* Tr. at 19, must be rejected for at least two reasons. First, unlike in *Grace II*, the plaintiff here was formally charged in the Information with violation of the statute as a whole, and the plaintiff has expressed his intent to return with a group to assemble on the plaza in violation of the Assemblages Clause. *See* Am. Compl. ¶ 29 ("In addition to wearing a sign while on the Supreme Court Plaza as he did before, Mr. Hodge also desires to return to the plaza area in front of the Supreme Court building and picket, hand out leaflets, sing, chant, and make speeches, either by himself or with a group of like-minded individuals."). His challenge to the constitutionality of the statute as a whole is therefore properly before the Court. *See, e.g.*, *Lederman v. United States*, 291 F.3d 36, 41 (D.C. Cir. 2002) (plaintiff had standing to challenge entire regulation given his arrest for leafleting and his "intent to return . . . to engage in other expressive activity[,]" through which he "established a 'distinct and palpable' threat of future and 'direct injury'—arrest" (quoting *Meese v. Keene*, 481 U.S. 465, 472 (1987))).

---

[25] Although the plaintiff did "stand," a term used in the Assemblages Clause, he did not do so in a "procession[] or assemblage[][,]" which requires a group or at least more than one person. *See Grace I*, 665 F.2d at 1207 (MacKinnon, J., dissenting in part and concurring in part) (stating that the Assemblages Clause "applies to group activity only" and not "solitary conduct").

These facts are notably in contrast to the facts underlying the Supreme Court's decision in *Grace II* to limit its review to the Display Clause of the statute. There, the plaintiffs had not been arrested or charged, but only threatened with arrest; each was threatened with arrest on separate days while handing out leaflets or wearing a sign alone, and only on the sidewalk in front of the Supreme Court. The Supreme Court clarified that while the D.C. Circuit "purport[ed] to hold § 13k unconstitutional on its face," that decision "must be read as limited" to the Display Clause because "[e]ach appellee appeared individually on the public sidewalks to engage in expressive activity, and it goes without saying that the threat of arrest to which each appellee was subjected was for violating the prohibition against the display of a 'banner or device.'" *Id*. at 175 & n.5. Absent a formal charging instrument specifying the precise clause of the statute that the plaintiffs were accused of violating, the Supreme Court cabined its review to the precise facts underlying the constitutional challenge, which the Court found limited to enforcement of the Display Clause on the sidewalks surrounding the Supreme Court. *Id*. at 183.

Second, the expressive activities prohibited by the Assemblages Clause and Display Clause are related, or "intertwined," and require the same analysis. *See, e.g.*, *Christian Legal Soc'y Chapter of the Univ. of Cal. v. Martinez*, 130 S. Ct. 2971, 2985 (2010) (noting that "speech and expressive-association rights are closely linked" and "[w]hen these intertwined rights arise in exactly the same context, it would be anomalous for a restriction on speech to survive constitutional review under our limited-public-forum test only to be invalidated as an impermissible infringement of expressive association" (citing *Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984) (understanding associational freedom as "implicit in the right to engage in activities protected by the First Amendment")). Thus, while the Court considers the Assemblages Clause and Display Clause separately, the Court's analysis is essentially the same.

36

### B.      Forum Analysis

The First Amendment provides, in relevant part, that "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."  First Amendment freedoms "are delicate and vulnerable, as well as supremely precious in our society."  *NAACP v. Button*, 371 U.S. 415, 433 (1963).  Thus, the Supreme Court has warned that "[b]ecause First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity."  *Id.*  Nonetheless, "[n]othing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities."  *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 799-800 (1985).  Acknowledging that the government, "'no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated,'" *id.* at 800 (quoting *Greer v. Spock*, 424 U.S. 828, 836 (1976)), the Supreme Court "has adopted a forum analysis as a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes[,]" *id.*  Consequently, the defendants urge the Court to conduct a forum analysis of the Supreme Court plaza as the threshold issue in evaluating the constitutionality of the statute, and to find "that the Supreme Court plaza is a nonpublic forum under First Amendment analysis."  Defs.' Reply at 2.

In conducting a forum analysis, the Court "proceed[s] in three steps: first, determining whether the First Amendment protects the speech at issue, then identifying the nature of the forum, and finally assessing whether the [government's] justifications for restricting . . . speech 'satisfy the requisite standard.'"  *Mahoney v. Doe*, 642 F.3d 1112, 1116 (D.C. Cir. 2011)

(quoting *Cornelius*, 473 U.S. at 797).  For purposes of this analysis, government property is divided into three categories – traditional public forum, designated public forum, and nonpublic forum.  *Id*. The category "determines what types of restrictions will be permissible" on that property.  *Initiative & Referendum Inst. v. U.S. Postal Serv.*, 685 F.3d 1066, 1070 (D.C. Cir. 2012) (hereinafter, "*Initiative & Referendum Inst. II*").  First, a traditional public forum, such as a public street or park, is government property "that has 'by long tradition or by government fiat . . . been devoted to assembly and debate.'"  *Id*. (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983)); *see also Snyder v. Phelps*, 131 S. Ct. 1207, 1218 (2011) ("[W]e have repeatedly referred to public streets as the archetype of a traditional public forum, noting that time out of mind public streets and sidewalks have been used for public assembly and debate." (internal quotation marks and citations omitted)).  Any restriction based on the content of speech in a public forum "must satisfy strict scrutiny, that is, the restriction must be narrowly tailored to serve a compelling government interest." *Christian Legal Soc'y Chapter of the Univ. of Cal.*, 130 S. Ct. at 2984 n.11 (internal quotation marks and citations omitted); *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009) (noting that in a traditional public forum, "[r]easonable time, place, and manner restrictions are allowed, but any restriction based on the content of the speech must satisfy strict scrutiny, that is, the restriction must be narrowly tailored to serve a compelling government interest" (citations omitted)).  Second, a designated public forum is "property that 'the State has opened for use by the public as a place for expressive activity.'"  *Initiative & Referendum Inst. II*, 685 F.3d at 1070 (quoting *Perry Educ. Ass'n*, 460 U.S. at 45).  "[S]peech restrictions in such a forum are subject to the same strict scrutiny as restrictions in a traditional public forum." *Christian Legal Soc'y Chapter of the Univ. of Cal.*, 130 S. Ct. at 2984 n.11 (internal quotation marks and citation omitted).  Finally, a nonpublic forum is "'not by tradition or designation a forum for public communication.'"

*Initiative & Referendum Inst. II,* 685 F.3d at 1070 (quoting *Perry Educ. Ass'n*, 460 U.S. at 46).

In a nonpublic forum, the government "may 'reserve the forum for its intended purposes,

communicative or otherwise, as long as the regulation on speech is reasonable and not an effort

to suppress expression merely because public officials oppose the speaker's view.'" *Id.* (quoting

*Perry Educ. Ass'n*, 460 U.S. at 46).

Thus, if the Court concludes that the Supreme Court plaza is a "nonpublic forum," as the

defendants urge, "it is . . . black-letter law that . . . the government . . . can exclude speakers on

the basis of their subject matter, so long as the distinctions drawn are viewpoint neutral and

reasonable in light of the purpose served by the forum." *Davenport v. Wash. Educ. Ass'n*, 551

U.S. 177, 188-89 (2007).  As a nonpublic forum, the government would have the most leeway in

limiting access to the plaza for otherwise protected expressive activity.  Indeed, "[l]imitations on

expressive activity conducted on this last category of property must survive only a much more

limited review" than would be the case for public or designated public fora.  *Int'l Soc'y for*

*Krishna Consciousness v. Lee*, 505 U.S. 672, 678 (1992).

In contrast, the plaintiff argues that the Court should not allow "forum analysis to trump

traditional principles of First Amendment jurisprudence where, as here, the restriction at issue is

an absolute ban on a broad category of protected speech, rather than a narrow time, place, or

manner regulation."  Pl.'s Opp'n to Defs.' Mot. to Dismiss or in the Alternative, for Summ. J.

("Pl.'s Opp'n"), ECF No. 15, at 4.  In this regard, the plaintiff echoes the view that "courts must

apply categories such as 'government speech,' 'public forums,' 'limited public forums,' and

'nonpublic forums' with an eye toward their purposes — lest we turn 'free speech' doctrine into

a jurisprudence of labels."  *Pleasant Grove City*, 555 U.S. at 484 (Breyer, J., concurring).

"Consequently, we must sometimes look beyond an initial categorization . . . to ask whether a

government action burdens speech disproportionately in light of the action's tendency to further

a legitimate government objective." *Id.*  In any event, the plaintiff contends that, even assuming the Supreme Court plaza is a nonpublic forum, both the Assemblages Clause and the Display Clause are unconstitutional.  Pl.'s Opp'n at 14-15, 30.  The Court agrees with the plaintiff.

### 1.      The Plaintiff's Speech is Protected by the First Amendment

As a preliminary matter, this Court must "determin[e] whether the First Amendment protects the speech at issue." *Mahoney*, 642 F.3d at 1116 (citing *Cornelius*, 473 U.S. at 797).  In this case, the plaintiff stood on the Supreme Court plaza with a sign reflecting a message that the U.S. government sanctions the adverse treatment of "African Americans and Hispanic People" in order "to engage in expression on a political matter of public interest and importance and to raise public awareness about" this issue.  Am. Compl. ¶ 18.  "There is no doubt that as a general matter peaceful picketing[,]" as the Court will construe the plaintiff's standing with a sign, is an "expressive activit[y] involving 'speech' protected by the First Amendment." *Grace II*, 461 U.S. at 176 (collecting cases).  Moreover, the message reflected on the plaintiff's sign was speech addressing a matter of public concern, which "occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Snyder*, 131 S. Ct. at 1215 (quoting *Connick v. Myers*, 461 U.S. 138, 145 (1983) (internal quotations marks omitted)) (holding that the First Amendment affords such speech special protection because "speech concerning public affairs is more than self-expression; it is the essence of self-government" (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74-75 (1964) (internal quotations omitted)).

### 2.      Assumption That The Supreme Court Plaza Is A Nonpublic Forum

The Court next turns to "identifying the nature of the forum" at issue. *Mahoney*, 642 F.3d at 1116 (citing *Cornelius*, 473 U.S. at 797).  The defendants, as noted, vehemently urge the Court to follow the lead of the D.C. Court of Appeals and conclude that the Supreme Court plaza is a "nonpublic forum," which would permit the government to place restrictions on expressive

activity so long as the restriction is "reasonable" and "viewpoint neutral."  Defs.' Mem. at 17.

The defendants advance five separate arguments in support of their contention that "[t]he

policies and historical usage of the Supreme Court plaza make clear that it is a nonpublic forum,

as the District of Columbia Court of Appeals has consistently found."  Id. at 11.  First, the

defendants highlight the history of the Supreme Court plaza, and point out that the Supreme

Court plaza has not been used for assembly, communication between citizens, and the discussion

of public questions since at least 1949 when 40 U.S.C. § 13k was enacted.  Id. at 12.  Moreover,

the defendants argue that the two instances when the Supreme Court allows limited expression

on the Supreme Court plaza – first, when attorneys and parties in a case before the Court are

permitted to address the media after oral argument in the case, and, second, when the Supreme

Court allows filmmakers to film on the plaza – "do not alter [the plaza's] character as a

nonpublic forum, since they are a far cry from the type of demonstration in which [the plaintiff]

in this case was engaged."  Id. at 14.  Second, the defendants indicate that the current and past

practice of the Supreme Court police, in determining whether a particular activity is permitted on

the Supreme Court plaza, is to "look to the language of section 6135, utilizing the narrowing

construction of the Assemblages Clause that has been adopted by the District of Columbia

courts."  Id. at 12.  Third, the defendants aver that the "physical nature" of the Supreme Court

plaza also supports their theory that it is a nonpublic forum.  Id. at 13.  They point out that the

plaza is set off from the perimeter sidewalks by eight steps, and both the steps and the plaza are

made of marble stone, in contrast to the concrete steps "which are made of concrete like many

other sidewalks throughout the city[,]" such that "even a casual observer would have no

difficulty recognizing that this grand plaza is a very different type of space from the typical

sidewalk throughout the rest of the city of Washington."  Id. (citing Oberwetter v. Hilliard, 639

F.3d 545, 552-53 (D.C. Cir. 2011) (holding that the inside of the Jefferson Memorial is a

41

nonpublic forum in part based on the physical characteristics of the space).  The defendants

argue, furthermore, that a finding that the Supreme Court plaza is a "nonpublic forum" is

consistent with the Supreme Court's decision in *Grace II* that the sidewalks surrounding the

Supreme Court are public fora, and that the Supreme Court's "carv[ing] out" of the perimeter

sidewalks in *Grace II*, while declining to apply the same reasoning to the plaza, suggests that the

Supreme Court recognized the differences between the plaza and sidewalk.  *Id*. at 13-14.  Fourth,

the defendants argue that there is a longstanding and important recognized interest "in protecting

the appearance of the courts as free from outside influence or the appearance from such

influence."  *Id*. at 13 (citing *Cox II*, 379 U.S. 559, 562 (1965)).  Finally, the defendants point to

the long-standing conclusion of the D.C. Court of Appeals' courts, which have found that the

Building and grounds of the Supreme Court are nonpublic fora.  *Id*. at 6 (citing *Lawler v. United

States*, 10 A.3d 122, 124 (D.C. 2010), *Potts v. United States*, 919 A.3d 1127, 1129 (D.C. 2007),

and *Bonowitz v. United States*, 741 A.2d 18, 22 (D.C. 1999)).

The plaintiff, by contrast, warns of the "limited utility" of forum analysis.  Pl.'s Opp'n at

3 (quoting *Members of City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 815

n.32 (1984)).  In particular, the plaintiff urges the Court to reject the "circular logic" that could

be created by relying on the statute's ban on expressive activity, which has worked effectively

over the past 60 years to squelch such activity on the Supreme Court plaza, to "constitute a

reason in itself for determining that a forum is nonpublic."  Pl.'s Opp'n at 3.  The plaintiff argues

that the Court should "eschew the use of the labels 'public' or 'nonpublic' in order to avoid

addressing the question of whether the legislation is supported by a sufficient governmental

interest which outweighs the public's First Amendment rights."  *Id*. at 4.  If the Court does

engage in forum analysis, however, the plaintiff argues that the plaza is either a traditional or

designated public forum "[b]ased on its history, uses, status, and characteristics."  *Id*. at 6-7.

Moreover, the plaintiff argues that even if the plaza is considered "a nonpublic forum or not a forum at all," the statute is still facially unconstitutional. *Id.* at 14, 30.

The Court assumes, without deciding, that the Supreme Court plaza is a nonpublic forum. The defendants' arguments that the plaza is a nonpublic forum "because traditionally it has not been a place of public assembly, communication and discourse, and its physical characteristics separate it clearly from the nearby sidewalks where expressive activity is lawful[,]" Defs.' Mem. at 17, all weigh in favor of a decision that the plaza is a nonpublic forum. Nevertheless, these factors – including traditional physical characteristics – are not dispositive here. The Court is mindful that this "tradition" is largely due to the enforcement of the challenged statute's absolute ban on expressive conduct in the form of assembling and displays on the plaza and, therefore, this history is to a significant extent artificially induced and should not itself be a basis for characterizing the property as a nonpublic forum.[26] Moreover, the physical features of the Supreme Court plaza – with its long benches and fountains and wide open space in front of an iconic American building open to the public – suggest a more welcoming invitation to the public and public expression than is suggested by the defendants or the statute. Certainly, unless told otherwise, it seems clear the public believes that the Supreme Court plaza is a public forum. *See, e.g.*, Pl.'s Opp'n at 8 n.13 (quoting website news source noting that "the Supreme Court plaza has become the public square as justices weigh in on the constitutionality of President Barack

---

[26] That the Supreme Court plaza has been subject to a statute banning expressive activity, which is now challenged as unconstitutional, for much of its existence makes the forum analysis more difficult than if this regulation had been imposed on an area which earlier was unregulated by this statute for any significant period of time. This is unlike the situation the Supreme Court faced in *Grace II*, when it focused only on the application of the statute to public sidewalks, which were, by tradition, public before the enactment of 40 U.S.C. § 13k. *See, e.g.*, Robert C. Post, Melville B. Nimmer Symposium, *Between Governance and Management: The History and Theory of the Public Forum*, 34 UCLA L. REV. 1713 (1987) (explaining that "public forum status is determined as of the situation prior to the attempted regulation of the resource" and, "[o]n no account, therefore, would the statute at issue in *Grace* be determinative of the public forum status of the Court's sidewalks"). Given the length of time that the challenged statute has been in effect for the Supreme Court plaza, the precise nature of the forum is more difficult to untangle.

Obama's health care law" (citation omitted)).[27]   In this case, however, categorizing the Supreme

Court plaza as a public or nonpublic forum is not necessary.  *See, e.g.*, *United States v. Kokinda*,

497 U.S. 720, 738 (1990) (Kennedy, J., concurring) (finding it unnecessary "to make a precise

determination whether this sidewalk and others like it are public or nonpublic forums" where the

"regulation at issue meets the traditional standards we have applied to time, place, and manner

restrictions of protected expression"); *Initiative & Referendum Inst. v. U.S. Postal Serv.*, 417

F.3d 1299, 1313 (D.C. Cir. 2005) (hereinafter, "*Initiative & Referendum Inst. I*").  Even if the

Court were to conclude that the plaza is a nonpublic forum, the absolute ban on speech set forth

in 40 U.S.C. § 6135 is not reasonable and, thus, the Court concludes that the [government's]

"justifications for restricting . . . speech" on the Supreme Court plaza simply do not "'satisfy the

requisite standard.'"  *Mahoney*, 642 F.3d at 1116 (quoting *Cornelius*, 473 U.S. at 797).[28]

### 3.   The Challenged Statute Is Not A Reasonable Limitation on Speech

"The reasonableness of the Government's restriction of access to a nonpublic forum must

be assessed in the light of the purpose of the forum and all the surrounding circumstances."

---

[27] The defendants rely heavily on *Oberwetter* for their theory that the physical characteristics of the Supreme Court plaza weigh in favor of a conclusion that it is a nonpublic forum.  *See, e.g.*, Defs.' Mem. at 13, 17.  The Court notes, however, that the D.C. Circuit in *Oberwetter* repeatedly emphasized the nature of the Jefferson Memorial as a "memorial" in concluding that the interior of the monument was a nonpublic forum.  That case is thus distinguishable from the instant case, which challenges a statute banning expressive conduct in an open area in front of the Supreme Court Building, which is not a memorial but a symbol of and setting for legal debate about the key issues at stake for the country.  Furthermore, as explained *infra*, the regulation at issue in *Oberwetter* is also distinguishable from the statute challenged here.

[28] Judge Silberman's concurrence in a case related to demonstrations on the Capitol grounds counsels in favor of declining to decide the nature of the Supreme Court plaza.  Noting that his panel was "certainly bound" by *Jeannette Rankin Brigade II*, in which the panel recognized the Capitol Grounds as a public forum, he suggested that it was possible that the Supreme Court could decide otherwise if the Court granted *certiorari*.  In so doing, he referred specifically to the Court's consideration of the precursor to the challenged statute in *Grace II*, noting that it is "distinctly possible" that the Court's decision in *Grace II*, "particularly the Court's implicit rejection of Justice Marshall's position that the whole of the Supreme Court's grounds are a traditional public forum, betokens a more sympathetic reception to the government's arguments" (presumably referring to the government's arguments that the East Front Sidewalk within the Capitol Grounds is a nonpublic forum).  *Lederman v. United States*, 291 F.3d 36, 48 (D.C. Cir. 2002) (Silberman, J., concurring) (noting that "[t]o be sure, *Jeannette Rankin Brigade* was summarily affirmed, but the Court rarely considers itself bound by the reasoning of its prior opinions . . . let alone a summary affirmance.").  Since the Court finds the challenged statute unreasonable, deciding whether the Supreme Court plaza is by nature a "nonpublic forum" is unnecessary.

*Cornelius*, 473 U.S. at 809.  "The First Amendment does not forbid a viewpoint-neutral exclusion of speakers who would disrupt a nonpublic forum and hinder its effectiveness for its intended purpose."  *Id.* at 811.  In assessing whether a regulation is reasonable, the Court must examine whether "it is consistent with the government's legitimate interest in maintaining the property for its dedicated use."  *Initiative & Referendum Inst. II*, 685 F.3d at 1073; *see also Greer*, 424 U.S. at 836 ("'The State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated.'" (citation omitted)).  In this regard, the restriction "'need only be *reasonable*; it need not be the most reasonable or the only reasonable limitation.'"  *Id.* (quoting *Cornelius*, 473 U.S. at 808).

Here, the defendants argue that the statute is plainly a "reasonable limitation on speech" because it is based on "two significant interests that are furthered by the statute[,]" namely, first, "permitting the unimpeded ingress and egress of visitors to the Court," and, second, "preserving the appearance of the Court as a body not swayed by external influence."  Defs.' Mem. at 18. The defendants point to the D.C. Court of Appeals' recognition of these two significant government interests in finding the statute reasonable, and argue that this Court should as well. Defs.' Mem. at 18-19.

The Court disagrees.  First, the Court does not find that an interest in allowing "unimpeded ingress and egress" of visitors to the Court is a sufficiently significant interest to justify the absolute prohibition on expressive activity on the plaza enshrined in the two clauses of the statute.  The statute encompasses not only a ban on activity that actually impedes ingress and egress, and/or is intended to impede ingress and egress, but also bans a variety of other unobtrusive actions ranging from the assembling of groups of two or more individuals on a bench on one side of the plaza, an individual standing in one place holding a sign of limited size, or the display of political messages on a T-shirt by one individual or a group of individuals all

wearing the same T-shirt.  *See* Tr. at 24-27.  A broad prohibition of expressive activity of this

nature is simply not "reasonable in light of," *Perry*, 460 U.S. at 49, the government's stated

purpose of providing for "unimpeded ingress and egress."  While the restriction need not be "'the

most reasonable or the only reasonable limitation[,]'" it must be reasonable, *Initiative &*

*Referendum Inst. II*, 685 F.3d at 1073 (quoting *Cornelius*, 473 U.S. at 808).  This restriction is

not reasonable, just as the D.C. Circuit determined a ban on pure solicitation in a nonpublic

forum was not reasonable.  *See Initiative & Referendum Inst. II*, 685 F.3d at 1073; *Initiative &*

*Referendum Inst. I*, 417 F.3d at 1315 ("It is clear that a broadscale prohibition against asking

postal patrons to sign petitions at other locations, whether such requests are made verbally or in

distributed pamphlets, is unconstitutional even if all postal properties are nonpublic forums.").

Second, the Court is also not convinced that the statute furthers the second "significant"

government interest proffered by the defendants, namely "preserving the appearance of the Court

as a body not swayed by external influence."  Defs.' Mem. at 18.  In support of their argument

that section 6135 furthers this interest, and is thus reasonable, the defendants indicate that the

"Supreme Court has explained that a state 'has a legitimate interest in protecting its judicial

system from the pressures which picketing near a courthouse might create.'"  *Id*. (quoting *Cox II*,

379 U.S. at 562).  But the challenged statute, which is plainly distinguishable from the statute at

issue in *Cox II* because, for example, it does not include an intent requirement, not only covers

people assembling on the plaza for picketing but also people assembling for any other reason,

and with no intention of picketing or exerting any influence on the Supreme Court.  It is hard to

imagine how tourists assembling on the plaza wearing t-shirts bearing their school's seal, for

example, could possibly create the appearance of a judicial system vulnerable to outside

pressure.  While there may be a legitimate interest in protecting the decorum of the judiciary, the

challenged statute is not a reasonable way to further that interest.

As the D.C. Circuit concluded decades ago, "[w]hile public expression that has an intent to influence the administration of justice may be restricted, . . . . Congress has accomplished that result with a more narrowly drawn statute, 18 U.S.C. § 1507, that is fully applicable to the Supreme Court grounds." *Grace I*, 665 F.2d at 1194 (citation omitted). The D.C. Circuit in *Grace I* was "unable to find any other significant governmental interest to justify the absolute prohibition of all expressive conduct contained in section 13k," *id.*, and thus held this precursor statute to 40 U.S.C. § 6135 "unconstitutional and void," *id*. Even assuming the plaza is a nonpublic forum, where "the government need not adopt the most narrowly tailored means available," *Initiative & Referendum Inst. II*, 685 F.3d at 1073, this Court believes that the D.C. Circuit's reasoning in *Grace I* is still instructive, and finds that none of the asserted governmental interests justifies the absolute ban on expressive activity enshrined in the statute, regardless of whether this area, which members of the public are free to visit, is considered a public or nonpublic forum. *See, e.g.*, *Grace II*, 461 U.S. at 184 (Marshall, J.) (concurring in part and dissenting in part) (concluding that 40 U.S.C. § 13k is unconstitutional on its face and noting that "[w]hen a citizen is in a place where he has every right to be, he cannot be denied the opportunity to express his views simply because the Government has not chosen to designate the area as a forum for public discussion" (internal citation and quotation marks omitted)); *Initiative & Referendum Inst. II*, 685 F.3d at 1069 (explaining that "[e]ven in nonpublic forums restrictions must be reasonable, and a ban on merely asking for signatures" in a nonpublic forum "would not be" (citing *Initiative & Referendum Inst. I*, 417 F.3d at 1314-16)); *Initiative & Referendum Inst. I*, 417 F.3d at 1315 (explaining that the Supreme Court has "repeatedly held absolute bans on pamphleteering and canvassing invalid, whether applied to nonpublic governmental forums or to private property, because of their substantial overbreadth" (footnotes omitted)).

"The First Amendment does not forbid a viewpoint-neutral exclusion of speakers who would disrupt a nonpublic forum and hinder its effectiveness for its intended purpose." *Cornelius*, 473 U.S. at 811.  Yet, it cannot possibly be consistent with the First Amendment for the government to so broadly prohibit expression in virtually any form in front of a courthouse, even the Supreme Court, in the name of concerns about "ingress and egress" and "preserving the appearance of the Court as a body not swayed by external influence."  Thus, even accepting the defendants' argument that the Supreme Court plaza is a nonpublic forum, "in light of the purpose of the forum and all the surrounding circumstances," *id.* at 809, the Court finds the statute unreasonable as untethered to any legitimate government interest or purpose.  As explained in more detail below, the statute is also substantially overbroad, and not susceptible to a limiting instruction, and thus unconstitutional on its face and void as applied to the Supreme Court plaza.[29]

It is worth pausing here to address the extent to which this Court is bound by the D.C. Circuit's decision in *Grace I*, and the decision of the three-judge panel in *Jeannette Rankin Brigade II*, which was summarily affirmed by the Supreme Court.  In both cases, as explained *supra*, the panels found the language of the challenged statute – in the form of the precursor to the Supreme Court statute and in the form of the Capitol Grounds statute, respectively – unconstitutional.  While both of these panels were clear in their disdain for the broad prohibition on expressive activity enshrined in the language of this statute, the Supreme Court in *Grace II* (1) limited its own holding to the Display Clause as applied to the sidewalks surrounding the Supreme Court, even though it had earlier summarily affirmed the panel's decision in *Jeannette Rankin Brigade II*, declaring void the entire Capitol Grounds statute, and (2) affirmed the D.C.

---

[29] Since the Court finds the statute unreasonable, it need not reach the question of whether the statute is "viewpoint-neutral" in this forum analysis discussion.

Circuit's *Grace I* decision only to the extent that it held the Display Clause unconstitutional as applied to the sidewalks surrounding the Supreme Court, and otherwise vacated the decision. *See Grace II*, 461 U.S. at 183-84.  Notably, however, in declining to reach the facial constitutionality of the statute, the Supreme Court did not reverse *as wrong* any of the D.C. Circuit's reasoning in *Grace I*.  In light of this guidance from the Supreme Court, this Court finds that it is not bound by the D.C. Circuit's opinion in *Grace I*, nor the Supreme Court's summary affirmance of the three-judge panel in *Jeannette Rankin Brigade*, related to a similar but different statute.  Nevertheless, this Court finds the reasoning in these decisions persuasive and instructive as it proceeds with an analysis of the overbreadth of the challenged statute.

### C.   The Challenged Statute is Overbroad in Violation of the First Amendment

 The challenged statute fails not only the forum analysis test as an unreasonably over-broad restriction on expressive activity, even in a nonpublic forum, to further the dual governmental interests of unobstructed access to, and the maintenance of order and decorum at, the Supreme Court plaza, but also "'a second type of facial challenge,' whereby a law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'"  *United States v. Stevens*, 130 S. Ct. 1577, 1591-92 (2010) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6 (2008)); *Initiative & Referendum Inst. I*, 417 F.3d at 1312-13 (explaining that the "overbroad" analysis is "the rule for facial challenges brought under the First Amendment").  Such a showing "'suffices to invalidate *all* enforcement of that law.'"  *Initiative & Referendum Inst. I*, 417 F.3d at 1313 (quoting *Virginia v. Hicks*, 539 U.S. 113, 118-19 (2003)).

To prevail on a facial overbreadth theory under the First Amendment, "particularly where conduct and not merely speech is involved," a plaintiff must show that a challenged law prohibits a "real" and "substantial" amount of protected free speech, "judged in relation to the statute's

plainly legitimate sweep," "until and unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression." *Broadrick v. Oklahoma*, 413 U.S. 601, 613, 615 (1973); s*ee also Members of City Council of Los Angeles*, 466 U.S. at 796, 800-01 (acknowledging that "[t]he concept of 'substantial overbreadth' is not readily reduced to an exact definition[,]" but it generally requires "a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court"); *Erznoznik v. Jacksonville*, 422 U.S. 205, 216 (1975) (since invalidation may result in unnecessary interference with a state regulatory program, "a state statute should not be deemed facially invalid unless it is not readily subject to a narrowing construction by the state courts").

The Supreme Court has "provided this expansive remedy out of concern that the threat of enforcement of an overbroad law may deter or 'chill' constitutionally protected speech — especially when the overbroad statute imposes criminal sanctions." *Virginia*, 539 U.S. at 119; *see also Bd. of Airport Comm'rs v. Jews for Jesus, Inc.*, 482 U.S. 569, 574 (1987) ("Under the First Amendment overbreadth doctrine, an individual whose own speech or conduct may be prohibited is permitted to challenge a statute on its face 'because it also threatens others not before the court -- those who desire to engage in legally protected expression but who may refrain from doing so rather than risk prosecution or undertake to have the law declared partially invalid.'" (citation omitted)).  When people "choose simply to abstain from protected speech" to avoid the risk of criminal penalties, the harm is not only to themselves "but society as a whole, which is deprived of an uninhibited marketplace of ideas." *Virginia*, 539 U.S. at 119.

Obviously, both analyses, *i.e.,* whether the challenged statute suffers from unconstitutional overbreadth and whether it is an unreasonable restriction even if the plaza were a nonpublic forum, require examination of the overbreadth of the statute.  "Before applying the

'strong medicine' of overbreadth invalidation," *id.*, the facial overbreadth analysis further requires an assessment of whether that overbreadth is "real" and "substantial," and whether the challenged statute may be subject to a limiting construction.  The Court now proceeds with that analysis.

Here, the plaintiff seeks a judgment that, *inter alia*, both clauses of the statute are unconstitutional on their face as overbroad under the First Amendment.  *See* Am. Compl., Count II.[30]  The defendants argue to the contrary in their motion, asserting that "[t]here is no colorable argument that either clause of the statute is overly broad, irrespective of the plaza's status under the public forum analysis" and that the plaintiff's arguments are "meritless and should be rejected."  Defs.' Mem. at 20-21.  The Court disagrees.  As discussed below, in this case, the Court finds that the overbreadth of the challenged statute is both real and substantial, and that judicial creation of a limiting construction is inappropriate.

### 1.      Overbreadth of Challenged Statute is Both Real and Substantial

The Court's "'first step in overbreadth analysis is to construe the challenged statute'" for "'it is impossible to determine whether a statute reaches too far without first knowing what the statute covers.'"  *Stevens*, 130 S. Ct. at 1587 (quoting *United States v. Williams*, 553 U.S. 285,

---

[30] The plaintiff also, as noted, challenges the statute for overbreadth under the Fifth Amendment in Count II ("First & Fifth Amendment (Overbreadth)").  The overbreadth doctrine is a "First Amendment . . . doctrine," however, in contrast to the related vagueness doctrine, which "is an outgrowth not of the First Amendment, but of the Due Process Clause of the Fifth Amendment."  *United States v. Williams*, 553 U.S. 285, 304 (2008).  Since the plaintiff has not explained any rationale for construing his overbreadth claim under the Fifth Amendment, the Court construes the plaintiff's overbreadth claim solely under the First Amendment overbreadth doctrine.  The government apparently construed the plaintiff's claim this way as well.  *See, e.g.*, Defs.' Mem. at 19 (referring to the plaintiff's overbreadth claims under the "First Amendment overbreadth doctrine" in contrast to the plaintiff's vagueness claims "under the First and Fifth Amendments"); *see also* Richard H. Fallon, Jr., Commentary, *As-Applied and Facial Challenges and Third-Party Standing*, 113 HARV. L. REV. 1321, 1355 (2000) (noting that "[i]n considering the circumstances under which facial challenges should be permitted, both commentators and Supreme Court Justices have often framed the question as whether overbreadth doctrine should extend beyond the First Amendment" (footnotes omitted)); *Jeannette Rankin Brigade I*, 421 F.2d at 1107 (Bazelon, C.J., dissenting from granting of three-judge panel) (noting that "the overbreadth analysis has found its most fertile soil in the area of First Amendment freedoms").

293 (2008)).  The Court then considers "whether the statute, as [the Court has] construed it,

criminalizes a substantial amount of protected expressive activity."  *Williams*, 553 U.S. at 297.

Proceeding in this manner, the Court examines the Assemblages Clause and the Display Clause

in turn and, as explained below, "read[s] [the statute] to create criminal prohibition of alarming

breadth."  *Stevens*, 130 S.Ct. at 1588.  The Court then explains how this analysis is consistent

with the Supreme Court's decision in *Grace II* as well as decisions of the D.C. Court of Appeals.

<blockquote>a.      **Real and Substantial Overbreadth of the Assemblages Clause**</blockquote>

First, with respect to the Assemblages Clause, the defendants essentially concede that

the clause, without a limiting construction, is substantially overbroad, explaining that the District

of Columbia courts "adopted a narrowing construction of the Assemblages Clause precisely in

order to avoid possible overbreadth concerns that would arise from the application of the literal

language of the statute."  Defs.' Mem. at 20.  Since the Court, for reasons explained in detail

below, does not adopt the limiting construction used by the D.C. Court of Appeals, the Court

agrees with the District of Columbia courts that the Assemblages Clause, without a limiting

construction, is overbroad in applying an absolute ban on parades, processions, and assembling.

This clause could apply to, and provide criminal penalties for, any group parading or assembling

for any conceivable purpose, even, for example, the familiar line of preschool students from

federal agency daycare centers, holding hands with chaperones, parading on the plaza on their

first field trip to the Supreme Court.  Moreover, as the *Pearson* court recognized, this clause

could apply not only to tourists and attorneys, but to Court employees.  *Pearso*n, 581 A.2d at

356.  Thus, the statute would apply to employees both assembling for lunch or protesting a labor

practice or the menu in the Supreme Court cafeteria.  This Court agrees that "[s]uch an absolute

ban on any group activity is not supported by the government's legitimate and important

interests[,]" for example, "in protecting the integrity of the Court, preventing the appearance of

judicial bias, and safeguarding the Court grounds and personnel." *Pearson*, 581 A.2d at 356-57

(footnotes omitted); *see also Boos v. Barry*, 485 U.S. 312, 332 (1988) (finding that a narrowing

construction saved the congregation clause in that case from overbreadth scrutiny where the

congregation clause "does not prohibit peaceful congregations[,]" and "its reach is limited to

groups posing a security threat").  Where the Assemblages Clause prohibits and criminalizes

such a broad range of plainly benign expressive activity, the Court finds the clause substantially

overbroad.

### b.        Real and Substantial Overbreadth of the Display Clause

Similarly, with respect to the Display Clause, the Court finds the clause substantially

overbroad.  This clause applies, for example, to the distribution of pamphlets, a ban the D.C.

Circuit emphatically concluded in *Initiative & Referendum Institute I* "is unconstitutional even

[in] nonpublic forums."  417 F.3d at 1315; *see also id.* (noting that the U.S. Postal Service "does

not even attempt to defend the regulation if it is construed as applying to pure solicitation").  The

defendants argue with respect to the Display Clause that there is "no risk that the Display Clause

will punish activity which is not 'contrary to the government's legitimate interests' in 'sheltering

and insulating the judiciary from the appearance of political influence.'"  Defs.' Mem. at 20.

Yet, the government essentially conceded at oral argument that the challenged statute would

prohibit, for example, a group of tourists assembling on the Supreme Court plaza, who are all

wearing t-shirts "in order to bring into public notice their particular organization, church group,

whatever group it may be, [or] school group[.]"  Tr. at 24-27 (government counsel responding

affirmatively to this Court's hypothetical about whether the challenged statute would cover a

group of tourists wearing t-shirts on the Supreme Court plaza, and acknowledging that the

Supreme Court police "might approach the kind of group you described in general terms and ask

them to move along" but urging the Court not to entertain such hypotheticals in this lawsuit); *see*

*also Grace I*, 665 F.2d at 1194 n.2 ("Indeed, at oral argument before this panel, Government counsel virtually conceded that even expressive T-shirts or buttons worn on the Supreme Court grounds would be prohibited by § 13k.").  While the government has tried to dissuade the Court from contemplating hypothetical scenarios covered by the challenged statute, the government provides no satisfying explanation for how an individual or group calling attention to a perceived injustice by distributing pamphlets or merely displaying a single unobtrusive sign or wearing t-shirts displaying their school, church, or organization logo, in front of an iconic government building – flanked with carvings of Justice, holding sword and scales, and The Three Fates, weaving the thread of life, no less – necessarily creates "the appearance of political influence" or in any way disturbs the decorum and order of the Supreme Court.  Furthermore, it is simply not true, as the government asserts, that there is "no risk that the Display Clause will punish activity which is not 'contrary to the government's legitimate interests' in 'sheltering and insulating the judiciary from the appearance of political influence[,]'" Defs.' Mem. at 20, when the Display Clause prohibits the wearing of t-shirts bearing school and organizational logos, and the government concedes that the challenged statute may be enforced against those wearing such t-shirts.  *See* Tr. at 24-27.  Accordingly, this Court finds the Display Clause, and thus the statute as a whole, with no limiting construction, unconstitutional on its face as substantially overbroad.

> **c.      Finding of Real and Substantial Overbreadth is Consistent With the Supreme Court's Decision in *Grace II* and Many of the Decisions of the D.C. Court of Appeals**

This Court's finding that the statute is substantially overbroad is consistent both with the Supreme Court's decision in *Grace II* and the Assemblages Clause cases from the D.C. Court of Appeals.  While the *Grace II* Court limited its analysis to the question before the Court, namely the right of the appellees to use the public sidewalks surrounding the Court for expressive activities prohibited under the Display Clause, the Court's decision in no way precludes a finding

that the statute is unconstitutional on its face.  *See Ayotte v. Planned Parenthood*, 546 U.S. 320,

329-30 (2006) (explaining that the *Grac*e *II* Court "crafted a narrow remedy . . . striking down a

statute banning expressive displays only as it applied to public sidewalks near the Supreme Court

but not as it applied to the Supreme Court Building itself").  Indeed, while the Supreme Court

only made a holding on a narrow issue, the majority opinion suggested a broader skepticism

about the Display Clause.  The Court noted, for example, that "[b]ased on its provisions and

legislative history, it is fair to say that the purpose of the Act was to provide for the protection of

the building and grounds and of the persons and property therein, as well as the maintenance of

proper order and decorum."  *Grace II*, 461 U.S. at 182.  While the Court did not "denigrate"

those purposes, the Court "question[ed] whether a total ban on carrying a flag, banner, or device

on the public sidewalks substantially serves these purposes."  *Id*.   The Court noted, for example,

that there was "no suggestion . . . that appellees' activities in any way obstructed the sidewalks or

access to the building, threatened injury to any person or property, or in any way interfered with

the orderly administration of the building or other parts of the grounds."  *Id*.  The same can be

said for the analogous facts before this Court, with the significant difference being only that the

plaintiff's activities took place eight steps up from the sidewalk on the plaza.

    Furthermore, Justice Marshall's partial concurrence and dissent in *Grace II*, concluding

that "40 U.S.C. § 13k is plainly unconstitutional on its face[,]" *id*. at 185, was prescient in

observing that "[s]ince the continuing existence of the statute will inevitably have a chilling

effect on freedom of expression, there is no virtue in deciding its constitutionality on a piecemeal

basis[,]" *id*. at 184 (Marshall, J.) (concurring in part and dissenting in part); *see id*. (explaining

that "[w]hen a citizen is in a place where he has every right to be, he cannot be denied the

opportunity to express his views simply because the Government has not chosen to designate the

area as a forum for public discussion" (internal citation and quotation marks omitted)).  Where

the chilling of speech has persisted over many years, just as Justice Marshall feared, this Court is compelled to rule this overbroad statute facially unconstitutional, as the D.C. Circuit plainly intended to do over thirty years ago in *Grace I*.  *See Grace I*, 665 F.2d at 1194 (finding 40 U.S.C. § 13k "repugnant to the First Amendment").

This Court's decision is also consistent with the decisions of the D.C. Court of Appeals regarding the Assemblages Clause.  In those cases, as noted, the D.C. Court of Appeals recognized the overbreadth of the clause and relied on a limiting construction in order to "save" the statute from constitutional challenge.  Defs.' Mem. at 7.  Indeed, tellingly, the *Pearson* court observed that "[s]uch an absolute ban on any group activity is not supported by the government's legitimate and important interests in protecting the integrity of the Court, preventing the appearance of judicial bias, and safeguarding the Court grounds and personnel."  *Pearson*, 581 A.2d at 356-57 (footnotes omitted).  This Court agrees.

### 2.    Judicial Creation of a Limiting Construction is Inappropriate

The Court next turns to the defendants' argument that any overbreadth concerns about the statute may be cured by adopting the limiting construction imposed on the Assemblages Clause by the District of Columbia courts.  The Court is cognizant that "making distinctions in a murky constitutional context, or where line-drawing is inherently complex, may call for a 'far more serious invasion of the legislative domain' than we ought to undertake[,]" *Ayotte*, 546 U.S. at 330, and that "[f]acial challenges are disfavored[,]" *Wash. State Grange*, 552 U.S. at 450.  Nevertheless, for the reasons explained below, the Court finds that the statute is not susceptible to a limiting construction.

The Supreme Court has counseled that "[g]enerally speaking, when confronting a constitutional flaw in a statute, we try to limit the solution to the problem.  We prefer, for example, to enjoin only the unconstitutional applications of a statute while leaving other

applications in force, or to sever its problematic portions while leaving the remainder intact[.]"
*Ayotte*, 546 U.S. at 328-29 (citations omitted).  "When a federal court is dealing with a federal
statute challenged as overbroad, it should . . . construe the statute to avoid constitutional
problems, if the statute is subject to such a limiting construction."  *New York v. Ferber*, 458 U.S.
747, 769 n.24 (1982).  Indeed, "[a] limiting construction that is 'fairly' possible can save a
regulation from facial invalidation."  *Initiative & Referendum Inst. I*, 417 F.3d at 1316 (quoting
*Bd. of Airport Comm'rs*, 482 U.S. at 575).  There are limits, however, to the judicial power to
provide a narrowing interpretation of statutory language in order to cure its otherwise
constitutional invalidity.  Thus, a "statute must be construed, if fairly possible, so as to avoid not
only the conclusion that it is unconstitutional, but also grave doubts upon that score . . . . [But]
avoidance of a difficulty will not be pressed to the point of disingenuous evasion."  *George
Moore Ice Cream Co. v. Rose*, 289 U.S. 373, 379 (1933).

 The defendants concede that the D.C. Court of Appeals "recognized" that "the literal
language of section 6135 may be read to prohibit any type of group activity on the Court
grounds, including congregation on the plaza by groups of tourists, or even by Court
employees."  Defs.' Mem. at 7.  Thus, in order to "save" the clause "from any possible
constitutional challenge," *id.*, the D.C. Court of Appeals held that the statute was "susceptible to
a narrowing construction, confining the scope of the clause to protection of 'the [Supreme Court]
building and grounds and of persons and property within, as well as the maintenance of proper
order and decorum,' and 'to preserve the appearance of the Court as a body not swayed by
external influence.'"  *Pearson*, 581 A.2d at 357 (internal citation omitted) (quoting *Grace II*, 461
U.S. at 182-83 and *Wall*, 521 A.2d at 1144); *see also Bonowitz v. United States*, 741 A.2d 18, 22-
23 (D.C. 1999) (finding section 13k restrictions reasonable "in light of the plaza's two primary
purposes: 'to permit the unimpeded access and egress of litigants and visitors to the Court, and to

preserve the appearance of the Court as a body not swayed by external influence'" (quoting *Wall*, 521 A.2d at 1144)); Defs.' Mem. at 20 (noting that "the District of Columbia courts have adopted a narrowing construction of the Assemblages Clause precisely in order to avoid possible overbreadth concerns that would arise from application of the literal language of the statute").

In prodding this Court to adopt this limiting construction, which the defendants emphasize is "for all practical purposes, the definitive judicial construction of the statute,"[31] the defendants assert that the D.C. Court of Appeals' limiting construction "allows application of the Assemblages Clause only for the protection of the Court Building and grounds and persons and property therein, the maintenance of order and decorum therein, and to preserve the appearance of the Court as a body not swayed by external influence." Defs.' Mem. at 20-21.

The Court does not find the defendants' arguments in support of adopting a limiting construction convincing for several reasons. First, the limiting construction imposed by the D.C. Court of Appeals is not rooted in the plain language of the statute. Again, the statute reads in full:

> It is unlawful to parade, stand, or move in processions or assemblages in the Supreme Court Building or grounds, or to display in the Building and grounds a flag, banner, or device designed or adapted to bring into public notice a party, organization, or movement.

40 U.S.C. § 6135. The *Pearson* court reached out to slim legislative history and beyond the actual words of the statute to narrow the meaning of the statute to "protection of 'the [Supreme Court] building and grounds and of persons and property within, as well as the maintenance of proper order and decorum' and 'to preserve the appearance of the Court as a body not swayed by external influence.'" *Pearson*, 581 A.2d at 357 (internal citation omitted) (quoting *Wall*, 521

---

[31] As noted, all prosecutions under the statute have occurred in the local D.C. courts, and the Deputy Chief of the Supreme Court Police asserts that in enforcing violations of the statute the police "look to the language of the statute, utilizing the narrowing construction of the Assemblages Clause that has been adopted by the District of Columbia courts." Dolan Decl. ¶¶ 7-8.

A.2d at 1144 and *Grace II*, 461 U.S. at 182-83).  Indeed, the *Pearson* court rejected the idea that there was any "requirement that a limiting construction must be derived from the express language of the statute," and emphasized that what was required was "that the statute itself be susceptible to the narrowing construction."  *Id*. at 358.[32]  At the same time, the *Pearson* court rejected in short order the appellants' contention that the Supreme Court's summary affirmance of *Jeannette Rankin Brigade II* "necessarily leads to the conclusion that the Supreme Court is also a public forum" and did not dwell on any larger discussion of the panel's decision in that case, dealing with a nearly identical statute, and its conclusion that no limiting construction was possible.  *Pearson*, 581 A.2d at 352 n.12.  While the Court appreciates the D.C. Court of Appeals' efforts to draw from its own precedent as well as the Supreme Court's language in order to save a statute originally drafted as the Capitol Grounds statute over 100 years ago, the Court is reluctant to, and ultimately cannot, accept a limiting construction that is not more directly rooted in the text of the statute itself.  *See, e.g.*, *Houston v. Hill*, 482 U.S. 451, 468 (1987) (explaining that an ordinance is "not susceptible to a limiting construction because . . . its language is plain and its meaning unambiguous"); *Akiachak Native Cmty. v. Salazar*, No. 06-969, 2013 U.S. Dist. LEXIS 45968, at *44 (D.D.C. Mar. 31, 2013) (declining to "adopt limiting constructions that have no basis in the statutory text").

---

[32] To find the statute susceptible to a narrowing construction, the *Pearson* court drew from the language in *Wall* and *Grace* regarding the purposes gleaned for the statute.  *See Pearson*, 581 A.2d at 357; *Wall*, 521 A.2d at 1144 (noting that the court was "satisfied" that the government's proffered purposes for the statute – "to permit the unimpeded access and egress of litigants and visitors to the Court and to preserve the appearance of the Court as a body not swayed by external influence" – were "'significant' governmental interests that can support a time, place or manner restriction" (citing *Cameron v. Johnson*, 390 U.S. 611 (1968) and *Cox II*, 379 U.S. at 562)); *Grace II*, 461 U.S. at 182 (concluding that "[b]ased on its provisions and legislative history, it is fair to say that the purpose of the Act was to provide for the protection of the building and grounds and of the persons and property therein, as well as the maintenance of proper order and decorum" and noting that 40 U.S.C. § 13k "was one of the provisions apparently designed for these purposes" and that "[a]t least, no special reason was stated for [40 U.S.C. § 13k's] enactment"); *Grace II*, 461 U.S. at 183 (not "discount[ing]" the government's proffered justification that it should not "appear to the public that the Supreme Court is subject to outside influence or that picketing or marching, singly or in groups, is an acceptable or proper way of appealing to or influencing the Supreme Court" but rejecting that justification with respect to the application of the Display Clause on the sidewalks surrounding the Supreme Court).

Second, the limited legislative history of the challenged statute, including that of its

predecessor statute (40 U.S.C. § 13k) and the Capitol Grounds statute (40 U.S.C. § 193g), simply

does not provide a sufficient basis for the limiting construction imposed by the D.C. Court of

Appeals.  When Congress promulgated 40 U.S.C § 13k it was primarily focused on extending the

blanket prohibitions on assemblages and displays that had long been in place at the United States

Capitol.  *See, e.g.*, 95 Cong. Rec. 8962 (1949) (statement of Rep. Celler) (noting that "all this

[House] bill does . . .  is to apply the same rules to the Supreme Court building and its adjoining

grounds as are now applicable to the Capitol itself – no more and no less.").  That statute

governing the U.S. Capitol Building and grounds has since been found unconstitutional.  *See,

e.g., Jeannette Rankin Brigade II*, 342 F. Supp. at 587 (characterizing the U.S. Capitol statute as

"a curiously inept and ill-conceived Congressional enactment").  Furthermore, while the

legislative history reveals that section 13k was enacted as part of a broader package of security

measures for the Supreme Court Building and grounds, nothing in the legislative history suggests

the absolute ban on expressive activity in section 13k was to be limited in any way.

Indeed, a ban on expressive activity in front of the Supreme Court could be seen as

consistent with, for example, a state's interest in "protecting its judicial system from the

pressures which picketing near a courthouse might create."  *Cox II*, 379 U.S. at 562.  While the

Supreme Court in *Cox II* upheld a Louisiana statute modeled after 18 U.S.C. § 1507, and

intended to enshrine that interest, the statute there is easily distinguishable from the overbroad

statute here, in part, because it included a clear intent requirement.  *See* LA. REV. STAT. ANN. §

14:401 (Cum. Supp. 1962) ("[w]hoever, with the intent of interfering with, obstructing, or

impeding the administration of justice, or with the intent of influencing any judge, juror, witness,

or court officer, in the discharge of his duty . . .") (cited in *Cox II*, 379 U.S. at 560); *see also

United States v. Carter*, 717 F.2d 1216, 1218 n.4 (8th Cir. 1983) (noting that the "crucial

difference between [40 U.S.C. § 13k] and 18 U.S.C. § 1507 [on which the Louisiana statute was based] is precisely the element of intent" and that 40 U.S.C. § 13k "did not require, as an element of the crime there defined, that the defendant intend to interfere with the administration of justice or to influence any judge or juror" and that, instead, "[i]t attempted to make criminal the simple display of a flag, banner, or device of a certain type, whether or not the defendant wished to influence the courts or obstruct the administration of justice").  Furthermore, the Supreme Court in *Cox II* repeatedly emphasized that the statute it upheld was "a precise, narrowly drawn regulatory statute which proscribes certain specific behavior."  *Cox II*, 379 U.S. at 562 (noting that "[a] State may adopt safeguards necessary and appropriate to assure that the administration of justice at all stages is free from outside control and influence" and that "[a] narrowly drawn statute such as the one under review is obviously a safeguard both necessary and appropriate to vindicate the State's interest in assuring justice under law"); *see also id*. at 567 (explaining that "[a]bsent an appropriately drawn and applicable statute, entirely different considerations would apply").  The narrowness of that Louisiana statute and 18 U.S.C. § 1507 on which it was based are in sharp contrast to the challenged statute here.

Third, the Court finds unavailing the defendants' assertion that the conclusion that the "limiting construction is not overly broad follows directly from *Oberwetter*."  Defs.' Supplemental Br. at 6.  That argument is not only unavailing, but also itself underscores the overbreadth of the challenged statute.  At issue in *Oberwetter*, a case involving expressive dancing at night at the Jefferson Memorial, was a National Park Service regulation prohibiting demonstrations without a permit.  As the defendants explain, the term "demonstrations" in that regulation included the following:

> picketing, speechmaking, marching, holding vigils or religious services and all other like forms of conduct which involve the communication or expression of

views or grievances, engaged in by one or more persons, the conduct of which has
the effect, intent or propensity to draw a crowd or onlookers.

*Oberwetter v. Hilliard*, 639 F.3d 545, 550 (D.C. Cir. 2011) (quoting 36 C.F.R. § 7.96(g)(1)(i)

(2010)) (cited in Defs.' Supplemental Br. at 6-7).   The definition also expressly *excludes* "casual

park use by visitors or tourists that is not reasonably likely to attract a crowd or onlookers."   36

C.F.R. § 7.96(g)(1)(i).

The defendants analogize that regulation to section 6135 and posit that the D.C. Circuit in

that case had "'little trouble' determining that the prohibition on demonstrations was both

viewpoint neutral and reasonable, and was therefore consistent with the First Amendment."

Defs.' Supplemental Br. at 7 (quoting *Oberwetter*, 639 F.3d at 553).   The defendants then argue

that "[i]f the Assemblages Clause of section 6135 is similarly construed to prohibit

demonstrations, picketing and other forms of group expressive activity," pursuant to the *Pearson*

limiting construction, "then *Oberwetter* dictates that the limitation is consistent with the First

Amendment."   *Id*.   Plainly, however, the statute here, with or without the D.C. Court of Appeals'

limiting construction, does not include a requirement that the prohibited conduct have "the

effect, intent or propensity to draw a crowd or onlookers" as did the regulation at issue in

*Oberwetter*.   Instead, the challenged statute contains no intent requirement, no requirement that

the conduct produce a particular result, and no suggestion that the prohibited conduct must be of

a nature that would "draw a crowd or onlookers."   The challenged statute is thus easily

distinguishable from the regulation reviewed in *Oberwetter*.

Fourth, First Amendment restrictions that carry criminal penalties also carry a heightened

risk of chilling speech.   Indeed, the Supreme Court has emphasized that "the 'severity of

criminal sanctions may well cause speakers to remain silent rather than communicate *even*

*arguably* unlawful words, ideas, and images.'"   *Initiative & Referendum Inst. I*, 417 F.3d at 1318

(emphasis in original) (quoting *Reno v. ACLU*, 521 U.S. 844, 872 (1997)).  In balancing these

tensions, this Court is especially wary of adopting a limiting construction that allows an

overbroad statute carrying criminal penalties to remain enforceable with the concomitant risk of

chilling expressive activity, particularly when more narrowly drawn statutes, including statutes

and regulations already in place, may serve the purposes of protecting the safety of the Justices,

Court personnel and the public, and avoiding obstructed access to the Supreme Court.  The

defendants point out that the Supreme Court police enforce the challenged statute only within the

limits of the D.C. Court of Appeals' construction, *see* Defs.' Statement of Material Facts Not in

Dispute ("Defs.' Facts"), ECF No. 23, at 6; Dolan Decl. ¶ 7, but this point is weak support for

their argument that this Court should adopt the D.C. Court of Appeals' narrowing construction.

While the Court does not doubt the good faith efforts of the Court police to exercise their

discretion within constitutional boundaries, "[w]e would not uphold an unconstitutional statute

merely because the Government promised to use it responsibly."  *United States v. Stevens*, 130 S.

Ct. 1577, 1591 (2010).[33]

---

[33] The procedural posture of the cases in which the challenges to 40 U.S.C. § 6135 have been reviewed by the
District of Columbia courts cannot be overlooked.  The D.C. Court of Appeals has examined the challenged statute
in the context of appeals of criminal prosecutions and convictions, in which the conduct at issue had raised sufficient
concerns on the part of law enforcement officers about public safety and impeding access to the Supreme Court to
result in arrests and initiation of criminal proceedings.  In *Pearson*, for example, the defendants were among
approximately *fifty thousand people* participating in a march to the Supreme Court.  *Pearson v. United States*, 581
A.2d 347, 349 (D.C. 1990).  The sheer magnitude of the assembly at issue may have prompted the court to find a
possible construction to uphold the constitutionality of the Assemblages Clause, and, indeed, the limiting
construction adopted by the court speaks to concerns regarding group demonstrations.  *See id.* at 357-58
("Therefore, when limited to group demonstrations directed at the Court which compromise the dignity and decorum
of the Court or threaten the Court grounds or its property or personnel, section 13k can withstand an overbreadth
challenge because the statute only prohibits group activity which is contrary to the government's legitimate
interests.").  Indeed, the concrete concerns that animated the limiting construction are consistent with the facts of
other criminal proceedings reviewed by the D.C. Court of Appeals, which have all involved groups protesting
contentious issues.  *See, e.g.*, *United States v. Wall*, 521 A.2d 1140, 1141-42 (D.C. 1987) (an individual who was
arrested along with forty other protestors, all part of a group of approximately 50,000 demonstrators, for carrying a
coffin-shaped box on to the plaza); *Bonowitz v. United States*, 741 A.2d 18, 19 (D.C. 1999) (a group that "unfurled
[at the main entrance of the Supreme Court] a banner thirty feet long by four feet wide which read 'STOP
EXECUTIONS'" while singing and chanting); *Potts v. United States*, 919 A.2d 1127, 1129 (D.C. 2007) (a group
protesting mistreatment of prisoners at the Abu Ghraib and Guantanamo prisons, with individuals wearing orange
jumpsuits and black hoods, with one individual holding a sign over his head reading "no taxes for war or torture");

Finally, the Court does not believe that it is possible in this instance to create a limiting construction without essentially rewriting the statute.  As Chief Judge Bazelon commented regarding the Capitol Grounds statute, "there are limits" to the process of applying a narrowing construction and "[t]here is no indication . . . that surgery would be appropriate to conform Section 193g to any presumed intention of Congress."  *Jeannette Rankin Brigade I*, 421 F.2d at 1101 (Bazelon, C.J., dissenting from granting of three-judge panel).  Since Congress did not revise that section when it revised the statutory framework related to the Capitol Grounds, Judge Bazelon stated that he "must conclude that Congress preserved Section 193g under a belief that its blanket prohibition extended to situations beyond the reach of these provisions" and that, "[c]onsequently, a narrower construction finds no support in this recent manifestation of legislative will."  *Id*. at 1102.  While recognizing that "[w]here Congress has been elliptic in mapping its intention onto the statute books, courts may supply an element of the offense which the legislature presumptively wished to require but neglected to state[,]" Judge Bazelon found "no indication . . . that surgery would be appropriate to conform Section 193g to any presumed intention of Congress."  *Id.* at 1101.  Nor would such surgery be appropriate here for several reasons.  First, as with the Capitol Grounds statute, there is simply no indication that Congress intended or has attempted to limit the broad prohibition set forth in the challenged statute.  "Consequently, a narrower construction finds no support in . . . legislative will."  *Id*. at 1102.  Second, no narrowing construction is necessary here, "as sometimes is the case in constitutional adjudication, to prevent the creation of a statutory vacuum in an area where appropriately narrow regulations may be necessary to protect legitimate state interests."  *Id*.  In this case, 18 U.S.C. §

---

*Lawler v. United States*, 10 A.3d 122, 124 (D.C. 2010) (a group standing with a line of people waiting to enter the Supreme Court to hear oral arguments that stepped out of line to "unfurl a large banner that read 'STOP EXECUTIONS'" and chant, "What do we want?  Abolition.  When do we want it?  Now."); *Kinane v. United States*, 12 A.3d 23, 25 (D.C. 2011) ("a large group of people gathered" on the plaza to protest on behalf of prisoners held in Guantanamo prison, who kneeled with their hands behind their backs at the "second set of steps leading to the main doors of the Supreme Court").

1507 as well as D.C. Code § 22-1307, which requires compliance with law enforcement authorities to avoid blocking use of streets or buildings' entrances,[34] satisfy the defendants' interests of ensuring ingress and egress into the Supreme Court building, maintaining proper order and decorum, and preserving the appearance of the Supreme Court as a body not swayed by external influence.  Furthermore, the Marshal of the Supreme Court, as noted, has the authority to prescribe necessary regulations to govern the plaza.  *See* 40 U.S.C. § 6102.

Third, and relatedly, if the Court were to rewrite this statute – for example, to impose on it an "intent" requirement that does not currently exist, or to limit the statute's reach to activity that actually impedes on ingress and egress, or to impose on the statute a definition of the kind of activity that gives the appearance of a judiciary swayed by external influence – the Court would be encroaching significantly on Congress's role and creating purposes for a statute that are not self-evident from the history or the plain language of the statute.  The Supreme Court has cautioned against judicially-drafted limiting constructions that amount to a re-write of the law since "doing so would constitute a serious invasion of the legislative domain and sharply diminish Congress's incentive to draft a narrowly tailored law in the first place."  *Stevens*, 130 S. Ct. at 1591-92 (internal quotation marks and citations omitted).  The defendants cite *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 841 (1986), for the proposition that "[a]lthough this Court will often strain to construe legislation so as to save it against constitutional attack, it must not and will not carry this to the point of perverting the purpose of a statute . . . or judicially rewriting it."  Defs.' Reply at 1 (internal quotation marks omitted).  Yet,

---

[34] Specifically, D.C. Code § 22-1307 makes it unlawful "for a person, alone or in concert with others, to crowd, obstruct, or incommode the use of any street, avenue, alley, road, highway, or sidewalk, or the entrance of any public or private building or enclosure or the use of or passage through any public conveyance, and to continue or resume the crowding, obstructing, or incommoding after being instructed by a law enforcement officer to cease the crowding, obstructing, or incommoding."

the defendants are essentially asking that this Court accept the District of Columbia courts' judicial rewriting of the statute, or create its own.[35]

The defendants also posit that, to the extent that the Court considers developing its own limiting construction, a "possible solution would be to *make explicit* what is *surely* the core intention of *Pearson*: that the statute reaches only demonstrations, picketing and other similar forms of group expressive activity." Defs.' Supplemental Br. at 7 n.2 (emphasis added).[36] Yet, that construction has no basis in the plain – and far broader – language of the statute or the legislative history. Thus, it would require this Court essentially to rewrite an overbroad statute and impose on it limitations not evidently intended by Congress. This Court concurs with the conclusion reached by the D.C. Circuit in *Grace I*, 665 F.2d at 1206, with respect to 40 U.S.C. § 13k, the virtually identical precursor to the challenged statute: "a validating construction is simply impossible here." As the Supreme Court has made clear, "a court would be remiss in performing its duties were it to accept an unsound principle merely to avoid the necessity of making a broader ruling." *Citizens United v. FEC*, 558 U.S. 310, 329 (2010). Accordingly, the Court rejects the defendants' invitation to accept the D.C. Court of Appeals' limiting

---

[35] Indeed, for decades the government has consistently and creatively attempted to save the language of this statute from constitutional challenge. With respect to the Capitol Grounds statute, in *Jeannette Rankin Brigade II*, the panel noted the defendants' "apparent recognition that the statute in its literal terms presents serious, not to say insuperable, constitutional problems" and that the defendants "pressed upon us for [the statute's] salvation a rigorously limiting construction." *Jeannette Rankin Brigade II*, 342 F. Supp. at 578. The government, for example, urged the court to "construe the statutory phrase 'flag, banner, or device' to include picket signs, placards, and billboards, but not lapel buttons, name cards, insignias, or armbands." *Id.* at 586 n.13. The panel rejected that invitation, however, noting that "[w]hile . . . this view may suit the Government's purpose, it finds no support in either the legislative history or other sections of the statute." *Id.* Similarly, this Court will not craft or adopt a limiting construction with no foundation in the legislative history or the statutory text itself.

[36] The defendants assume that this construction of the statute would be constitutional if the Court accepts the defendants' position that the Supreme Court plaza is a nonpublic forum, in which restrictions on speech are permissible so long as they are viewpoint neutral and reasonable. *See Davenport v. Wash. Educ. Ass'n*, 551 U.S. 177, 188-89 (2007). Since the Court finds that this proposed limiting construction also has no basis in the plain language of the statute or the legislative history and is not tied to any significant government purpose, it remains arguable whether this construction would be reasonable, even if viewpoint neutral.

construction and leaves any future iterations of this overbroad statute to Congress rather than allow the statute to continue chilling speech.[37]

As the D.C. Circuit found over thirty years ago in *Grace I*, and as a three-judge panel of this court, affirmed by the Supreme Court, found with respect to the nearly identical statute governing the policing of the U.S. Capitol in *Jeannette Rankin Brigade II*, the challenged statute is "repugnant to the First Amendment." *Grace I*, 665 F.2d at 1194; *Jeannette Rankin Brigade II*, 342 F. Supp. at 587, *aff'd*, 409 U.S. 972 (1972) (characterizing the statute governing the U.S. Capitol grounds as "a curiously inept and ill-conceived Congressional enactment," declining to accept a limiting construction, and asserting that the necessary "rewrit[ing]" of the statute "is a function more appropriately to be performed by Congress itself").  Regardless of whether this statute prohibits expressive activity in a public or nonpublic forum, the absolute prohibition on expressive activity in the statute is unreasonable, substantially overbroad, and irreconcilable with the First Amendment.  The Court therefore must find the statute unconstitutional and void as applied to the Supreme Court plaza.[38]

---

[37] Since the Court finds the statute facially unconstitutional as overbroad, it need not address in detail the plaintiff's claim that the statute is also void for vagueness.  The Court notes, however, that it construes the statute as providing reasonable notice of an overly broad prohibition on expressive activity on the Supreme Court plaza.  *See, e.g.,* Defs.' Mem. at 18 (noting that "section 6135 effectively prohibits all types of demonstrations and expressive activity on the Court grounds"); *Grace II*, 461 U.S. at 176 (with respect to the Display Clause, "accept[ing] the Government's contention, not contested by appellees, that almost any sign or leaflet carrying a communication, including Grace's picket sign and Zywicki's leaflets, would be 'designed or adapted to bring into public notice [a] party, organization or movement[,]'" and noting that "[s]uch a construction brings some certainty to the reach of the statute").  Furthermore, the plaintiff, as the defendants point out, appears to confuse overbreadth for vagueness.  *See, e.g.,* Pl.'s Opp'n at 24-25 (arguing in a section of the brief dedicated to a discussion of the purported *vagueness* of the statute that "[t]he Assemblages Clause as written is so *broad* that even-handed enforcement, if possible would lead to absurd results[,]" for example, that "the late Chief Justice Rehnquist and former Justice O'Connor would have been subject to arrest and prosecution when they marched in an assemblage or procession across the Supreme Court plaza" (emphasis added)).  Nor does the Court need to reach the plaintiff's Equal Protection clause claim regarding the Display Clause since the Court decides the plaintiff's facial challenge in his favor.

[38] The Court emphasizes that this decision does not leave the Supreme Court plaza unprotected.  *See* discussion at *supra* note 34 and accompanying text; 18 U.S.C. § 1507; D.C. Code § 22-1307; 40 U.S.C. § 6102.

**IV.     CONCLUSION**

For the reasons discussed above, the defendants' motion for summary judgment is denied.  The challenged statute – 40 U.S.C. § 6135 – is unconstitutional and void under the First Amendment, and, therefore, summary judgment is granted to the plaintiff on that basis.  An appropriate Order will accompany this opinion.

**Date:** June 11, 2013

/s/ *Beryl A. Howell*
BERYL A. HOWELL
United States District Judge